**STERLINGTON, PLLC**
Brenton R. Babcock (State Bar No. 162,120)
Jonathan Sherman (*pro hac vice forthcoming*)
Jesse Sherrett (*pro hac vice forthcoming*)
Patrick McDonough (*pro hac vice forthcoming*)
530 Fifth Avenue, Suite 804
New York, New York 10036
Tel: (212) 433-2993
brent.babcock@sterlingtonlaw.com
jonathan.sherman@sterlingtonlaw.com
jesse.sherrett@sterlingtonlaw.com
patrick.mcdonough@sterlingtonlaw.com
*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| HAKAN KARDES,<br><br>Plaintiff,<br><br>v.<br><br>ALIGNMENT HEALTHCARE, INC., ALIGNMENT HEALTHCARE USA, LLC, JOHN KAO, DAWN MARONEY, ROBERT SCAVO, AND ANDREAS WAGNER,<br><br>Defendants. | Case No.:<br><br>**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

## COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

1. This dispute arises from Defendants' retaliation against Plaintiff Hakan Kardes ("Kardes" or "Plaintiff"), a senior executive of Alignment Healthcare, Inc. ("Alignment" or the "Company"), a NASDAQ-listed company that delivers senior care through Medicare Advantage ("MA") plans, after he discovered and internally reported that the Company had materially misclassified, and continued to misclassify, millions of dollars in operating expenses ("OpEx") as capital expenditures ("CapEx"). These accounting irregularities artificially inflated Alignment's previously reported and projected Adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("Adjusted EBITDA"), a key non-GAAP financial metric central to the Company's reported financial performance and executive compensation structure.

2. In March 2025, Kardes reported these accounting irregularities to, among others, Defendant John Kao ("Kao"), Alignment's Chief Executive Officer and Kardes's supervising officer. Instead of acting on the information, Kao responded by turning on Kardes and initiating an unrelenting campaign of retaliation against him. By and through that campaign, Defendants injured Kardes's career and professional reputation and ultimately constructively discharged him from the Company.

3. The misclassification of OpEx as CapEx enabled Alignment to publicly boast (on February 27, 2025) that its full-year Adjusted EBITDA for 2024 constituted its "first full year of positive adjusted EBITDA as a public company"— absent the $8-10 million in accounting irregularities that Kardes reported, this number would have been materially negative rather than positive. The materiality of those irregularities was further demonstrated by Alignment's own publicly disclosed 2024 executive incentive targets, under which Adjusted EBITDA was a core corporate performance metric, with a threshold of negative $10 million and a target range of $0 to $5 million. Thus, the approximately $8–10 million in accounting irregularities Kardes identified was of a magnitude sufficient to move the Company's Adjusted EBITDA performance

-2-

across the very ranges Alignment itself used to measure corporate performance and determine executive incentive compensation. At the same time, the accounting irregularities also enabled Alignment to announce full-year 2025 Adjusted EBITDA guidance of between $35 million and $60 million.

4.     Before his reporting of these accounting irregularities and the ensuing retaliation, Kardes had an uninterrupted and extraordinary record of success, recognition and promotion within the Company.  At the time of his protected disclosures, Kardes was already one of Alignment's most senior executives. In January 2025, Kao named Kardes Chief Transformation Officer and assigned him additional enterprise-critical responsibilities. Plans had been put in place to expand his role and elevate him into an even broader President or enterprise Chief Operating Officer-level role by mid-year 2025. As part of those expanded responsibilities, Kardes deepened his review of the Company's strategic initiatives, budgets, resource allocations, project capacity, and underlying financial assumptions. It was through that work that Kardes discovered the accounting irregularities.

5.     This dispute is, in one sense, a straightforward retaliation case: Kardes was subjected to adverse employment actions for reporting accounting irregularities. The reality is far worse. Over six years, Kardes's data science expertise, relentless work ethic, and operational acumen transformed the Company's prospects. Recruited as Alignment's first Chief Data Officer, Kardes conceived and built AVA (Alignment Virtual Application), the Company's proprietary artificial-intelligence and analytics platform that became the operational backbone of its business. AVA and the unified data architecture beneath it became a competitive differentiator for Alignment, helped attract institutional investment, and became a centerpiece of the Company's successful 2021 IPO. Kardes's work then drove the metrics on which Alignment's profitability depends: under his leadership, the Company's Star Ratings climbed until 100% of its members were enrolled in 4-Star or higher plans—materially increasing the federal

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE,
UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

quality-bonus revenue at the heart of its business—while member retention and year-over-year membership growth rose dramatically.

6. When Kardes joined Alignment, the Company faced significant operational and strategic challenges. Over the following six years, Kardes played a central role in transforming the Company's prospects, and those of its CEO, Kao.  As a result, Kao and Kardes developed a close relationship, and Kao repeatedly turned to Kardes to solve the Company's most difficult and consequential problems.

7. That is why, when Kardes discovered what he reasonably believed were serious accounting irregularities, he did what he had repeatedly done before: he raised the issue internally and sought to correct it. Kardes went to Kao in good faith, expecting that the Company would address the issues compliantly and correct the underlying practices.  Kao, who had become Kardes's mentor, had announced just a few months earlier plans to expand Kardes's role and elevate him to President or to enterprise Chief Operating Officer by mid-year 2025.

8. Despite this history and the relationship Kardes built with Kao, Kardes's reporting prompted Kao to turn against him in dramatic and rapid fashion. A week or two after Kardes reported the accounting irregularities, Kao eliminated the plan to promote Kardes. He stripped Kardes of virtually all responsibility and all direct reports, including the artificial-intelligence and data-science functions, and the AVA platform (that Kardes had personally conceived and built), and handed them to an executive who had played no part in creating them. He subjected Kardes to hostile and humiliating treatment, both privately and in the presence of colleagues leaving Kardes with no choice but to express his intent to resign on April 9, 2025. However, this course of retaliatory conduct continued, culminating in the Company's April 14, 2025, internal announcement of Kardes's departure from Alignment. The following day, on April 15, 2025, the Company filed a Form 8-K with the Securities and Exchange Commission, which constructively terminated Kardes's employment and used the capital markets to injure his reputation gratuitously. The retaliation continued

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

thereafter, including through Alignment's withholding of the second half of Kardes's earned 2024 performance bonus.

9. The internal announcement on April 14, 2025, and the 8-K filing on April 15, 2025, were the final and consummating acts of Defendants' constructive discharge of Kardes. In the 8-K filing, Alignment publicly announced to the securities markets that Kardes's "resignation as Chief Experience Officer was effective immediately," and described his departure in terms that multiple recipients understood to convey an involuntary termination (thus adversely impacting his reputation in the market). Alignment filed the 8-K without Kardes's input or approval of its language, misidentified his title (using his legacy title rather than his actual expanded role), and irrevocably severed his officer status, all while Kardes remained nominally employed through May 16, 2025. The 8-K was the culmination of a continuing course of retaliatory adverse employment actions against Kardes in retaliation for his internal reporting that the Company had materially misclassified OpEx as CapEx.

10. Kao knew from Kardes's history at Alignment that Kardes did not merely identify problems but solved them. Kardes had repeatedly taken on the Company's most difficult enterprise issues and corrected them. Kardes had also corrected non-compliant supplemental benefit practices that he reasonably believed misled seniors about the practical value of advertised benefits and prevented or impeded access to those benefits. When Kardes discovered the OpEx/CapEx irregularities, he approached them the same way: he raised the issue, sought supporting documentation, challenged inaccurate classifications, and proposed a corrective transparency model.

11. That made Kardes a serious risk to Defendants' financial prospects and the public financial narrative they had presented to investors. If Kardes were permitted to continue exercising authority over the relevant budgets and capitalization practices, he would have been positioned to require accurate OpEx/CapEx allocation, which would have increased reported operating expenses, reduced reported Adjusted EBITDA, and called into question the Company's profitability and valuation outlook,

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

from which senior executives like Kao personally benefited. Defendants' response was not to permit Kardes to fix the issue, but to remove him from the very budget visibility and authority necessary to do so, reassign core functions he had built, and ultimately force him out of the Company.

12. Kao was aided in all these actions by Dawn Maroney, Alignment's President, Robert Scavo, Alignment's Chief Information Officer, and Andreas Wagner, Alignment's Chief Human Resources Officer.

13. Kardes timely filed a complaint with the Occupational Safety and Health Administration ("OSHA") on October 14, 2025, under Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A (OSHA File No. 301064300).  Over 180 days have passed since he filed his complaint with OSHA such that he is entitled to bring his SOX claim in this Court.

<b><u>PARTIES</u></b>

14. Hakan Kardes is a natural person who, at all times relevant to the conduct alleged herein, resided in and was domiciled in the State of Washington, where he maintained his home and from which he performed his employment duties for Alignment on a fully remote basis. Kardes holds a Ph.D. in Computer Science and Engineering from the University of Nevada, Reno (2012) and a B.S. in Computer Engineering from Bogazici University, Istanbul (2009). Kardes was employed by Alignment from January 2019 through May 16, 2025. Although Alignment later identified Kardes only by the title Chief Experience Officer, his actual responsibilities substantially exceeded that title. In January 2025, Kao elevated Kardes into an expanded Chief Transformation Officer role and assigned him additional enterprise-critical responsibilities, with plans to further elevate him into a broader President or enterprise Chief Operating Officer-level role by mid-year 2025.

15. Defendant Alignment Healthcare, Inc. ("Alignment" or the "Company") is a Delaware corporation headquartered at 1100 W. Town and Country Road, Suite 1600, Orange, California 92868. Alignment is a citizen of both the State of Delaware

-6-

(its state of incorporation) and the State of California (the state in which it maintains its principal place of business). Alignment's common stock is listed on the NASDAQ Global Select Market under the ticker symbol "ALHC." Alignment is a company with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and is therefore subject to the whistleblower protection provisions of SOX Section 806.

16.    Defendant Alignment Healthcare USA, LLC ("Alignment USA") is a Delaware limited liability company and a wholly owned subsidiary of Alignment Healthcare, Inc. Alignment USA is the entity identified as the "Employer" in Kardes's Employment Agreement dated April 11, 2021. On information and belief, Alignment USA maintains its principal place of business at 1100 W. Town and Country Road, Suite 1600, Orange, California 92868. Alignment USA is a citizen of the States of Delaware and California. Alignment USA is named as a defendant with respect to all counts, as the contracting party under the Employment Agreement and as Kardes's direct employer.

17.    Defendant Kao is a natural person and, at all relevant times, has served as Chief Executive Officer of Alignment. On information and belief, Kao is a citizen of the State of California. Kao is an individual "with supervisory authority over the employee" within the meaning of 18 U.S.C. § 1514A(a). Kao personally directed the adverse employment actions against Kardes and is individually liable under SOX and other applicable laws.

18.    Defendant Dawn Maroney ("Maroney") is a natural person and, at all relevant times, has served as President of Alignment. On information and belief, Maroney is a citizen of the State of California. Maroney is an individual "with supervisory authority over the employee" within the meaning of 18 U.S.C. § 1514A(a). Maroney participated in the adverse employment actions against Kardes and is individually liable under SOX and other applicable laws.

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

19. Defendant Robert L. Scavo ("Scavo") is a natural person and, at all relevant times, has served as the Chief Information Officer of Alignment. On information and belief, Scavo is a citizen of the state of Colorado. Scavo is a "person working for the employer who has the authority to investigate, discover, or terminate misconduct" within the meaning of 18 U.S.C. § 1514A(a). Scavo personally participated in the adverse employment actions against Kardes and is individually liable under SOX and applicable laws.

20. Defendant Andreas Wagner ("Wagner") is a natural person and, at all relevant times, has served as the Chief Human Resources Officer of Alignment. On information and belief, Wagner is a citizen of the State of California. As CHRO, Wagner had direct authority over personnel decisions, employment actions, performance management, and the investigation of employee complaints. Wagner is an "officer" and "employee" of a covered company within the meaning of 18 U.S.C. § 1514A(a), and a person with authority to "investigate, discover, or terminate misconduct" within the meaning of that section. Wagner personally participated in the adverse employment actions against Kardes and is individually liable under SOX and other applicable laws.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction over Plaintiff's SOX claims pursuant to 18 U.S.C. § 1514A(b)(1)(B) and 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. This Court's supplemental jurisdiction under 28 U.S.C. § 1367 extends to each of Plaintiff's Washington and California state-law claims, all of which arise from the same case, dispute or controversy as Plaintiff's federal claim under SOX.

22. Venue is proper in the Central District of California, Southern Division, pursuant to 28 U.S.C. § 1391(b) because Defendant Alignment Healthcare, Inc. maintains its principal place of business in Orange, California, which is within the

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

Southern Division of this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in Orange County, California.

23.    Plaintiff's residence in Washington does not affect the propriety of venue in this District. Venue remains proper under 28 U.S.C. § 1391(b) because Defendants Alignment Healthcare, Inc. and Alignment Healthcare USA, LLC maintain their principal place of business in this District, the individual Defendants reside in or are subject to personal jurisdiction in California, and the retaliatory decisions and a substantial part of the events giving rise to Plaintiff's claims occurred in Orange County, California.

## FACTUAL BACKGROUND

24.    Alignment was founded in 2013 as a Delaware limited liability company under the name Alignment Healthcare Holdings, LLC. From its inception, the Company has described its mission as "improving healthcare one senior at a time" and has positioned itself as a technology-enabled healthcare services company that operates a value-based care platform focused on managing Medicare Advantage plans. Under Kardes's direction, the Company developed a proprietary artificial intelligence and analytics platform known as AVA, which became the core of the Company's operational and financial reporting infrastructure and a central component of its public market differentiation narrative. On March 17, 2021, the Company converted from a Delaware limited liability company into a Delaware corporation and changed its name to Alignment Healthcare, Inc.

25.    Alignment derives substantially all of its revenue from the federal Medicare program, administered by the Centers for Medicare & Medicaid Services ("CMS"), an agency of the United States Department of Health and Human Services. Alignment operates as a value-based care platform whose business model is centered on the management of Medicare Advantage plans, under which it receives capitated per-member per-month payments funded by federal appropriations. Consequently, Alignment's financial performance – including the OpEx and CapEx classifications

-9-

that form the subject matter of Kardes's protected disclosures – is supported by revenue generated from taxpayer funds disbursed through the Medicare program.

26. Misrepresentations in Alignment's SEC filings regarding its cost structure, EBITDA, and operating performance adversely affect not only investors in Alignment's common stock traded on the NASDAQ Global Select Market, but also the integrity of a federally funded healthcare program serving hundreds of thousands of Medicare beneficiaries. Alignment's financial performance is also critical to executive and employee compensation.

27. Alignment went public on March 26, 2021, with an initial public offering price of $18.00 per share. The Company has reported net losses every year since going public, including net losses of approximately $148.2 million in 2023, $128.1 million in 2024, and $978,000 in 2025.

28. A critical financial metric for Alignment is Adjusted EBITDA, a non-GAAP measure that the Company uses in earnings releases, investor presentations, and executive compensation calculations. Adjusted EBITDA is a direct input to the Company's Annual Incentive Plan ("AIP"), which determines the cash bonus paid to each Named Executive Officer. For fiscal year 2024, the year in which the accounting irregularities were concentrated, Adjusted EBITDA carried a 35% weighting in the AIP's corporate performance calculation, up from 20% the prior year.

29. Adjusted EBITDA is also a component of the Company's Performance Share Unit ("PSU") vesting formula. The September 2023 PSU grants used the metric "Adjusted EBITDA less Capital Expenditures," which carried at a 20% weight in the PSU performance formula. However, in March 2024, the Company changed the PSU formula to use standalone "Adjusted EBITDA" with a 50% weight and eliminated the capital expenditure deduction. This had the effect of amplifying the effect of any increase in Adjusted EBITDA on the PSU distributions.

30. Adjusted EBITDA is also the headline profitability metric reported to investors and the public securities markets, and thus any material misstatement of

-10-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

Adjusted EBITDA directly affects the Company's stock price and, by extension, the value of all equity-based compensation held by its executives. Alignment's own proxy statements identified Adjusted EBITDA as one of the three "most important financial performance measures" used to align compensation actually paid to named executive officers with Company performance, along with Adjusted Gross Profit and Revenue. Thus, any material misstatement or inflation of Adjusted EBITDA directly affected not only the Company's investor-facing profitability narrative, but also the compensation framework and equity value of Alignment's senior executives.

31.     The distinction between CapEx and OpEx is therefore directly material to the Company's public financial disclosures, its reported path to profitability, and the personal compensation of its senior executives, including Defendants Kao, Maroney, Scavo, and Wagner.

32.     Defendant John Kao founded the Company in 2013 and has served as its Chief Executive Officer and as a member of its Board of Directors since 2014.

33.     Defendant Dawn Maroney joined Alignment in 2014 as its Chief Sales, Product and Marketing Officer and was promoted to President, Markets in 2015.

34.     Defendant Robert Scavo joined the Company as Chief Information Officer in September 2020, in advance of the Company's IPO. Shortly after joining Alignment, Scavo hired Mike Lewis as a Vice President and direct report within his organization to manage the Data Technology Solutions ("DTS") division's budgets, including OpEx and CapEx classifications and the methodology used to capitalize labor costs. As CIO, Scavo had direct authority over the DTS division's staffing, budgets, project classifications, and the time-tracking system that allocated employee hours between capital expenditures and operating expenses. Unlike other departments, whose budgets were managed through the Company's Finance function, DTS maintained direct control over its budget and related capitalization processes under Scavo and Lewis for years.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

35.     Defendant Andreas Wagner joined the Company as Chief Human Resources Officer in January 2024.

### I.     Kardes Joins Alignment and Rapidly Becomes One of Its Most Valued and Trusted Executives

36.     Kardes immigrated to the United States in 2009 after earning a bachelor's degree in computer engineering from Bogazici University in Istanbul, one of Turkey's most competitive institutions. He earned his Ph.D. in Computer Science at the University of Nevada, Reno in 2012, with academic training focused on large-scale data architecture, algorithms, predictive modeling, data science, and statistical systems.

37.     Before joining Alignment, Kardes worked as a principal data scientist at Intelius,[1] where he helped design and scale one of the largest consumer data processing systems then in operation, and at Cambia Health Solutions, where he applied predictive analytics and risk modeling methodologies to healthcare operations, claims processing, quality performance measurement, and cost management in Medicare Advantage environments. Through that experience, Kardes developed a deep understanding that Medicare Advantage is fundamentally a data-driven business model in which financial performance, regulatory compliance, and patient outcomes are directly influenced by how accurately an organization integrates, models, and applies data across risk adjustment, quality measures, utilization management, and member engagement.

38.     Kardes joined Alignment on January 7, 2019, as its first Chief Data Officer. He was recruited to build the data infrastructure that would become central to the Company's business model and its successes.

---

[1]     Intelius offers online search tools to help consumers make personal decisions by providing background checks, access to public records, reverse phone and address lookup, and the like.  Among his many contributions in three years there, Dr. Kardes built a proprietary machine-learning "linking engine" that synthesized personal data from multiple sources into unified data to be used in background checks.

-12-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

39.    Upon joining, Kardes led the design and implementation of a Unified Data Architecture integrating clinical, operational, financial, and member-level data into a scalable enterprise platform, and under his leadership, Alignment developed AVA—the Company's proprietary artificial intelligence and analytics platform. AVA became the Company's core operational backbone supporting risk prediction, care management, Medicare Stars performance analytics, member engagement optimization, growth, and financial reporting. The early success of this architecture contributed materially to Alignment securing institutional investments, including funding from Fidelity and other investors. These technology capabilities became a central component of Alignment's IPO narrative in March 2021, positioning the Company as a differentiated, innovative, and data-driven Medicare Advantage company.

40.    Kao publicly frequently praised Kardes's leadership in data science, artificial intelligence, and member experience, including on LinkedIn and in executive settings. Kardes's work in AI, predictive analytics, and member experience transformation was regularly highlighted in the Company's earnings calls, investor presentations, and external communications. Kardes was invited to speak at artificial intelligence and healthcare technology conferences, representing Alignment's innovation strategy and technology-forward operating model. In August 2023, Business Insider named Kardes one of "30 Leaders Under 40 Transforming Healthcare" and in December 2023, Becker's Healthcare named him one of "37 Emerging Leaders." Copies of Kao's public praise of Kardes on LinkedIn, and Business Insider's article, are attached as **Exhibits A and B** to this Complaint.

41.    Prior to his reporting of Alignment's accounting irregularities to Kao on March 18, 2025 (discussed below), Kardes had an unbroken record of exceptional performance, continuous career advancement, and consistent recognition from Kao and Alignment's senior leadership. Over the course of his six-year tenure, Kardes was promoted several times – from Chief Data Officer upon joining in January 2019, to

-13-

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE,
UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

Chief Technology Officer in April 2021, to Chief Technology and Experience Officer in March 2023, and to Chief Experience Officer in 2024. Kao further expanded Kardes's authority in January 2025 by appointing him as Chief Transformation Officer with a mandate spanning six enterprise-critical operational areas, and promising Kardes that he would be promoted again by July 2025 to either President of AVA Technologies or to an enterprise COO-type role.

42.    Kardes' March 2023 promotion to Chief Technology and Experience Officer added to his responsibilities the oversight of the Company's CMS Stars rating program. The CMS Star Ratings program is a quality measurement system under which Medicare Advantage plans are scored annually on a one-to-five star scale based on clinical quality, member satisfaction, and operational metrics, with plans achieving four stars or above receiving significantly enhanced premium rebates from CMS – creating a direct and material financial incentive that makes star rating performance one of the most consequential drivers of revenue and profitability for Medicare Advantage companies like Alignment.

43.    Kardes's March 2023 promotion to Chief Technology and Experience Officer occurred at a critical time for Alignment. The Company was facing significant enterprise execution challenges. In 2022 and 2023, the Company did not achieve the level of membership growth it had targeted, and its stock price had declined substantially from its $18.00 IPO price, trading below $6.00 during this period. Internally, Alignment was also experiencing increasing member disenrollment, elevated dissatisfaction with its Concierge customer-service function, and dissatisfaction with supplemental benefits marketed to seniors, including OTC, grocery, dental, transportation, vision, and hearing benefits.

44.    Around the same time, CMS was implementing changes to the Medicare Stars program, and Alignment's major California plan was trending toward a 3.5-Star rating, creating a material risk to the Company's quality bonus revenue, competitive positioning, and investor narrative. Kao and Alignment looked to Kardes to address

-14-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

these challenges because they required the same combination of data science, artificial intelligence, member experience, Stars performance, operational analytics, and enterprise transformation expertise that had defined Kardes's work at the Company up to that point.

45.    Kardes responded by initiating a comprehensive overhaul of Alignment's member experience and Stars execution model. Among other things, he insourced and redesigned the Concierge call-center function, re-architected supplemental benefits so that OTC, grocery, dental, transportation, vision, hearing, and related benefits worked more consistently as promised and marketed to seniors, raised concerns regarding non-compliant mail-order OTC practices, and established alternative processes to ensure seniors received the advertised benefits. To rebuild member trust and identify systemic issues, Kardes also provided his personal email address and phone number to hundreds of thousands of members, personally engaging with their concerns and using those interactions to identify root-cause operational failures. Within six months, Alignment's largest contract maintained its 4-Star rating, the Company achieved one of its most successful Annual Enrollment Periods, member retention improved by approximately 30%, and year-over-year membership growth increased by approximately 44%. By the end of the following year, 100% of Alignment's members were enrolled in 4-Star or higher plans (which had the effect of materially increasing quality-based bonus revenues and strengthening the Company's competitive positioning), year-over-year membership growth increased to approximately 59%, and Alignment's Google ratings improved from approximately 3.5 to 4.9 based on more than 10,000 genuine member reviews.

46.    By early 2025, Kardes held one of the broadest executive portfolios at Alignment. He reported directly to Kao and was responsible for functions central to the Company's growth, profitability, regulatory performance, member retention, and investor narrative, including Data Science, Artificial Intelligence, enterprise technology strategy, Medicare Stars, Member Experience, Supplemental Benefits,

Clinical Care Management, and related enterprise performance initiatives. His role cut across clinical, operational, financial, technology, and member-facing functions, giving him visibility into, and responsibility for, some of the Company's most consequential performance drivers.

47. He was also one of the four highest-compensated executives at the Company: according to the 2024 Proxy Statement, Kardes's total 2023 compensation was $3,221,474, including a base salary of $425,000, an actual bonus of $434,913 (120.4% of target), an additional discretionary bonus of $90,000, and a PSU grant of 406,000 units at target with a grant date fair value of $2,330,440.

48. Kardes's annual performance reviews were consistently exceptional, and Kao repeatedly praised Kardes's leadership, judgment, and importance to Alignment. In January 2025, Kao told Kardes that he was "the man to do the job" and stated, "Your DNA is in our company. It's as much your company as mine." Kao's praise was consistent with his prior public endorsement of Kardes. In 2023, after Kardes was named one of Business Insider's top healthcare executives under age forty, Kao publicly praised Kardes on LinkedIn for his "brilliance in data science" and for taking on expanded responsibility for Member Services to ensure that "every interaction with our members counts." As recently as March 4, 2025 – just fourteen days before Kardes reported the accounting irregularities – told Kardes, in reference to his Clinical Care Management and Member Journey work, "This is the best thing I've seen in the last 5–10 years."

49. On March 3, 2025, Kardes received a Performance Share Unit award at 116.8% of his target, accompanied by a written communication from Kao and the Board of Directors extending "a special thank you . . . for your exceptional performance" and recognizing his "leadership and contributions."

50. On March 17, 2025 – the day before he reported the accounting irregularities to Kao – Kardes presented the enterprise transformation initiatives that had been part of his expanded role at Alignment's company-wide leadership offsite

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

before more than 100 executives, during which Kao publicly acknowledged his accomplishments and praised his leadership. That same day, Kao and Maroney selected him to represent Alignment at the prestigious Aspen Ideas: Health Conference in June 2025 as one of the Company's two Health Fellows.

51.    Around the same period, Kardes was also leading Alignment's Stars litigation strategy, a matter that had substantial financial and strategic implications for the Company because of its potential impact on Star Ratings, CMS bonus revenue, and Alignment's investor narrative. Kao praised Kardes's work on that strategy, stating in substance that Alignment was "shaking the industry."

52.    The abrupt and inexplicable reversal of Kardes's extraordinary upward trajectory that began immediately following his March 18, 2025, reporting of accounting irregularities stands in stark and revealing contrast to this sustained record of recognition, advancement, success and trust at Alignment.

II.    **Kao Substantially Expands Kardes's Enterprise Role at Alignment Just Weeks Before Kardes Reported the Accounting Irregularities**

53.    By late 2024 and early 2025, Alignment had achieved substantial growth but was facing a new set of enterprise execution challenges. The Company needed to support rapid membership growth, improve operating leverage, reduce administrative costs, stabilize delayed technology implementations, and strengthen execution across several high-impact operational workstreams. These challenges included the delayed Facets claims-system implementation, DTS budget and delivery issues, enterprise automation opportunities, Claims Appeals, Clinical Operations, Medicare Risk Adjustment, and other transformation initiatives necessary to scale the Company efficiently.

54.    These challenges directly aligned with Kardes's record of building data-driven operating platforms, using artificial intelligence and analytics to improve execution, and transforming complex cross-functional operations. Against that backdrop, in January 2025, Kao elevated Kardes into a Chief Transformation Officer

-17-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

role, expanding his authority and responsibilities across enterprise-critical operational areas in six priority areas, including Alignment's implementation of the Facets claims processing system, while Alignment finalized the corresponding job description. This was not merely a hypothetical future title or retention discussion: Kardes was asked to begin performing the expanded role immediately.

55.    Separately, Kao also told Kardes that this January 2025 role expansion would be followed by an additional promotion by mid-2025 to either President of AVA Technologies or to an enterprise Chief Operating Officer-level role. As part of that planned elevation, Kao also told Kardes that a substantial portion of DTS, including the engineering teams, would transition under Kardes's oversight by mid-year.

56.    Wagner was directly involved in implementing Kardes's expanded Chief Transformation Officer role. On January 22, 2025, Kao convened a meeting with Kardes, Maroney, and Wagner to discuss Kardes's expanded scope. Kao brought Wagner into the meeting specifically to align the necessary organizational changes, reinforcing that Kardes's role was transitional and would further expand by mid-year to President, AVA Technologies or Enterprise COO.

57.    By early 2025, Alignment's implementation of Facets was significantly delayed and had reached "red" status, meaning it was well behind schedule and flagged as a material implementation risk. Kao asked Kardes to assume oversight of the Facets project in January 2025 due to its critical nature and failed implementation up to that date, and asked Kardes to immediately stabilize the implementation of Facets and deliver it for the Company.

58.    The Company's DTS division was, at that point, managing the implementation of Facets. Scavo, Alignment's Chief Information Officer, oversaw DTS on a day-to-day basis. DTS was the division responsible for software development and technology infrastructure, and the division in which the misclassification of CapEx and OpEx described above and below was concentrated. As

-18-

CIO, Scavo had direct authority over DTS staffing, budgets, project classifications, and the time-tracking system that allocated employee hours between CapEx and OpEx.

59.    Scavo announced Kardes's oversight role of the Facets implementation to the project's leadership team on January 27, 2025. That same day, Scavo informed Kardes that they should jointly review CapEx initiatives within DTS with a view to providing recommendations on those initiatives to Kao.

60.    On January 31, 2025, Kao directed Kardes to ensure delivery of the Facets project, expressing dissatisfaction with the project's progress under Scavo. Kao publicly announced Kardes's new oversight role at a leadership meeting on January 31, 2025, and Kardes took over Facets implementation that day. Within two months, Kardes had stabilized the implementation and had delivered significant process improvements such that it was no longer in "red" status.

61.    Between January 24 and February 7, 2025, Kardes's responsibilities were further expanded to include oversight of Clinical Operations, and the Claims Appeals departments.

62.    Kao repeatedly communicated these role expansions during one-on-one meetings with Kardes and publicly announced them during leadership meetings. During one such announcement on February 7, 2025, Alignment's then-CFO, Thomas Freeman, congratulated Kardes on the expanded role and stated, "Timely expansion of your role! Happy you're diving into clinical ops . . ."

63.    On February 14, 2025, in a DTS budget meeting, Kao announced that DTS engineering teams would be transitioned to Kardes's oversight by mid-year 2025. Kao also directed that Kardes be included in all DTS budgeting meetings because he would be accountable for the DTS teams as part of his expanded role.

64.    During the same meeting, Wagner messaged Kardes to thank him for helping Scavo with the DTS budget. Wagner's message demonstrated his awareness that Kardes was actively reviewing DTS's budget, staffing, and resource allocations,

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

which is the same review process that led to Kardes's discovery of the CapEx/OpEx irregularities.

### III.    Kardes's Discovery of OpEx/CapEx Accounting Irregularities

65.    As part of his expanded Chief Transformation Officer role and the planned transition of substantial DTS oversight to him, Kardes began reviewing DTS's 2025 budget, staffing, project classifications, and resource alignment in early February 2025.

66.    The February review was initially focused on defining and prioritizing 2025 Strategic Initiatives, aligning resources to those initiatives, and identifying the staffing and vendor adjustments necessary to meet budget targets set by Kao.

67.    At that time, as Chief Information Officer, Scavo had direct control over DTS budgeting, capital expenditure planning, and related accounting practices. Scavo also hired Mike Lewis as a direct report within his organization, to manage DTS's budgets, including OpEx and CapEx classifications and labor capitalization methodology.

68.    As part of Kardes's transition to his expanded role, he began seeking greater budgeting transparency in connection with the 2025 Strategic Initiative scoping and the planned DTS transition to his oversight. This included more granular visibility into DTS labor allocation practices to account for OpEx and CapEx.

69.    In February 2025, Scavo told Freeman, Alignment's CFO, that he and Kardes would conduct team-by-team reviews of CapEx initiatives to identify reductions and develop measurable objectives for each investment area. Scavo set up time for Kardes to review each DTS leader's department to identify CapEx reductions.

70.    On February 7, 2025, Scavo acknowledged to Kardes that the entirety of Moez Slimi's ("Slimi") engineering team (56 individuals) was classified as almost 100% CapEx. Slimi was a Vice President of Software Engineering who reported to Scavo in the DTS division.

-20-

71.    Kardes believed that this classification was questionable based on his knowledge of the team's work and discussions with Slimi, who walked Kardes through the roles of individual team members, their projects, and the day-to-day operational support responsibilities within the team.

72.    On February 14, 2025, Alignment formally added Kardes to the DTS budget review process. During a meeting held on that day, Kao publicly told attendees that the majority of DTS would transition to Kardes's leadership by mid-year and that Kardes would be responsible for DTS's performance and budget. Kao specifically directed Kardes to help reduce the overall DTS budget.

73.    Following Kao's directive, Kardes requested and received project plans, staffing assignments, vendor statements of work, timelines, and classifications of DTS labor and vendor costs between CapEx and OpEx.

74.    On February 24, 2025, in connection with CFO Thomas Freeman's request regarding CapEx budget and staffing reductions, Scavo stated in writing that he wanted Kardes to work with him on the reduction list because Kardes will "inherit most of this." This confirmed that Scavo understood the planned DTS transition to Kardes as an impending transfer of responsibility.

75.    Around this time, Kardes began noticing that certain DTS personnel were reflected in labor allocation reports as having CapEx allocations that appeared disproportionately high relative to their actual compensation levels and assigned work. Kardes flagged this observation directly with Scavo on February 25, 2025.

76.    On February 25, 2025, during a CapEx review meeting with Kao, Kao reaffirmed that Alignment needed to reduce its overall CapEx budget to $28 million. Kardes expressed his commitment to reducing costs but also emphasized that CapEx and OpEx needed to be reviewed holistically and accurately.

77.    On February 27, 2025, Alignment publicly announced its first full year of positive Adjusted EBITDA of $1.3 million for fiscal year 2024. The Company also projected Adjusted EBITDA of $35 million to $60 million for 2025.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

78. In early March 2025, after receiving Kao's feedback on the scope of certain CapEx initiatives and after initial staffing reductions and vendor adjustments were finalized, Kardes deepened his review of DTS resource allocations to finalize return-on-investment calculations and to obtain final approvals for the 2025 Strategic Initiatives.

79. During this more detailed project-scope review, Kardes discovered that DTS did not have as much true capacity for capitalizable new initiatives as the reports had suggested. He spoke with all DTS team leaders and confirmed that much of their work, previously classified as CapEx, was in fact day-to-day OpEx. Specifically, significant activities related to production support, operational maintenance, remediation, bug fixes, and other day-to-day operational work were improperly recorded as CapEx initiatives rather than OpEx.

80. During this review, Kardes discovered what he reasonably believed to be substantial operating expenses improperly classified as capital expenditures, inconsistent with applicable accounting standards. He further discovered that this misclassification of expenditure was pervasive throughout the DTS division. These irregularities arose because the CapEx classifications recorded within DTS did not align with the actual work personnel performed.

81. The misclassification was operationalized through a time-tracking system called Harvest. In Harvest, DTS engineers recorded their hours under one of three codes: "SI" (Strategic Initiative) and "NE" (New Enhancements), classified as CapEx, or "SU," classified as OpEx. The designation determined whether an employee's labor costs were capitalized on the Company's balance sheet or expensed on the income statement as an operating cost. DTS personnel were directed to use these codes as a budget-tracking mechanism and, on information and belief, were not informed of the accounting implications of coding time to SI or NE. As a result, personnel were asked to code projects and time in a particular way without understanding that those entries could determine whether labor costs were capitalized on the balance sheet or expensed

-22-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

on the income statement. Capitalizing labor costs as assets on the balance sheet removed those labor costs from current-period operating expenses and excluded them from the Adjusted EBITDA calculation, thereby inflating Alignment's reported profits.

82. During discussions with DTS leaders, Kardes was informed that starting in early 2024, under Scavo's oversight, DTS leaders had frequently been pressured – especially by Mike Lewis, who managed DTS finance reporting to Scavo, and Scavo himself – to classify time as SI/CapEx regardless of the nature of the actual work performed, and that, on multiple occasions, they had been asked to make retrospective timesheet changes to record their work as CapEx.

83. Kardes also observed that the system logic used to extract labor hours for capitalization did not appear to align with the percentage of capitalizable work performed compared to total hours worked.

84. The classification of software-related costs as CapEx or OpEx is governed by Accounting Standards Codification 350-40 ("ASC 350-40"), which establishes a three-phase framework for internal-use software development. Under ASC 350-40, costs may be capitalized only during the "application development stage", after the project is sufficiently defined and approved, which is the phase in which the company is actively writing code, performing integration testing, and configuring new software for its intended function. Costs incurred during the two other phases – i.e., the preliminary project phase (planning, evaluating alternatives, determining feasibility) and the post-implementation/operation phase – must be recorded and expensed as OpEx. Critically, once software is placed into service, the costs of operating, maintaining, supporting, and making minor modifications to that software are post-implementation costs that must be expensed as OpEx under ASC 350-40, regardless of how they are coded in a company's internal time-tracking system. This includes day-to-day system monitoring, bug fixes, troubleshooting, routine data processing, user support, and incremental enhancements that do not add significant new functionality.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

85.     ASC 350-40 thus draws a bright line: building new software capabilities is capitalizable, but keeping existing systems running is not. At Alignment, much of the work performed by DTS engineers classified as "100% capex" consisted of precisely the kind of post-implementation operational activity that ASC 350-40 requires to be recorded as OpEx, including the maintenance of existing platforms, support of daily operations, performance of routine data processing, and providing ongoing technical support. The wholesale classification of entire engineering teams as CapEx, without distinguishing between development and operational tasks, is inconsistent with the project-by-project, activity-by-activity analysis required by ASC 350-40.

**IV.     Kardes's Reporting of the Misclassification of OpEx as CapEx**

86.     From this time through early April 2025, Kardes continued to request transparency, supporting documentation, and accurate allocation between CapEx and OpEx from DTS and Finance personnel, including moving certain costs from CapEx to OpEx where appropriate. Kardes also informed Finance and DTS leadership that previously presented CapEx amounts were estimates and needed to be readjusted based on the actual underlying work – what Kardes referred to as being "based on reality."

87.     Beginning the week of March 10, 2025, Kardes raised concerns about irregular CapEx and OpEx allocations within DTS directly with Scavo and informed him that he was uncomfortable with the discrepancies between the work being performed and how costs were being allocated in DTS's financial records. Kardes told Scavo that he believed the practice was wrong and needed to be addressed. Kardes also informed Scavo that he was working with DTS personnel to design a more accurate financial transparency model.

88.     On or about March 11, 2025, Kardes wrote to Scott Ropp (SVP of Finance) and Mike Lewis stating that the Company needed to "migrate some dollars from capex to opex."

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

89. On March 13, 2025, Kardes provided Alignment's executive team (the "CEOC") with a high-level overview of the 2025 Strategic Initiatives and an updated FY 2025 analysis showing materially lower CapEx capacity available for those initiatives than previously anticipated, once idle time and operational activities were accurately and properly accounted for. Because the meeting ran long due to other topics, the executives were able to discuss only a limited number of initiatives at a high level.

90. On March 17, 2025, Kardes attended a Company leadership offsite with approximately 100 Alignment leaders, where he presented on the status of the Facets implementation and key enterprise transformation priorities. During the offsite, Kao publicly referenced Kardes's transformation work, acknowledged his achievements, and praised his leadership.

91. On March 18, 2025, Kardes met with Kao for approximately one hour to review the 2025 Strategic Initiatives, DTS budgets, and CapEx/OpEx allocation assumptions. Kardes had requested the meeting in part to report to Kao the accounting irregularities he had identified during the DTS budget and capacity reviews in the allocation of CapEx and OpEx, and to propose a new approach to handling these allocations.

92. During the March 18 meeting, Kardes told Kao that a substantial portion of the reported DTS CapEx capacity consisted of non-capitalizable operational work, including production support, bug remediation, post-implementation maintenance, and day-to-day system support activities. Kardes told Kao that, based on his review of staffing allocations and initiative classifications, the gap between reported CapEx capacity and actual capitalizable initiative work was at least approximately $8 million to $10 million for FY 2024 and $10 million for FY 2025. As a result, the true capacity and dollars available for capitalizable new initiatives were materially lower than previously represented.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

93. Kardes also raised a related timing concern: by mid-March 2025, near the end of the first quarter, the 2025 Strategic Initiatives had still not been approved. Kardes reminded Kao that until initiatives were sufficiently approved and defined, costs associated with those projects could not be properly capitalized as approved capitalizable project work. Kardes was concerned that DTS was recording or planning to record CapEx before the underlying projects had been properly approved.

94. To address these issues, Kardes proposed an executive-level DTS transparency model designed to: (a) allocate spend accurately between OpEx and CapEx based on the nature of work performed; (b) create clear accountability for what DTS was delivering versus what was being funded; and (c) support benchmark-informed costing for major support functions.

95. Kao did not dispute the accounting irregularities Kardes raised. Kao asked questions and provided suggestions on the proposed approach before ending the meeting to attend to another commitment.

96. Kardes's analysis identified at least approximately $10 million in operating expenses that appeared to have been misclassified as capital expenditures in the FY 2025 budget and capacity planning process. Based on his discussions with DTS leaders regarding prior-year practices, Kardes also estimated that at least $8 million to $10 million of operating expenses had been misclassified as capital expenditures in FY 2024's actual financial results. Kardes understood that these issues would materially affect Alignment's reported and projected Adjusted EBITDA, particularly because the Company had recently reported only $1.3 million of positive Adjusted EBITDA for fiscal year 2024 and had publicly projected $35 million to $60 million of Adjusted EBITDA for fiscal year 2025.

97. If the Company corrected the misclassification, it would eliminate the Company's first-ever positive EBITDA, and the Company would never have crossed the profitability threshold it had publicly announced in February 2025.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

98.     As a C-suite officer of a publicly traded company, Kardes understood that Alignment's financial statements, which are filed with the SEC and relied upon by investors, must accurately reflect the nature of the Company's expenditures. When his review revealed that millions of dollars in operating expenses had been systematically misclassified as capital expenditures, he understood this had the direct effect of materially inflating the Company's reported profitability in its public filings. The retroactive manipulation of employee time records to support those classifications—where DTS leaders reported being pressured to capitalize all hours regardless of the work performed and to change timesheets after the fact—went beyond any good-faith disagreement over accounting methodology. It reflected a falsification of the books and records underpinning the Company's financial reporting.

99.     Upon information and belief, Kao and Scavo met later on March 18, 2025, for a private dinner.

100.    Scavo had the strongest personal motive of any individual at Alignment to retaliate against Kardes. Kardes's protected disclosures directly implicated Scavo's management of DTS, under which he controlled the budgets, the Harvest time-tracking system, and the project classification methodology that produced the misclassification of CapEx and OpEx. Scavo's direct report, Mike Lewis, had pressured DTS leaders to classify time as CapEx regardless of actual work performed. If the misclassification were acknowledged, Scavo would face direct personal accountability for the practices within his division.

101.    Scavo also had a direct professional motive to undermine Kardes. The planned transition of DTS from Scavo to Kardes, which Kao had publicly announced in January and February 2025, represented a significant diminishment of Scavo's authority and responsibilities. Kardes's review of the DTS budgets and CapEx classifications threatened to expose practices under Scavo's watch. By the time of the March 18, 2025, dinner with Kao, Scavo had both personal accountability concerns

-27-

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE,
UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

and professional self-interested reasons to support—or encourage—Kao's decision to reverse DTS's transition to Kardes.

102.　For Kardes, everything changed after his discussion with Kao on March 18, 2025. Within a period of just 14 days, Kao had reversed every aspect of the promised promotions to Kardes and began a course of conduct designed to force Kardes out of the Company in retaliation for Kardes' reporting of the CapEx/OpEx irregularities.

## V.　Adverse Employment Actions Taken Against Kardes in Relation for His Reporting of the Accounting Irregularities

103.　After Kardes reported the OpEx/CapEx irregularities, Defendants began a course of retaliatory conduct that stripped Kardes of his core responsibilities, excluded him from DTS budget oversight, and made his continued employment intolerable for any executive in his position.

104.　After the March 18 dinner, Scavo's behavior toward Kardes changed markedly. Scavo became unresponsive and avoided discussions with Kardes, in contrast to their close working relationship earlier in 2025. Scavo did not return Kardes's calls for approximately one week after the dinner. Upon information and belief, in the days following the dinner, Scavo told DTS leaders that he would continue leading DTS, not Kardes—thereby actively undermining the planned transition before Kao had formally reversed it.

105.　During the same period, Scavo and others sought to rehire an individual who had recently been laid off as part of a collectively developed cost-reduction plan designed to meet the Company's budget targets—a process in which Scavo himself had participated. They cited an unrelated SOX control issue involving claims inventory reporting as the basis for the proposed rehire, even though the relevant work was already being handled by other employees. Kardes opposed the decision because DTS operating expenses were already materially understated as a result of the OpEx/CapEx classification issues he had identified, adding the position would further increase costs,

and reversing the prior layoff decision for one individual would be unfair to other affected employees, particularly where the individual had personal relationships with those advocating for his return.

106.   On March 29, 2025, Wagner nevertheless pushed the decision forward and wrote that "Rob and Hakan will find ways to offset the cost impact." Kardes responded that he did not support the decision and that those proposing the rehire should address its budget impact.

107.   Immediately thereafter on March 29, 2025, Andreas Wagner, Alignment's Chief Human Resources Officer, denied all of Kardes's pending promotion requests for his team members that had been proceeding through the Company's HR process, further undermining Kardes's authority. Kardes told Kao that he saw this as retaliation.

108.   On the same day, Kardes contacted Maroney about the situation and reported the CapEx/OpEx irregularities to her.  Kardes informed her that he believed at least approximately $8 to $10 million in DTS expenses were improperly classified as CapEx for FY 2024.  He also explained that the DTS budget and accounting presentation was being manipulated and that Kao was being misled. During that call, Maroney discouraged Kardes from documenting his concerns in writing and suggested that these were matters that would be better handled through verbal discussions.

109.   Kardes understood the risk of documenting compliance concerns, particularly because another executive who had raised unrelated compliance concerns regarding Medicare risk adjustment was being managed out and later left the Company after raising those concerns.

110.   During an April 1, 2025, executive meeting, Kao announced that the planned DTS transition from Scavo to Kardes would no longer happen. Maroney and Wagner were present at this meeting. Wagner's presence at this meeting was not incidental; as CHRO, he was responsible for implementing the organizational changes that Kao was announcing, and his attendance confirmed that the reversal of Kardes's expanded role had been coordinated with him in advance.

-29-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

111. When Kardes reminded Kao that he was following the strategy Kao had asked him to lead, Kao responded: "Well I've changed it now—this is the new direction. What are you going to do?"

112. Kao refused to provide any explanation for the cancellation of Kardes's promotion and simply stated that the decision reflected conversations with a "few board members."

113. The cancellation of the DTS transition was a material adverse employment action. It reversed the expanded responsibilities Kao had assigned to Kardes only weeks earlier, removed Kardes from the budget area in which he had identified and reported the CapEx/OpEx irregularities, and prevented him from implementing the financial transparency model he had proposed to correct those issues.

114. On April 2, 2025, Kao indicated that AVA 2.0—the next generation of the platform Kardes had built—be handed over to another employee, removing Kardes from the project he had created.

115. This was a sharp reversal from January 2025, when Kardes had shared the AVA 2.0 and AVA 3.0 vision and AI priorities with Kao for Kao's JPM Healthcare Conference interviews and later spent approximately one hour walking Kao through the future vision for AVA and next steps. On January 29, 2025, Kao referenced his discussions with Kardes multiple times during a Company leadership call and described how Alignment would advance AVA in 2025 based on the vision Kardes had laid out.

116. On April 4, 2025, in discussions between Alignment's then-Chairman of the Board, Joseph Konowiecki, and Kardes, Konowiecki confirmed that the Board was unaware of any performance issues concerning Kardes or of discussions regarding Kao's abrupt cancellation of the DTS transition from Scavo to Kardes.

117. Kardes explained the governance issues in DTS, the concerns DTS leaders had raised, and Kao's sudden change in behavior toward him. Konowiecki told

-30-

Kardes that he would speak with Kao and that Kao should at least explain the nature of the sudden change.

118. On April 4, 2025, Kardes raised the OpEx/CapEx irregularities with Scott Ropp (SVP, Finance), who reported to Alignment's CFO. Ropp understood the serious nature of the issue and confirmed that it was a problem requiring correction.

119. On April 6, 2025, Georgie Sam, one of DTS's senior-most leaders and the Senior Vice President of Data Engineering, resigned from Alignment after the Company failed to investigate his complaints regarding Scavo's conduct.

120. Upon information and belief, in the days prior to Sam's resignation, Wagner met directly with both Sam and Slimi to discuss their concerns about Scavo's management of DTS. On or about April 2–3, 2025, at Kao's direction, Wagner and Maroney met with Sam, who raised concerns about Scavo's management of DTS. A separate meeting was arranged with Slimi at which only Wagner was present. Slimi confirmed Sam's concerns and raised additional issues about Scavo's management and practices within DTS. Through these meetings, Wagner had direct, firsthand knowledge of the DTS governance and budget concerns intertwined with Kardes's protected disclosures regarding the CapEx/OpEx misclassification.

121. On April 7, 2025, Kao convened an in-person meeting regarding the "DTS Org" with no set agenda.

122. Kardes later learned that the meeting had been arranged in response to concerns Georgie Sam had raised the prior week to Maroney and Wagner regarding serious DTS governance concerns stemming from Scavo's conduct. Sam did not join the meeting.

123. During the meeting, Kao was accompanied by his personal security guard, which was highly unusual. The security guard sat directly behind Kardes, causing Kardes to reasonably perceive that the meeting had been staged to intimidate him and, if he objected or challenged any decision, to escort him out.

124.   During that meeting, Kao grew angry and hostile with Kardes and laid out a new organizational chart that stripped Kardes of the migration of DTS oversight to him. When Kardes remained silent and respectfully listened, Kao looked at him and said loudly, "You can leave if you have other things to do." Kardes left, perceiving the situation as hostile.

125.   Even as Defendants were escalating adverse actions against him, Kardes continued to perform his responsibilities in good faith and to protect Alignment's interests. Over the weekend before April 7, 2025, Kardes worked extensively to prepare a CMS Star Ratings recommendation document for anticipated White House meetings and worked with outside counsel on Alignment's response in its CMS Stars litigation, which was due April 7, 2025.

126.   On April 8, 2025, Slimi also resigned from Alignment after he had raised concerns about DTS leadership and governance practices overseen by Scavo, which had gone unaddressed.

127.   On April 8, 2025, in a phone call overheard by Kardes, Kao called Wagner and blamed Kardes directly for Sam's and Slimi's resignations, saying that Kardes had "promised them the world" but failed to deliver. During the call, Kao also directed that Kardes's AI and Data Science responsibilities be transferred to Scavo. Scavo accepted and assumed those responsibilities.

128.   Kardes later learned that Kao's actions on April 8, 2025, in directing Kardes's AI and Data Science responsibilities be transferred to Scavo, were pretextual, and that it was Kao—not Kardes—who had promised Sam and Slimi significant promotions and compensation packages in an effort to retain them before their resignation. After both rejected Kao's offers, Kao placed the blame on Kardes without any evidence or reason.

129.   The transfer of Kardes's AI and Data Science responsibilities was especially punitive because Kardes was a data scientist by training, held a Ph.D. in

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

Computer Science, and had built Alignment's AI platform, while Scavo lacked comparable data science, artificial intelligence, or computer science credentials.

130.    Moreover, Scavo had been experiencing significant performance and credibility issues, including with the Facets claims system implementation, which was one of the reasons Kao had previously asked Kardes to become involved in that project. The decision to transfer Kardes's AI and Data Science responsibilities to Scavo was also inconsistent with concerns about Scavo previously expressed by Maroney on multiple occasions.

131.    Previously, on February 24, 2025, Maroney expressed significant frustration with Scavo's conduct and the accuracy of information he was providing to Kao, stating in substance that Scavo was providing "inaccurate/incomplete info to John" and cautioning Kardes to be careful and limit what he shared with Scavo. Maroney also said she was "so furious" about the situation. Despite those concerns, Kao directed the transfer of Kardes's core AI and Data Science functions to Scavo shortly after Kardes reported the CapEx/OpEx irregularities. By accepting the transfer of Kardes's responsibilities, Scavo was a direct participant in and beneficiary of the retaliatory conduct.

132.    The transfer of AI and Data Science to Scavo would have inflicted serious professional and reputational harm on Kardes. It stripped Kardes of core functions directly tied to his expertise, title, executive identity, and external reputation, while also taking away any visibility he had into the DTS budgets and accounting practices about which he had raised concerns.

133.    On the evening of April 8, 2025, Wagner called Kardes to deliver the new organizational chart. Wagner was not merely relaying information. When Kardes refused to accept the decision, stating plainly that it was retaliation and a demotion, and after he requested a fair discussion, Wagner responded that "everything was final and nothing would change." When Kardes reiterated his objection, Wagner asked: "Then what are you going to do?"—effectively pressuring Kardes toward resignation.

134. Kardes asked directly whether Wagner wanted him to resign, adding that the changes were punitive and made without facts. Wagner challenged him: "How do you know?" Kardes replied that his office was next to Kao's and he had overheard the conversation himself, referring to the earlier discussion among Kao, Wagner, and Scavo in which Kao directed the transfer of Kardes's responsibilities. Kardes emphasized that, as Kao's direct report, he needed to discuss the matter with Kao. Wagner dismissed this, stating it "would not change anything."

135. Later that evening, Kardes called Konowiecki, who did not answer despite having told Kardes the previous week that he would speak with Kao regarding his abrupt change in treatment of Kardes. Kardes then messaged Kao and Maroney asking for an explanation for the abrupt changes.

136. The following day, on April 9, 2025, in a meeting with Kao and Maroney, Kardes sought an explanation for why his core responsibilities were being removed and asked if there were any performance-related concerns, given he had heard none previously. Maroney responded that it was "not a coincidence" and appeared "suspicious" that Sam and Slimi had resigned at approximately the same time, effectively trying to place blame for both resignations on Kardes.

137. At the end of this meeting, Kao told Kardes he had two options: (1) remain working under the revised structure, which had removed all his core operational responsibilities (including Data Science, AI, User Experience) and visibility into any DTS budgeting practices; or (2) leave the Company.

138. Later that same day, Maroney followed up with Kardes regarding the ultimatum given to him. Although Kardes's employment agreement provided for a 90-day notice period, Maroney told him that the "ideal" timing for his departure would be by the end of the month. The pressure on Kardes to resign was unmistakable.

139. On April 9, 2025, at 6:20 p.m., Kardes provided written notice via email to Kao and Maroney that he would resign, effective at the end of his contractual 90-day notice period. Kardes did so only after Defendants had threatened to formalize the

-34-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE,
UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

removal of his core responsibilities including removal from oversight of the DTS budget issues he had reported, accused him of causing executive resignations, and presented him with the choice of accepting a humiliating and professionally damaging demotion or leaving. Kardes's notice was not voluntary in any meaningful sense; Defendants had made his continued employment intolerable for an executive in his position.

140.   In the email, Kardes stated he would do "whatever is necessary" to complete an appropriate transition.

141.   Kardes's employment agreement stated that his "Termination Date" upon resignation is 90 days after the date of written notice of resignation. Thus, Kardes remained employed by Alignment and continued to perform his duties after he sent his notice of resignation.

142.   Kardes's April 9, 2025, email did not complete his constructive discharge and did not constitute final, definitive, or unequivocal notice that his employment or officer status would end. Kardes communicated only a conditional intention to resign at the end of his contractual 90-day notice period, and his status remained fluid and reversible. Kardes continued performing his duties diligently, remained fully engaged in his role and Company matters, and continued to challenge the abrupt changes to his responsibilities and the retaliatory and punitive actions being taken against him. Moreover, as explained below, through April 14-15, 2025, Defendants continued to propose alternative roles under which Kardes would remain employed (discussed below), and Alignment retained the ability to withdraw its adverse actions, restore Kardes's responsibilities, correct the record, or offer a role that did not exclude him from the very DTS budget issues he had reported. Kardes's departure did not become final and irrevocable until Alignment internally announced it on April 14, 2025 and publicly filed its Form 8-K on April 15, 2025.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

## VI.    Alignment Constructively Discharges Kardes

143.    On April 10, 2025, the day after Kardes provided his notice of resignation, Kao approached Kardes at the Health Evolution Summit. Kao accused Kardes of self-aggrandizement and explicitly threatened legal action if Kardes ever "did anything similar to AVA," the platform Kardes had personally designed and built. Kao's threat implicitly acknowledged that AVA was Kardes's creation while simultaneously warning him not to use his own expertise with a competitor. Kao also reiterated the unfounded allegation that Kardes had solicited the resignations of Sam and Slimi. This constituted a further adverse action—threats and intimidation directed at an employee who remained employed by the Company.

144.    During this period, Defendants also pressured Kardes not to take any action that could harm Alignment's stock price, while invoking his vested equity as leverage. Kardes understood these statements were an effort to silence him and discourage him from further raising or documenting the compliance, governance, and financial-reporting concerns he had identified.

145.    That same day, Maroney asked Kardes whether he would be interested in staying on at Alignment if she spoke with Kao. She offered only two alternatives to Kardes to stay on at the Company: "Chief of Staff" to Kao or a position reporting directly to her. Both proposals represented dramatic demotions from Kardes's actual role and from the "President, AVA Technologies" or "Enterprise COO" title that had been promised to him just weeks earlier.

146.    The offers did not make Kardes's departure voluntary or render the working conditions tolerable. Each alternative kept Kardes away from DTS budget oversight, removed him from the core functions he had built and led for years, and would have required him to accept a diminished role inconsistent with his expertise, title, compensation, and executive stature. Kardes declined both positions.  At that stage, however, the situation had not yet been finalized. Maroney's inquiry confirmed that Alignment still had the ability to reverse course, discuss alternatives, and

-36-

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE,
UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

determine whether Kardes would remain with the Company in a role that restored his responsibilities and did not isolate him from the very issues he had reported.

147. On April 14, 2025—one day before the 8-K filing—both Kao and Maroney filed Form 144 notices with the SEC proposing sales of Alignment stock: 270,000 shares for Kao and 230,000 shares for Maroney. Both sales were through Rule 10b5-1 trading plans. In the three months preceding the filings, Kao had sold approximately 884,901 shares for approximately $13.74 million, and Maroney had sold approximately 450,961 shares for approximately $6.57 million.

148. Since March 1, 2025, Defendants Kao, Maroney, Scavo and Wagner have continued to aggressively liquidate their Alignment holdings. Since that time, analysis of Alignment's public Form 4 filings show that Kao has sold approximately 5.1 million shares of Alignment stock for a total of more than $90.3 million; Maroney has sold nearly 1.95 million shares for a total of approximately $35.3 million; Scavo has sold over 290,000 shares for a total of approximately $4.7 million; and Wagner has sold nearly 111,000 shares for a total of approximately $2.0 million. All told, Form 4s filed by the four individual Defendants show that they have collectively sold nearly 7.5 million shares since March 2025, for total proceeds of approximately $132.3 million.

149. On April 14, 2025, Alignment circulated an internal memorandum to Company employees announcing Kardes's departure and stating that his last working day would be May 16, 2025.

150. On April 15, 2025, Alignment filed a Form 8-K with the SEC under Item 5.02 (Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers). The 8-K stated:

> "On April 9, 2025, Hakan Kardes, Chief Experience Officer of Alignment Healthcare, Inc. (the 'Company'), notified the Company of his intention to resign his employment with the Company to pursue other professional opportunities. Mr. Kardes' resignation as Chief Experience Officer was effective

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

immediately. He will remain employed with the Company through May 16, 2025 to facilitate the transition of his duties to other senior employees of the Company."

151.   The Company's filing of the 8-K made Defendants' constructive discharge of Kardes irrevocable. Kardes's employment situation remained fluid prior to April 15, which is confirmed by Maroney's repeated inquiries regarding whether Kardes would accept a different role or a different reporting structure to stay on at the Company. Once the 8-K was filed and disseminated to the market, Kardes's departure as an officer of Alignment was official and could not be undone without significant prejudice to Kardes. Thus, the 8-K functioned as the Company's definitive, public, and irrevocable act of discharge.

152.   The 8-K also terminated Kardes as an Officer of the Company "effective immediately." This was inconsistent with Kardes's April 9 notice and his contractual 90-day notice period. Kardes had not agreed to his officer role terminating immediately, and he had not authorized Alignment to publicly characterize his departure as an immediately effective officer resignation.

153.   Kardes had no knowledge of the 8-K's content before it was made, nor was he asked for input or approval of its language.

154.   The events from April 1 through April 15, 2025 constitute a single, continuing course of retaliatory conduct in response to Kardes's reporting of the CapEx/OpEx irregularities that collectively caused Kardes's constructive discharge.

155.   Defendants stripped Kardes of his core responsibilities, kept him away from DTS budget oversight, presented him only with humiliating and professionally damaging alternatives, pressured him to resign, and then finalized his departure internally and publicly. Collectively, these actions made Kardes's continued employment intolerable for a person in his position and caused his constructive discharge.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

## VII.    The Materiality of the Reported Accounting Irregularities

156.    Under ASC 350-40, costs related to internal-use software may be capitalized only during the application and infrastructure development phase. Costs for activities such as day-to-day support, maintenance, and operations must be expensed as incurred. The misclassification of at least approximately $8–10 million in OpEx as CapEx for FY 2024 had the effect of (a) removing those expenses from the operating expense line of the income statement, thereby inflating operating income and Adjusted EBITDA; and (b) presenting a more favorable picture of Alignment's operating leverage, SG&A efficiency, and Adjusted EBITDA performance than would have existed if the costs had been properly expensed.

157.    The issue was material because Alignment publicly emphasized operating leverage, SG&A efficiency, Adjusted EBITDA, and technology-enabled scalability as central components of its investor narrative. These were not immaterial back-office accounting issues. They went directly to the Company's reported cost structure, operating efficiency, and profitability trajectory.

158.    Research analysts also focused on these issues. During Alignment's Q2 2025 earnings call, an analyst specifically questioned management about the Company's unusually low SG&A ratio, noting that Alignment's updated guidance implied full-year SG&A below 10% and asking how durable that level of SG&A efficiency was as the Company continued to scale. In response, Kao emphasized Alignment's unified data architecture, AVA, clean workflows, and technology-enabled operating model as reasons the Company did not need the same level of staffing and reconciliation effort as legacy competitors.

159.    Kao's response was significant because the unified data architecture, AVA platform, and AI-enabled operating model he referenced were areas Kardes had built and led. At the same time, Kao's answer omitted the OpEx/CapEx and other DTS budget irregularities Kardes had reported only months earlier, including Kardes's concern that DTS was recording operational labor and support activities as CapEx

-39-

rather than OpEx. Those irregularities, if corrected, would have increased operating expenses, reduced reported Adjusted EBITDA, and called into question the same SG&A efficiency and operating-leverage narrative analysts were probing.

160.   Alignment reported Full Year 2024 Adjusted EBITDA of $1.3 million—its first-ever positive result. If the $8–10 million misclassification were corrected, Adjusted EBITDA would have been negative by approximately $7–9 million. The Company would not have crossed the profitability threshold it publicly announced on February 27, 2025.

161.   Alignment's own proxy statements and executive compensation framework confirm the materiality of Kardes's findings and reporting. As described in Alignment's proxy statements, Adjusted EBITDA was one of the Company's most important corporate performance goals for purposes of executive compensation. The misclassification directly impacted executive compensation through multiple channels. First, Alignment's Annual Incentive Plan ("AIP") used standalone Adjusted EBITDA—without any capital expenditure deduction—as a corporate performance metric. For fiscal year 2024, the Adjusted EBITDA weighting was increased to 35% (from 20% in FY2023), making it the most heavily weighted financial metric in the AIP formula.

162.   The materiality of the $8 million to $10 million misclassification is demonstrated by Alignment's own AIP targets. The 2025 Proxy Statement discloses the FY2024 AIP performance targets for Adjusted EBITDA: Threshold of negative $10.0 million, Target of $0.0–$5.0 million, and Maximum of $20 million. Against that scale, an $8 million to $10 million adjustment was plainly material: it could move reported Adjusted EBITDA from a below-target or near-threshold result to a target-level result. The actual result was reported at 100% of Target. If the $8–10 million misclassification were corrected, actual Adjusted EBITDA would have been approximately negative $7–9 million—still above the Threshold but dramatically below the Target range. This meant that had the Company corrected the

-40-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

misclassifications, the AIP would have paid out at a lower rate than the 141.7% corporate funding rate actually achieved, and thus the Individual Defendants' AIP compensation would have been materially lower. The FY2024 AIP bonuses were: Kao $1,337,223 (141.7% of his $943,770 target); Freeman $680,783; Maroney $707,388; and Wagner $519,119.

163. Wagner also had a direct financial interest in the continuation of the CapEx/OpEx misclassification. Wagner's total compensation for FY2024 was $2,450,162, including a base salary of $452,308, stock awards valued at $1,600,000 (comprising a one-time sign-on grant of 155,785 RSUs vesting over four years and regular annual RSU and PSU awards of 60,000 units each), and non-equity incentive compensation of $389,339 (with an additional $129,780 of his AIP bonus paid in immediately vested stock grants, for a total AIP payout of $519,119 at 135% of target). Wagner's AIP bonus was calculated using the same Adjusted EBITDA metric that the CapEx/OpEx misclassification inflated. Correcting the misclassification would have reduced the AIP corporate funding rate, and diminished Wagner's bonus payout. In addition, Wagner's PSU awards (60,000 units at target, with a maximum of 120,000 units) used standalone Adjusted EBITDA with a 50% weighting under the March 2024 formula, meaning any continued inflation of EBITDA through misclassification would flow directly through to Wagner's PSU payouts without arithmetic offset.

164. In addition, the Compensation Committee awarded discretionary bonuses to Kao ($1,000,000), Freeman ($500,000), and Maroney ($500,000), citing "above-target membership growth and financial results." The "financial results" justifying those discretionary bonuses rested in part on the inflated Adjusted EBITDA figures. The total performance-based cash compensation paid to Kao alone exceeded $2.3 million.

165. The discretionary awards were notable for two reasons. First, they were justified in part by "financial results" that included Adjusted EBITDA figures Kardes reasonably believed were inflated by the OpEx/CapEx misclassification he had

-41-

reported. Second, in March 2025, Alignment retrospectively changed the 2024 AIP calculation methodology for other employees, reducing bonus outcomes that employees had expected to earn and reducing performance ratings for certain employees in a targeted manner. Those reductions decreased employee compensation expenses and improved the Company's reported Adjusted EBITDA, while senior executives received additional discretionary bonuses tied in part to the Company's reported financial results. This occurred despite a year in which Alignment employees had delivered extraordinary operational results, including approximately 59% year-over-year membership growth, substantial retention improvements, and 100% of membership in 4-Star or higher-rated plans.

166.   In addition, the March 2024 PSU grants changed the performance formula to use standalone Revenue (50% weight) and Adjusted EBITDA (50% weight)—eliminating the prior "less Capital Expenditures" deduction. Under this new formula, the CapEx/OpEx misclassification directly inflated the PSU metric dollar-for-dollar with no offset. The 2024 PSU grants were substantial: Kao received 330,000 PSUs at target ($1,650,000); Freeman received 110,000 ($550,000); Maroney received 130,000 ($650,000); and Wagner received 60,000 ($300,000). The measurement period for these PSUs is fiscal year 2026, but the change in formula itself is significant: by removing the capital expenditure deduction, the Company ensured that any continued inflation of EBITDA through misclassification would flow directly through to PSU payouts without the arithmetic offset that existed under the prior formula.

167.   Software-related assets constituted 89.6% of all capitalized property in Alignment's 2025 10-K ($218 million of $243 million total). The concentration of capitalized assets in the software category is consistent with Kardes's reporting of aggressive over-capitalization.

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

## VIII.  Unpaid Compensation and Forfeited Equity

168.   Alignment did not pay Kardes the second half of his earned 2024 performance bonus and failed to properly remit amounts withheld from his final paycheck, including 401(k) contributions.

169.   As a result of his constructive termination, Kardes also forfeited substantial earned and unvested equity. This included, but was not limited to, the second tranche of his achieved September 2023 PSU grant, consisting of 237,103 PSUs, which were scheduled to vest on December 31, 2025, subject to continued employment. Kardes also forfeited 70,000 PSUs at target, with up to 140,000 PSUs at maximum achievement, issued in 2024; 39,677 PSUs at target, with up to 79,354 PSUs at maximum achievement, issued in 2025; 149,076 RSUs, approximately 80% of which were scheduled to vest within two years; and 9,124 stock options scheduled to vest within approximately one year.

170.   As described in Alignment's 2024 Proxy Statement, a termination Without Cause or resignation With Good Reason entitles Kardes to one year's base salary and target annual cash incentive bonus as severance, a pro rata bonus for the year of termination, and 12 months of COBRA. Alignment has offered nothing.

## IX.  Kardes's Washington Employment and the Washington Nexus

171.   At all times relevant to this action, Kardes resided in the State of Washington and performed his duties for Alignment remotely from his home in Washington. Washington was Kardes's regular and principal place of work.

172.   Substantially all of the work Kardes performed for Alignment was performed by Kardes from Washington, including his oversight of the DTS organization, his review and reporting of the Company's CapEx/OpEx classifications, and his preparation of the analyses underlying his protected disclosures.

173.   Kardes made his protected disclosures from Washington, working remotely by telephone, videoconference, and electronic mail.

174.    Defendants' retaliatory acts were directed at, and caused damage to, Kardes in Washington. The reversal of his promotion, the stripping of his responsibilities, the ultimatums concerning his continued employment, and the communications culminating in his constructive discharge were transmitted to Kardes at his residence and place of work in Washington.

175.    Kardes suffered his economic and reputational injuries in Washington as a result of Defendants' retaliation. This includes, but is not limited to, his lost compensation, forfeited equity, unpaid wages, and harm to his professional standing.

176.    Alignment treated Washington as Kardes's work location for payroll, tax-withholding, and employment-administration purposes.

177.    The Employment Agreement does not designate California as Kardes's place of work, and during all relevant periods, Kardes never relocated to or performed his duties from California. Kardes's employment relationship with Alignment was centered in Washington, where he lived and worked.

**COUNT I**

**Violation of the Sarbanes-Oxley Act of 2002, Section 806**

**(18 U.S.C. § 1514A)**

**(Against All Defendants)**

178.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

179.    At all relevant times, Defendant Alignment Healthcare, Inc. was a "company with a class of securities registered under section 12 of the Securities Exchange Act of 1934" within the meaning of 18 U.S.C. § 1514A(a). Alignment's common stock is registered under Section 12(b) of the Exchange Act and trades on the Nasdaq Global Select Market under the ticker symbol "ALHC." Alignment is therefore a "covered employer" subject to Section 806.

180.    At all relevant times, Plaintiff was an "employee" of Alignment within the meaning of 18 U.S.C. § 1514A(a). Kardes was employed by Alignment from January

-44-

2019 through May 16, 2025, serving in a series of increasingly senior executive roles until his constructive discharge on April 15, 2025, while remaining nominally employed through May 16, 2025.

181. Defendants John Kao, Dawn Maroney, Robert Scavo, and Andreas Wagner are individually liable under Section 806. The statute prohibits retaliation by "any officer, employee, contractor, subcontractor, or agent of such company." 18 U.S.C. § 1514A(a). At all relevant times, Kao was the Chief Executive Officer, Maroney was the President and Chief Operating Officer of Alignment, Scavo was the Chief Information Officer, and Wagner was the Chief Human Resources Officer. Each personally participated in the retaliatory conduct described herein.

182. Kardes engaged in protected activity within the meaning of 18 U.S.C. § 1514A(a)(1). Between approximately March 11 and April 4, 2025, Kardes provided information regarding conduct that he reasonably believed constituted violations of SEC rules and regulations and of federal law relating to fraud against shareholders, including:

a. On or about March 11, 2025, Kardes reported to Scavo, the CIO with operational control over the DTS division where the accounting irregularities were concentrated, that the CapEx/OpEx numbers were inaccurate and needed correction;

b. On or about March 11, 2025, Kardes wrote to Scott Ropp (SVP of Finance) and Mike Lewis stating that the Company needed to revise its CapEx allocations to OpEx;

c. On or about March 13, 2025, Kardes presented to the CEOC CapEx capacity availability that was materially lower than previously anticipated;

d. On or about March 18, 2025, Kardes reported directly to Defendant Kao the full scope of the CapEx/OpEx irregularities, showing him the discrepancy between reported and actual CapEx figures and estimating the gap at approximately $8–10 million for FY24;

-45-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

e. On or about March 28, 2025, Kardes also informed Finance and DTS leadership in writing that previously presented CapEx budget allocations presented to the Board of Directors were estimates and needed to be re-adjusted based on the actual underlying work – what Kardes referred to as being "based on reality.";

f. On or about March 29, 2025, Kardes reported the CapEx/OpEx irregularities to Maroney during a phone call in which he informed her that approximately $8 to $10 million in DTS expenses were improperly classified as CapEx for FY24; and

g. On or about April 4, 2025, Kardes raised the CapEx/OpEx irregularities with Scott Ropp, who was a direct report of Alignment's CFO, and who understood the serious nature of the misclassification, confirming it was a problem that required correction and fixing.

183. Kardes's communications constituted protected activity because they provided information regarding conduct that Kardes reasonably believed constituted violations of (a) 15 U.S.C. § 78m(a) and SEC Rules 13a-1 and 13a-13 (requiring accurate financial reporting in periodic reports); (b) SEC Rules 13a-14 and 15d-14 (requiring CEO and CFO certifications of the accuracy of financial statements); (c) 17 C.F.R. § 210.5-02 (Regulation S-X) (governing the balance sheet classification of assets and expenses); (d) 15 U.S.C. § 78m(b)(2)(A) (requiring registrants to maintain books, records, and accounts that accurately and fairly reflect their transactions); (e) 15 U.S.C. § 78m(b)(2)(B) (requiring registrants to maintain adequate internal accounting controls); (f) 15 U.S.C. § 78j(b) and SEC Rule 10b-5 (prohibiting fraud and material misstatements or omissions in connection with the purchase or sale of securities); and (g) 18 U.S.C. § 1348 (securities fraud), to the extent the CapEx/OpEx irregularities were undertaken knowingly and with the intent to deceive investors regarding the Company's financial performance.

-46-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

184.   Kardes's belief that the conduct violated the foregoing provisions was objectively reasonable. Kardes had direct operational knowledge of the work performed by DTS personnel and determined that production support, bug fixes, maintenance, and other day-to-day activities were being improperly classified as CapEx in violation of ASC 350-40. Kardes was informed by DTS leaders that they had been pressured to capitalize all hours regardless of the actual nature of the work and had been asked to change timesheets retrospectively. Kardes understood that the misclassification inflated Adjusted EBITDA by at least approximately $8–10 million, which was sufficient to convert the Company's first-ever positive EBITDA ($1.3 million) into a negative result. Kardes's concerns were also independently corroborated by the SVP of Finance, who agreed that the irregularities required immediate review and correction. A reasonable person with Kardes's training, experience, and access to these facts would believe that the misclassification constituted a violation of federal securities laws and SEC rules.

185.   Defendants were aware of Kardes's protected activity. Before Kardes made his protected disclosures, Kao had personally asked Kardes to define and review capitalizable projects, and Scavo had likewise sought Kardes's assistance with DTS CapEx planning and related budget issues. Around March 11 to March 13, 2025, Kardes reported the CapEx/OpEx irregularities directly to Scavo and told him that the discrepancies between the work being performed and the costs being classified as CapEx were wrong and needed to be addressed. Kardes reported the CapEx/OpEx irregularities directly to Defendant Kao on March 18, 2025. Kardes also reported the CapEx/OpEx irregularities directly to Defendant Maroney during a March 29, 2025, phone call, in which she sought to dissuade Kardes from documenting them in writing. Kao confirmed his awareness of Kardes's findings during their March 18 meeting.

186.   Defendants subjected Kardes to unfavorable personnel actions within the meaning of 18 U.S.C. § 1514A(a), which prohibits retaliation including discharge,

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

demotion, suspension, threats, harassment, and discrimination "in any other manner." The unfavorable personnel actions included, but were not limited to:

a. The April 1, 2025 reversal of the DTS transition and planned mid-year President of AVA Technologies / COO promotion;

b. The April 2, 2025 removal of Kardes from AVA 2.0, the platform he designed and built;

c. The April 7, 2025 hostile meeting with Kao's personal security guard present, and Kao's statement "You can leave if you have other things to do";

d. Kao's April 8, 2025 directive to transfer Kardes's AI and Data Science responsibilities to Scavo after blaming Kardes for the resignations of Sam and Slimi;

e. The April 8, 2025 threat to strip virtually all of Kardes's meaningful responsibilities, delivered as "effective immediately" by CHRO Wagner, accompanied by the statement "Then what are you going to do?";

f. The constructive discharge of Kardes, consummated by Defendants' final and irrevocable acts of April 14–15, 2025 (Kardes's last day of employment being May 16, 2025), resulting from Defendants' deliberate creation of working conditions so intolerable that a reasonable person in Kardes's position would have felt compelled to resign;

g. The April 10, 2025 threats by Kao at the Health Evolution Summit, including threats of legal action if Kardes "did anything with AVA";

h. The April 10–11, 2025 offer to Kardes by Defendants of alternative positions that were clear demotions — i.e., "Chief of Staff" to Kao or a role reporting directly to Maroney — while refusing to restore him to his prior positions, each of which represented a dramatic demotion inconsistent with his expertise, title, track record of success, and executive stature;

-48-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

i.  The April 14, 2025 internal announcement of Kardes's departure from Alignment;

j.  The April 15, 2025 filing of a Form 8-K with the SEC that publicly terminated Kardes's officer status, misidentified his title, and mischaracterized his departure, all without Kardes's knowledge, input, or approval;

k.  The failure to pay Kardes's earned 2024 performance bonus and the withholding of amounts from his final paycheck, including 401(k) contributions;

l.  The forfeiture of substantial equity compensation in the form of Performance Awards ("PSUs") and Restricted Stock Units ("RSUs") caused by the constructive discharge; and

m.  The failure to pay severance to which Kardes was entitled under Section 6(c) of the Employment Agreement upon a resignation with Good Reason.

187.  Kardes's protected activity caused or was a contributing factor in each of the unfavorable personnel actions described above. The temporal proximity alone gives rise to an inference of causation: the retaliatory conduct began within 14 days of Kardes's March 18, 2025 report to Defendant Kao. Before that report, Kardes was promoted and lauded; after it, his position in the Company was systematically degraded.

188.  Beyond temporal proximity, the following facts further establish that Kardes's protected activity was a contributing factor in the unfavorable personnel actions:

a.  *Reversal of the planned promotion and role expansion*. From December 2024 through mid-March 2025, Kao actively promoted Kardes's expansion into a Chief Transformation Officer and planned elevation into President of AVA Technologies or enterprise Chief Operating Officer-

-49-

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

level role. The abrupt and systematic reversal of this trajectory began within days of Kardes's March 18 protected disclosure, escalated through the April 8 orders stripping him of core responsibilities, and culminated in the Company's April 14 internal announcement of his departure and April 15 Form 8-K publicly announcing his immediate resignation as an officer.

b. *Scavo's participation in the retaliation*: Scavo, the executive whose division was the subject of Kardes's protected disclosures, had dinner with Defendant Kao on the same day Kardes reported the full scope of the misclassification to Kao (March 18, 2025). Within 14 days, Kao reversed the DTS transition that would have moved DTS from Scavo's control to Kardes's. On April 8, 2025, Kao punitively directed that Kardes's AI and Data Science responsibilities be transferred to Scavo, stripping Kardes of core functions tied to his expertise, executive identity, and external reputation. Scavo was both a participant in and direct beneficiary of the retaliation.

c. *Expressed retaliatory intent*. On April 8, 2025, Kao told Wagner he blamed Kardes for the departures of both Sam and Slimi, that Kardes had "promised them the world" and failed to deliver, and that as a result, he wanted to transfer Kardes's responsibilities for leading Data Science and AI to Scavo and demote Kardes to report into Maroney.

d. *Absence of legitimate justification*. Defendants gave no legitimate, non-retaliatory explanation for the abrupt reversal of Kardes's promised promotion and the stripping of his responsibilities. When Kardes reminded Kao on April 1 that he was following Kao's own strategy, Kao's only response was: "Well I've changed it now."

e. *Suppression of documentation*. Maroney's March 29 effort to dissuade Kardes from documenting the CapEx/OpEx issues in writing is evidence of Defendants' desire to suppress the protected disclosures.

-50-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE,
UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

f. *Disparate treatment*. Scavo, the executive who oversaw the CapEx/OpEx classification practices, remained employed and listed as CIO in the 2025 Proxy Statement. Kardes, the executive who reported the misclassification, was constructively discharged.

g. *Financial motive*. Acknowledging the misclassification would have reduced FY2024 Adjusted EBITDA from a positive $1.3 million to a negative $7–9 million, dramatically reducing AIP bonuses (funded at 141.7% of target), potentially damaging the stock price on which millions of dollars in PSU and RSU awards depended. Defendants Kao, Maroney, and Wagner personally received FY2024 AIP bonuses of $1,337,223, $707,388, and $519,119, respectively, plus discretionary bonuses of $1,000,000 (Kao) and $500,000 (Maroney), respectively, based in part on the inflated financial results.

189. Kardes filed a timely complaint with OSHA on October 14, 2025, under File No. 301064300. More than 180 days have elapsed since the filing of the administrative complaint without a final decision by the Secretary of Labor. Kardes is therefore entitled to bring this action for *de novo* review in this Court pursuant to 18 U.S.C. § 1514A(b)(1)(B) and 29 C.F.R. § 1980.114(a).

190. As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1514A, Kardes has suffered and continues to suffer damages including, but not limited to:

a. Front pay in lieu of reinstatement;

b. Lost compensation, including back pay with interest from the date of constructive termination;

c. Lost equity compensation, including forfeited PSUs and RSUs;

d. Unpaid earned 2024 performance bonus;

e. Unpaid severance under Section 6(c) of the Employment Agreement;

-51-

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

f.  Compensatory damages, including compensation for emotional distress, reputational harm, and damage to his professional standing caused by the retaliatory 8-K filing;

g.  All "special damages sustained as a result of the discrimination" within the meaning of 18 U.S.C. § 1514A(c)(2)(C);

h.  Reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1514A(c)(2)(C); and

i.  Such other and further relief as this Court deems just and proper.

## COUNT II

### Violation of Wash. Rev. Code Ann. § 21.40.090

### (Whistleblower Retaliation)

### (Against Alignment Healthcare, Inc. and Alignment Healthcare USA, LLC)

191.  Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

192.  This Count is pleaded as Plaintiff's primary state-law cause of action. To the extent the Court determines that California law rather than Washington law governs the employment relationship, Plaintiff pleads Count III (California Labor Code § 1102.5) in the alternative; to the extent the Court determines that Washington law governs, Plaintiff pleads this Count as controlling.

193.  The Washington Whistleblower Award and Protection Act, RCW chapter 21.40, became effective July 23, 2023. Wash. Rev. Code Ann. § 21.40.090(1) provides that "no employer may directly or indirectly terminate, discharge, demote, suspend, threaten, harass, or in any other manner retaliate against, an individual because of any lawful act done by the individual," including, as set forth in § 21.40.090(1)(d), "making disclosures to a person with supervisory authority over the employee, or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct, regarding matters subject to the jurisdiction of the securities administrator, securities division, or the securities and exchange commission."

-52-

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

194.   Wash. Rev. Code Ann. § 21.40.090(1)(c) separately protects an individual from retaliation for "making disclosures that are required or protected under" the Sarbanes-Oxley Act of 2002, the Securities Act of 1933, the Securities Exchange Act of 1934, or any other law, rule, or regulation subject to the jurisdiction of the Securities and Exchange Commission.

195.   At all relevant times, Alignment was an "employer," and Kardes was an "individual" and internal reporter, within the meaning of Wash. Rev. Code Ann. § 21.40.090.

196.   At all relevant times, Kardes resided in and performed his work from Washington, and the retaliatory conduct alleged herein was directed at and caused damage to him in Washington, such that the Washington Whistleblower Award and Protection Act governs Defendants' conduct and the damages to Kardes caused by that conduct.

197.   Kardes engaged in activity protected by Wash. Rev. Code Ann. § 21.40.090(1)(c) and (1)(d). Through the disclosures described in ¶ 182 above, Kardes made disclosures to Defendant Kao (CEO), Defendant Scavo (CIO), Defendant Maroney (President), and Defendant Wagner (CHRO), and Scott Ropp (SVP of Finance), each a person with supervisory authority over Kardes or with authority to investigate, discover, or correct the misconduct. These disclosures concerned the Company's material misclassification of operating expenses as capital expenditures, a matter squarely within the jurisdiction of the SEC and the Washington Securities Division.

198.   Kardes's disclosures were also disclosures protected under the Sarbanes-Oxley Act and the Securities Exchange Act of 1934 within the meaning of Wash. Rev. Code Ann. § 21.40.090(1)(c), for the reasons alleged in Count I and in ¶ 182.

199.   For the reasons set out in ¶ 183 above, Kardes reasonably believed that the conduct he disclosed concerned violations of the securities laws, and such disclosures were made in good faith. None of the exceptions in Wash. Rev. Code Ann.

-53-

§ 21.40.090(2) applies: Kardes did not knowingly or recklessly make any false, fictitious, or fraudulent statement or misrepresentation, did not use any false writing or document, and did not act with knowledge or reckless disregard as to whether his disclosures were false or frivolous.

200.   For the reasons articulated in ¶ 185 above, Defendants were aware of Kardes's protected activity.

201.   Because of Kardes's protected activity, Defendants directly and indirectly retaliated against Kardes by means of the adverse actions described in ¶ 186 above, each of which constitutes prohibited retaliation under Wash. Rev. Code Ann. § 21.40.090(1).

202.   Kardes's protected activity caused or was a contributing factor in each of the unfavorable personnel actions described above. The temporal proximity alone gives rise to an inference of causation: the retaliatory conduct began within 14 days of Kardes's March 18, 2025 report to Defendant Kao. Before that report, Kardes was promoted and lauded; after it, his position in the Company was systematically degraded. For the reasons articulated in ¶¶ 187-188 above, beyond temporal proximity, Kardes's protected activity caused or was a contributing factor in the unfavorable personnel actions.

203.   This action is timely. Wash. Rev. Code Ann. § 21.40.090(5) permits an action to be brought within the later of six years after the retaliatory action or three years after the date the facts material to the right of action were or should have been known, and in no event more than ten years after the violation. The retaliatory conduct occurred in 2025, well within these periods.

204.   Pursuant to Wash. Rev. Code Ann. § 21.40.090(10), nothing in the Act diminishes any other right or remedy available to Kardes, including under the Sarbanes-Oxley Act, and this Count is pleaded in addition to Plaintiff's other claims.

205.   As a direct and proximate result of Defendants' violations of Wash. Rev. Code Ann. § 21.40.090, Kardes has suffered and continues to suffer damages, and is

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

entitled to the full relief authorized by Wash. Rev. Code Ann. § 21.40.090(6), including but not limited to: (a) front pay in lieu of reinstatement; (b) two times the amount of back pay otherwise owed, together with interest; (c) litigation costs, expert-witness fees, and reasonable attorneys' fees; (d) actual damages, including for lost equity compensation, unpaid earned 2024 performance bonus, unpaid severance, and compensation for emotional distress, reputational harm, and damage to his professional standing; and (e) any combination of the foregoing and such other and further relief as this Court deems just and proper.

## COUNT III

### Violation of California Labor Code § 1102.5

### (Whistleblower Retaliation – Pleaded in the Alternative to Count II)

### (Against Alignment Healthcare, Inc. and Alignment Healthcare USA, LLC)

206. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

207. Plaintiff pleads this Count in the alternative to Count II. To the extent the Court determines that California law governs Kardes's state law whistleblower retaliation claim, Plaintiff asserts this claim under California Labor Code § 1102.5; to the extent the Court determines that Washington law governs, Count II controls and this Count is pleaded as an alternative.

208. California Labor Code § 1102.5(b) provides that "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information … to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance … if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

209.   At all relevant times, Defendant Alignment was Kardes's "employer" within the meaning of Labor Code § 1102.5. Defendants Kao, Maroney, Scavo, and Wagner are each a "person acting on behalf of the employer" and each a "person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance" within the meaning of the statute. Kao, as CEO, Maroney, as President and COO, Scavo, as CIO, and Wagner, as CHRO, personally directed and participated in the retaliatory conduct described herein while acting in their capacities as Alignment's most senior officers.

210.   Kardes engaged in protected activity under Labor Code § 1102.5(b) through the disclosures described in ¶ 182 above, each of which constituted a disclosure of information to a person with authority over the employee—specifically, to CEO Kao, CIO Scavo, Maroney, Wagner, and the SVP of Finance Ropp—regarding conduct that Kardes reasonably believed disclosed violations of state and federal statutes and regulations.

211.   Kardes had reasonable cause to believe that the information he disclosed revealed violations of the state and federal statutes and regulations identified in ¶ 183, and additionally: (a) Generally Accepted Accounting Principles, specifically ASC 350-40, governing the capitalization of costs associated with internal-use software development; and (b) California Corporations Code § 25401 (prohibiting materially misleading statements in connection with the offer or sale of securities) and § 25501 (civil liability for violations thereof). Kardes's reasonable cause is established by the facts set forth in ¶¶ 183-184 above.

212.   Kardes's belief was objectively reasonable for the reasons set out in ¶¶ 183-184 above. Kardes had direct operational knowledge of the actual work performed by DTS personnel and personally confirmed with team leaders that maintenance, production support, bug fixes, and other day-to-day operational activities were being classified as capital expenditures in violation of ASC 350-40. DTS leaders informed Kardes that they had been pressured by DTS Finance to capitalize all hours regardless

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

of actual work performed, and that employees had been asked to change their timesheets retrospectively. Kardes understood that the approximately $8–10 million misclassification inflated the Company's headline Adjusted EBITDA metric by an amount sufficient to convert the Company's first-ever positive EBITDA ($1.3 million) into a negative result, and that the inflated figures had been reported to investors and the SEC and used to determine executive compensation. Kardes's concerns were independently corroborated by the SVP of Finance, who agreed that the irregularities required immediate review and correction.

213.    In direct retaliation for Kardes's protected disclosures, Defendants subjected Kardes to the adverse employment actions described in ¶ 186 above, each of which independently constitutes an adverse employment action under Labor Code § 1102.5. Kardes's protected disclosures were a contributing factor in each of the adverse employment actions described above.

214.    Kardes's protected disclosures were a contributing factor in each adverse action, as established by the facts set forth in ¶¶ 187-188 above. In addition, the first adverse action occurred within 14 days of Kardes's March 18 reporting of the accounting irregularities to Kao — well within the 90-day window that creates a rebuttable presumption of retaliation under Labor Code § 1102.5, as amended by SB 497 (2023), effective January 1, 2024.

215.    Pursuant to California Labor Code § 1102.5(f), each Defendant is liable for a civil penalty not exceeding $10,000 per employee for each violation of § 1102.5. The adverse actions described above constitute multiple separate violations of the statute, each independently subject to the civil penalty.

216.    As a direct and proximate result of Defendants' violations of California Labor Code § 1102.5, Kardes has suffered and continues to suffer damages including, but not limited to:

    a.    Front pay in lieu of reinstatement;

-57-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

    b. Lost compensation, including back pay with interest from the date of constructive termination;

    c. Lost equity compensation, including forfeited PSUs and RSUs;

    d. Unpaid earned 2024 performance bonus;

    e. Unpaid severance under the Employment Agreement;

    f. Compensatory damages, including compensation for emotional distress, reputational harm, and damage to professional standing;

    g. Civil penalties of up to $10,000 per violation pursuant to Labor Code § 1102.5(f);

    h. Reasonable attorney's fees pursuant to Labor Code § 1102.5(j);

    i. Punitive damages; and

    j. Such other and further relief as this Court deems just and proper.

## COUNT IV

### Breach of Employment Agreement

### (Against Alignment Healthcare, Inc. and Alignment Healthcare USA, LLC)

217. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

218. On or about April 11, 2021, Kardes and Alignment Healthcare USA, LLC (the "Employer") entered into a written Employment Agreement (the "Agreement"). The Agreement is governed by California law. Alignment Healthcare, Inc., as the parent entity that controlled Kardes's employment relationship and the entity whose officers directed the conduct at issue, is bound by and liable for breaches of the Agreement.

219. The Agreement is a valid and enforceable contract. Kardes performed his obligations under the Agreement, or was excused from performance by Alignment's prior material breaches.

220. Section 3 of the Agreement provides that during the Employment Period, Kardes "shall have the usual and customary duties, responsibilities and authority of

such position." Section 3 further provides that Kardes "hereby accepts such employment and positions and agrees to diligently and conscientiously devote Employee's full and exclusive business time, attention, and best efforts in discharging and fulfilling Employee's duties and responsibilities hereunder." The Agreement thus establishes a mutual obligation: Alignment was required to provide Kardes with the duties and authority commensurate with his position, and Kardes was required to devote his full efforts to those duties.

221.   Alignment materially breached Section 3 by systematically stripping Kardes of virtually all of his duties, responsibilities, and authority from April 1 through to the Company's April 14 internal announcement of his departure and April 15 Form 8-K publicly announcing his immediate resignation as an officer. Specifically, Alignment: (a) cancelled Kardes's planned elevation into a President or COO-type role and reversed the DTS transition and broader expansion of authority that Kao had directed over the preceding three months (April 1); (b) removed Kardes from leadership of AVA 2.0—the platform he had designed and built—and, as Kardes learned from colleagues, asked another executive to lead it (April 2); (c) directed the transfer of Kardes's AI and Data Science responsibilities to Scavo (April 8); and (d) stripped Kardes of nearly all meaningful responsibilities (April 8). By April 8, 2025, Kardes's remaining duties bore no resemblance to the "usual and customary duties, responsibilities and authority" of his executive role, nor to the core areas of expertise and enterprise responsibility for which Alignment had hired, promoted, and repeatedly relied upon him, including data science, artificial intelligence, technology, AVA, and enterprise transformation—areas Kao himself had publicly endorsed as central to Kardes's leadership. The April 14 internal announcement and April 15 Form 8-K then consummated that course of conduct by publicly and internally severing Kardes from the role and authority he had held. The stripping of duties was not a good-faith reassignment. Alignment's breach of Section 3 was material.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

222.   Section 4(b) of the Agreement provides that Kardes "shall be eligible to receive a cash bonus" based on the achievement of performance goals, with a Target Bonus Percentage of 50% and a Maximum Bonus Percentage of 100% of Base Salary. Alignment subsequently increased Kardes's annual bonus opportunity to 85% of Base Salary at target and 170% of Base Salary at maximum, as reflected in the Company's public proxy disclosures identifying Kardes as a Named Executive Officer. Section 4(b) further provides that the Bonus is payable "within 30 days following the rendering of the Employer's audited financial statements for the relevant calendar year, but not later than June 1st of the year immediately following such relevant calendar year."

223.   Kardes earned a 2024 performance bonus. In March 2025, the Compensation Committee certified that the FY2024 AIP funded at 141.7% of target, and Kardes was informed that his PSU award for 2024 performance had been set at 116.8% of target. The initial part of Kardes's 2024 bonus was paid, but Alignment failed to pay the remaining part. Under Section 4(b), the full 2024 bonus was due no later than June 1, 2025. Alignment paid only the initial portion of Kardes's earned 2024 bonus, withholding the remaining portion. To the extent Alignment characterizes the unpaid portion as subject to a "CMS Star Ratings adjustment" or "holdback," that characterization does not reflect any genuine dispute over Kardes's entitlement, and Alignment did not pay the withheld portion even by the fourth-quarter-2025 holdback date described in its own public proxy disclosures. Alignment's failure to pay the remaining portion of the earned bonus constitutes a breach of Section 4(b) and a further retaliatory adverse action following Kardes's protected disclosures and constructive discharge.

224.   Section 4(c) of the Agreement provides that during the Employment Period, Kardes shall be subject to the Employer's benefit plans and arrangements. Alignment's 401(k) plan provides for employer matching contributions of up to 4% of eligible compensation. Alignment withheld 401(k) contributions from Kardes's compensation that were never transferred to his retirement account. This failure to

-60-

remit withheld 401(k) contributions constitutes a breach of Section 4(c) and the incorporated benefit plan terms.

225.   Section 6(c) of the Agreement provides that in the event of (i) a termination by the Employer without Cause, (ii) resignation by the Employee with Good Reason, or (iii) delivery by the Employer of a Notice of Nonrenewal, the Employer shall pay or provide to the Employee the Severance Benefits, consisting of: (i) severance pay equal to 1.0 times the sum of Base Salary paid in substantially equal installments over 12 months; (ii) a pro rata amount of the Bonus for the calendar year in which the Termination Date occurs; and (iii) 12 months of COBRA premium reimbursement. Alignment subsequently enhanced the severance benefits applicable to Kardes, as reflected in its public proxy disclosures, to provide that (i) the severance payment would equal 1.0 times the sum of Base Salary and the target annual cash incentive bonus, and (ii) a pro rata portion of the annual cash incentive bonus for the year of termination, determined after year-end based on the amount Kardes would have received had his employment not been terminated.

226.   Kardes's departure constituted either a termination without Cause or a resignation with Good Reason, either of which triggers Section 6(c). The Agreement defines "Good Reason" to include, at clause (ii), "a material breach by the Employer of this Agreement." Alignment's stripping of Kardes's duties in violation of Section 3 constituted a material breach triggering Good Reason. Alignment's subsequent failure to pay his earned bonus in violation of Section 4(b) independently constituted an additional material breach triggering Good Reason. Moreover, Kardes's constructive discharge, through Alignment's deliberate creation of intolerable working conditions to force his departure, is properly characterized as a termination without Cause, because the Company engineered the resignation rather than simply accepting a voluntary departure.

227.   Alternatively, to the extent Alignment contends it terminated Kardes for Cause, Section 12 of the Agreement provides that if "it is subsequently determined by

-61-

a court of competent jurisdiction, as the case may be, that the Employer did not have Cause for the termination, then for purposes of this Agreement, the Employer's decision to terminate shall be deemed to have been a termination without Cause, and the Employer shall be obligated to pay the Severance Benefits specified under Section 6(c)." No Cause existed for Kardes's termination. Kardes engaged in no misconduct; he reported what he reasonably believed to be a material accounting misclassification. Alignment would therefore be obligated to pay Section 6(c) Severance Benefits under Section 12.

228. With respect to the Good Reason cure procedure, the Agreement provides that Good Reason "shall not be Good Reason" unless, within 60 days of the triggering event, the Employee notifies the Employer in writing and the Employer fails to correct the circumstance within 60 days. Alignment is estopped from enforcing this procedural requirement because Alignment's own conduct made compliance with the cure procedure futile, in that Kao stated that the reorganization was final ("Well I've changed it now"). Wagner likewise told Kardes that "everything was final and nothing would change," and, when Kardes stated that it is not acceptable and he needed to discuss the matter directly with Kao, Wagner responded that it "would not change anything." The April 14 internal announcement and the subsequent April 15 8-K filing publicly and irrevocably terminated Kardes's officer status, thereby rendering the cure period futile and moot.

229. Section 6(a) of the Agreement provides that upon termination for any reason the Employee shall receive "the unpaid portion of the Base Salary and paid time off accrued and payable through the Termination Date." To the extent Alignment withheld any accrued and unpaid Base Salary, paid time off, or other amounts due through May 16, 2025, including the 401(k) contributions deducted but not remitted, Alignment breached Section 6(a).

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

230.   As a direct and proximate result of Alignment's breaches of the Employment Agreement, Kardes has suffered and continues to suffer damages including, but not limited to:

    a.  Severance pay pursuant to Section 6(c)(i), as subsequently enhanced and reflected in Alignment's public proxy disclosures, equal to 1.0 times the sum of Kardes's Base Salary and target annual cash incentive bonus;

    b.  A pro rata annual cash incentive bonus for calendar year 2025, determined after year-end based on the amount Kardes would have received had his employment not been terminated, pursuant to Section 6(c)(ii) and the enhanced severance terms reflected in Alignment's public proxy disclosures;

    c.  12 months of COBRA premium reimbursement pursuant to Section 6(c)(iii);

    d.  The remaining unpaid portion of the earned 2024 performance bonus pursuant to Section 4(b);

    e.  Withheld 401(k) contributions that were never remitted to Kardes's retirement account;

    f.  Any accrued and unpaid Base Salary and paid time off through the Termination Date pursuant to Section 6(a);

    g.  Interest on all unpaid amounts; and

    h.  Such other and further relief as this Court deems just and proper.

## COUNT V

## Wrongful Termination in Violation of Public Policy

## (Against Alignment and Alignment USA)

231.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

232.   This Count is pleaded under Washington common law as Plaintiff's primary public-policy wrongful-discharge claim. To the extent the Court determines

that California law governs this claim, Plaintiff pleads the California common-law claim for wrongful termination in violation of public policy (Count VI) in the alternative; to the extent the Court determines that Washington law governs, Plaintiff pleads this Count as controlling.

233. Under Washington common law, an employer may not discharge an employee for reasons that contravene a clear mandate of public policy. Such a claim sounds in tort and permits recovery of compensatory damages, including lost compensation and damages for emotional distress and reputational harm.

234. Alignment and Alignment USA jointly employed Kardes throughout his tenure with the Company. At all relevant times, Kardes resided in and performed his work for Alignment from the State of Washington, and the retaliatory conduct alleged herein was directed at and experienced by Kardes in Washington.

235. An employer-employee relationship existed between Kardes and Alignment at all relevant times. Kardes was employed by Alignment from January 2019 through May 16, 2025, serving in a series of increasingly senior executive roles and performed his duties remotely from Washington during the period relevant to this claim.

236. Kardes's constructive discharge contravened clear mandates of Washington (and federal) public policy embodied in, among other sources:

237. *The Securities Act of Washington*, *Wash. Rev. Code Ann. § 21.20.010*. The State of Washington, through the Securities Act of Washington, has made it unlawful to engage in fraud or to make untrue statements or material omissions in connection with the offer, sale, or purchase of securities (Wash. Rev. Code Ann. § 21.20.010), reflecting Washington's clear and substantial public policy against securities fraud and in favor of accurate financial disclosure;

238. *The Washington Whistleblower Award and Protection Act, Wash. Rev. Code Ann. § 21.40*. The State of Washington enacted the Whistleblower Award and Protection Act (effective July 23, 2023) in an effort to protect internal reporters of

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

securities-law violations. In so doing, Washington has declared a clear and fundamental public policy protecting whistleblowers who expose financial fraud, given the impact of such financial fraud on the investing public, market integrity, and the safeguarding of accurate financial disclosures upon which millions of investors rely.

239.    *Sarbanes-Oxley Act Section 806, 18 U.S.C. § 1514A.* Congress enacted Section 806 to protect employees of publicly traded companies who report conduct that they reasonably believe constitutes a violation of the federal securities laws, SEC rules or regulations, or any provision of federal law relating to fraud against shareholders. The public policy of protecting corporate whistleblowers who expose financial fraud is fundamental and substantial—it serves the investing public, promotes market integrity, and safeguards the accuracy of financial disclosures upon which millions of investors rely.

240.    *The Securities Exchange Act of 1934, including Section 10(b) and Rule 10b-5.* The accurate reporting of financial results by publicly traded companies is a fundamental public policy of both federal and Washington law. The misclassification of material expenses to inflate reported financial metrics implicates the public's interest in honest securities markets.

241.    Each of these public policies is clear, well-established, and fundamental. Each is grounded in constitutional or statutory provisions rather than derived solely from regulatory or ethical principles, inures to the benefit of the public at large, and not merely to Kardes; and was firmly established at the time of Kardes's constructive discharge in 2025.

242.    Kardes's conduct of reporting on what he reasonably believed to be employer misconduct and potential accounting and/or securities fraud, i.e., whistleblowing, falls within a category of activity Washington courts have long recognized as protected by the public-policy tort.

243.    Alignment constructively discharged Kardes. Alignment deliberately created, and knew or should have foreseen that its conduct would create, working

conditions so intolerable that a reasonable person in Kardes's position would have felt compelled to resign, and Kardes did resign as a result, as alleged in the constructive-discharge paragraphs above. The constructive discharge was consummated by Defendants' final and irrevocable acts on April 14–15, 2025; Kardes's last day of employment was May 16, 2025.

244. Kardes's protected whistleblowing activity was a cause of his constructive discharge. The violation of the public policies identified above was a substantial motivating reason for Alignment's adverse actions, as demonstrated by the following:

245. *Temporal proximity*. Kardes's most significant protected disclosures occurred on or about March 18, 2025, when he reported the $8–10 million CapEx-to-OpEx misclassification and related GAAP violations to Kao, Alignment's Chief Executive Officer. Within approximately two weeks—on April 1, 2025—Defendants began systematically dismantling Kardes's role. The retaliation accelerated over the following days through orders stripping him of core responsibilities on April 8, 2025, and culminated in the Company's April 14 internal announcement of his departure and April 15 Form 8-K publicly announcing his immediate resignation as an officer.

246. *Reversal of the promised promotion and role expansion*. From December 2024 through mid-March 2025, Kao actively promoted Kardes's expansion into an expanded Chief Transformation Officer role and planned elevation into a President of AVA Technologies or enterprise Chief Operating Officer role. This trajectory reversed abruptly after Kardes's March 18 protected disclosure, escalated through the stripping of his responsibilities, and culminated in the Company's April 14 internal announcement and April 15 Form 8-K.

247. *Punitive intent*. Kao stated on April 8, 2025, that he blamed Kardes directly for Sam's and Slimi's resignations (even after both rejected Kao's offers of significant promotions and compensation increases to remain at the Company), claiming that Kardes had "promised them the world" but failed to deliver.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

248. *Pretextual justifications*. Alignment's 8-K characterized Kardes's departure as a voluntary resignation "to pursue other professional opportunities," but failed to disclose the retaliatory circumstances that compelled it.

249. *Institutional motive*. Kardes's disclosures threatened the financial interests of Alignment's senior executives. The $8–10 million misclassification artificially inflated Adjusted EBITDA, which was the dominant performance metric driving executive compensation under the AIP (weighted at 35% for FY2024) and PSU awards (weighted at 50% under the March 2024 formula change). Correcting the misclassification would have reduced incentive payouts to the individual defendants.

250. *Pattern of escalating retaliation*. The adverse actions followed a pattern of escalation that tracked Kardes's continued whistleblowing: denial of pending promotions and suppression of documentation in late March 2025, systematic duty-stripping in April 2025, and constructive termination in April–May 2025.

251. *Disparate treatment*. Kardes was the only senior executive who raised concerns about the CapEx/OpEx misclassification. He was also the only C-suite officer who was subjected to duty-stripping and forced resignation. Scavo, the Chief Information Officer who exercised authority over DTS budgets, project classifications, and the capitalization processes at issue, remained in his position and was not subjected to any adverse action; instead, core responsibilities taken from Kardes were given to Scavo.

252. *Post-resignation retaliation*. After Kardes resigned, Alignment filed an 8-K on April 15, 2025, that publicly announced Kardes's departure without disclosing the retaliatory circumstances, effectively controlling the narrative and damaging Kardes's professional reputation. Kao also made post-resignation threats regarding Kardes's restrictive covenants.  Kao, Maroney, and Scavo, acting as officers and managing agents of Alignment, directly committed, authorized, and ratified the retaliatory conduct.

-67-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

253.   Discouraging the conduct in which Kardes engaged would jeopardize the public policies identified above, and no adequate alternative means exists that would render this common-law remedy unnecessary. The statutory remedies protecting these policies are not exclusive. Wash. Rev. Code Ann. § 21.40.090(10) expressly provides that nothing in that chapter diminishes any other right or remedy, and Section 806 of the Sarbanes-Oxley Act is likewise non-exclusive. This common-law claim is therefore available in addition to Kardes's statutory claims.

254.   Defendants had no overriding justification for Kardes's constructive discharge. Kardes's reporting of suspected securities law and accounting violations was conduct the public policies identified above are designed to protect, and no legitimate business interest overrode Alignment's obligation not to retaliate against him for it. Defendants' lack of any overriding justification is confirmed by the following:

255.   *Absence of any performance or misconduct rationale*. In the months, weeks, and days before his March 18, 2025 report, Kardes received uniformly exceptional performance reviews, repeated promotions, a Performance Share Unit award at 116.8% of target, a written commendation from Kao and the Board, and public praise from Kao, including as recently as March 4 and March 17, 2025. Kardes engaged in no misconduct and committed no performance failure that could justify the reversal of his promised promotion, the stripping of his responsibilities, or his constructive discharge.

256.   *No explanation offered*. When Kardes asked why his responsibilities were being removed, Kao refused to give any legitimate, non-retaliatory reason, stating only, "Well I've changed it now—this is the new direction. What are you going to do?" and attributing the decision vaguely to conversations with "a few board members." When Kardes asked whether there were any performance concerns, he was told there were none.

257.   *The Board was unaware of any justification*. On April 4, 2025, then-Chairman Joseph Konowiecki confirmed to Kardes that the Board was unaware of any

performance issues concerning Kardes or of any basis for Kao's abrupt cancellation of the DTS transition.

258. *The proffered rationale was pretextual.* To the extent Defendants blamed Kardes for the resignations of Georgie Sam and Moez Slimi, that justification was false. It was Kao, not Kardes, who had promised Sam and Slimi promotions and compensation to retain them, and Kao shifted blame to Kardes only after both declined his offers. The Company's Form 8-K likewise characterized Kardes's departure as a voluntary resignation "to pursue other professional opportunities," omitting the retaliatory circumstances that in fact compelled it.

259. *Disparate treatment.* Scavo, who oversaw the DTS division and the CapEx/OpEx classification practices Kardes reported, suffered no adverse action and remained employed as Chief Information Officer, while Kardes, who reported the misclassification, was constructively discharged. This disparity further demonstrates the absence of any legitimate justification for the actions taken against Kardes.

260. As a direct and proximate result of Defendants' wrongful discharge of Kardes in violation of public policy, Kardes has suffered and continues to suffer damages, including but not limited to:

    a. Front pay in lieu of reinstatement;

    b. Lost compensation, including salary, bonuses, and benefits from the date of constructive discharge;

    c. Lost equity compensation, including PSUs and RSUs that would have vested but for the wrongful termination;

    d. Compensatory damages for emotional distress, humiliation, anxiety, and mental anguish;

    e. Damage to Kardes's professional reputation and career;

    f. Interest on all amounts due; and

    g. Such other and further relief as this Court deems just and proper.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

# COUNT VI

## Wrongful Termination in Violation of Public Policy

## Pleaded in the Alternative to Count V

## (Against Alignment and Alignment USA)

261. Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

262. This Count is pleaded in the alternative to Count V. To the extent the Court determines that California law governs, Plaintiff asserts this California common-law claim; to the extent the Court determines that Washington law governs, Count V controls and this Count is pleaded as an alternative.

263. Under California common law, an employer may not discharge an employee in violation of a fundamental public policy of this state. Such a claim sounds in tort and permits recovery of compensatory damages, emotional distress damages, and punitive damages.

264. Alignment and Alignment USA jointly employed Kardes throughout his tenure at the Company. Alignment USA is a wholly owned subsidiary of Alignment.

265. Kardes's termination violated fundamental public policies embodied in the following constitutional and statutory provisions:

266. *Sarbanes-Oxley Act Section 806, 18 U.S.C. § 1514A.* Congress enacted Section 806 to protect employees of publicly traded companies who report conduct that they reasonably believe constitutes a violation of the federal securities laws, SEC rules or regulations, or any provision of federal law relating to fraud against shareholders. The public policy of protecting corporate whistleblowers who expose financial fraud is fundamental and substantial—it serves the investing public, promotes market integrity, and safeguards the accuracy of financial disclosures upon which millions of investors rely.

-70-

267.    *California Labor Code § 1102.5*. Section 1102.5 prohibits employers from retaliating against employees who disclose information to persons with authority over the employee where the employee has reasonable cause to believe the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. The California Legislature has declared that the protection of whistleblowers is a fundamental public policy of this state. Cal. Lab. Code § 1102.5(a)–(c).

268.    *The Securities Exchange Act of 1934, including Section 10(b) and Rule 10b-5*. The accurate reporting of financial results by publicly traded companies is a fundamental public policy of both federal and California law. The misclassification of material expenses to inflate reported financial metrics implicates the public's interest in honest securities markets.

269.    Each of these public policies satisfies the four requirements required for this claim: (1) each is supported by constitutional or statutory provisions rather than derived solely from regulatory or ethical principles; (2) each inures to the benefit of the public at large, not merely to Kardes individually; (3) each was well-established at the time of Kardes's constructive discharge in 2025; and (4) each is fundamental and substantial.

270.    Kardes was employed by Alignment from January 2019 through May 16, 2025, serving in a series of increasingly senior executive roles. An employer-employee relationship existed between Kardes and Alignment at all relevant times.

271.    Alignment constructively discharged Kardes. A constructive discharge constitutes a termination for purposes of this claim. Alignment deliberately created working conditions so intolerable that a reasonable person in Kardes's position would have felt compelled to resign. Specifically, from April 1 onwards, Alignment: (a) reversed the Chief Transformation Officer expansion that Kao had directed over the preceding three months; (b) removed Kardes from AVA 2.0—the platform he had conceived, designed, and built; (c) transferred Kardes's AI and Data Science

responsibilities to Scavo; (d) stripped Kardes of all meaningful CTO responsibilities; (e) offered Kardes only a demeaning "head of Stars litigation" role that bore no resemblance to his contracted position; (f) arranged for Kao's personal security guard to attend the April 7 meeting and sit directly behind Kardes—an extraordinary and intimidating measure that caused Kardes reasonably to perceive that the meeting had been staged to facilitate his immediate removal if he objected to or challenged the decisions being imposed on him; and (g) Kao's comments on April 8, 2025 that placed blame on Kardes for Sam's and Slimi's resignations. Kardes's constructive discharge was consummated by Defendants' final and irrevocable acts on April 14–15, 2025; his last day of employment was May 16, 2025.

272. Alignment's constructive discharge of Kardes was substantially motivated by Kardes's protected whistleblowing activity. The violation of the public policies identified above was a substantial motivating reason for Alignment's adverse actions, as demonstrated by the following:

273. *Temporal proximity*. Kardes's most significant protected disclosures occurred on or about March 18, 2025, when he reported the $8–10 million CapEx-to-OpEx misclassification and related GAAP violations to Kao, Alignment's Chief Executive Officer. Within approximately two weeks—from April 1, 2025—Defendants began systematically dismantling Kardes's role. The retaliation accelerated over the following days through orders stripping him of core responsibilities on April 8, 2025, and culminated in the Company's April 14 internal announcement of his departure and April 15 Form 8-K publicly announcing his immediate resignation as an officer.

274. *Reversal of the promised promotion and role expansion*. From December 2024 through mid-March 2025, Kao actively promoted Kardes's expansion into an expanded Chief Transformation Officer role and planned elevation into a President of AVA Technologies or enterprise Chief Operating Officer role. This trajectory reversed abruptly after Kardes's March 18 protected disclosure, escalated through the stripping

-72-

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE,
UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

of his responsibilities, and culminated in the Company's April 14 internal announcement and April 15 Form 8-K.

275.   *Punitive intent*. Kao stated on April 8, 2025, that he blamed Kardes directly for Sam's and Slimi's resignations (even after both rejected Kao's offers of significant promotions and compensation increases to remain at the Company), claiming that Kardes had "promised them the world" but failed to deliver.

276.   *Pretextual justifications*. Alignment's 8-K characterized Kardes's departure as a voluntary resignation "to pursue other professional opportunities," but failed to disclose the retaliatory circumstances that compelled it.

277.   *Institutional motive*. Kardes's disclosures threatened the financial interests of Alignment's senior executives. The $8–10 million misclassification artificially inflated Adjusted EBITDA, which was the dominant performance metric driving executive compensation under the AIP (weighted at 35% for FY2024) and PSU awards (weighted at 50% under the March 2024 formula change). Correcting the misclassification would have reduced incentive payouts to the individual defendants.

278.   *Pattern of escalating retaliation*. The adverse actions followed a pattern of escalation that tracked Kardes's continued whistleblowing: denial of pending promotions and suppression of documentation in late March 2025, systematic duty-stripping in April 2025, pressure not to take actions that could harm Alignment's stock price, while invoking Kardes's vested equity as leverage and constructive termination in April–May 2025.

279.   *Disparate treatment*. Kardes was the only senior executive who raised concerns about the CapEx-to-OpEx misclassification. He was also the only C-suite officer who was subjected to duty-stripping and forced resignation. Scavo, the Chief Information Officer who exercised authority over DTS budgets, project classifications, and the capitalization processes at issue, remained in his position and was not subjected to any adverse action; instead, core responsibilities taken from Kardes were directed to Scavo.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

280. *Post-resignation retaliation*. After Kardes resigned, Alignment filed an 8-K on April 15, 2025, that publicly announced Kardes's departure without disclosing the retaliatory circumstances, effectively controlling the narrative and damaging Kardes's professional reputation. Kao also made post-resignation threats regarding Kardes's restrictive covenants.  Kao, Maroney, and Scavo, acting as officers and managing agents of Alignment, directly committed, authorized, and ratified the retaliatory conduct, and their conduct satisfies the California Civil Code § 3294(a) malice/oppression standard.

281. As a direct and proximate result of Defendants' wrongful termination in violation of public policy, Kardes has suffered and continues to suffer damages including, but not limited to:

    a. Front pay in lieu of reinstatement;

    b. Lost compensation, including salary, bonuses, and benefits from the date of constructive discharge;

    c. Lost equity compensation, including PSUs and RSUs that would have vested but for the wrongful termination;

    d. Compensatory damages for emotional distress, humiliation, anxiety, and mental anguish;

    e. Damage to Kardes's professional reputation and career;

    f. Punitive damages under California Civil Code § 3294, in an amount appropriate to punish Alignment and to deter similar conduct, based on Alignment's oppressive, fraudulent, and malicious conduct in retaliating against Kardes for his good-faith reporting of suspected securities law violations and financial fraud;

    g. Interest on all amounts due; and

    h. Such other and further relief as this Court deems just and proper.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

## COUNT VII

### Violation of Washington Wage Statutes — Willful Withholding of Wages

### (Wash. Rev. Code Ann. §§ 49.52.050, 49.52.070, 49.48.010 and 49.48.030)

### (Against Alignment Healthcare, Inc. and Alignment Healthcare USA, LLC)

282.   Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

283.   At all relevant times, Kardes resided in and performed his work for Alignment from the State of Washington, he earned his wages in Washington, and Washington's wage-protection statutes govern the payment of his wages.

284.   At all relevant times, Kardes was an "employee," and Alignment was an "employer," within the meaning of Wash. Rev. Code Ann. § 49.48 and 49.52.

285.   Under Wash. Rev. Code Ann. § 49.48.010, upon the end of employment an employer must pay the employee all wages due. Under Wash. Rev. Code Ann. § 49.52.050(2), it is unlawful for any employer, or any officer, vice principal, or agent of the employer, who "wilfully and with intent to deprive the employee of any part of his or her wages, [to] pay any employee a lower wage than the wage such employer is obligated to pay."

286.   Under Wash. Rev. Code Ann. § 49.52.070, any employer or officer, vice principal, or agent who violates Wash. Rev. Code Ann. § 49.52.050(1) or (2) is liable to the aggrieved employee for twice the amount of the wages unlawfully withheld as exemplary damages, together with costs of suit and reasonable attorneys' fees.

287.   Alignment failed to pay Kardes wages that were due and owing, specifically the remaining unpaid portion of Kardes's earned 2024 performance bonus. That portion became due and payable after the Compensation Committee certified the FY2024 Annual Incentive Plan at 141.7% of target, and Alignment paid the initial portion of the bonus, thereby acknowledging Kardes's entitlement to it. Alignment did not pay the remaining portion by June 1, 2025 — the outside payment date expressly stated in Section 4(b) of the Employment Agreement — and did not pay it at any time

thereafter, including by the fourth quarter of 2025, the later date on which the Company's own public proxy disclosures represented that any held-back amounts would be paid.

288.   Earned performance-based compensation of this kind constitutes wages, and amounts deducted from an employee's pay but not remitted are wages unlawfully withheld. These wages remained unpaid at the end of Kardes's employment on May 16, 2025.

289.   Alignment's failure to pay these wages was willful and with intent to deprive Kardes of his wages. The withholding was volitional and was not the result of any bona fide dispute over Kardes's entitlement. The Company itself certified the 2024 bonus and paid the first half, then withheld the second half in the wake of Kardes's protected reporting. There is no bona fide dispute as to the amount of wages owed or to the fact that Kardes was an employee owed these wages.

290.   As a direct and proximate result of Defendants' violations, Kardes is entitled to recover the full amount of the unpaid wages; an additional equal amount as exemplary (double) damages under Wash. Rev. Code Ann. § 49.52.070, his costs of suit and reasonable attorneys' fees under Wash. Rev. Code Ann. §§ 49.52.070 and 49.48.030, and prejudgment interest.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Hakan Kardes respectfully prays for judgment against Defendants Alignment Healthcare, Inc., Alignment Healthcare USA, LLC, John Kao, Dawn Maroney, Robert Scavo, and Andreas Wagner, jointly and severally where applicable, as follows:

1.    Front pay, including, but not limited to, lost future base salary, annual incentive compensation, long-term incentive compensation, equity awards, retirement plan contributions, employee benefits, and other perquisites of employment;

COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE,
UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT

2. Back pay with interest, including, but not limited to, all lost base salary, unpaid wages, annual incentive compensation, long-term incentive compensation, equity awards and vesting, retirement plan contributions, employee benefits, and other compensation;

3. Any damages multipliers for back pay otherwise owed, including multipliers available pursuant to Wash. Rev. Code Ann. §§ 21.40.090(6)(b) and 49.52.070;

4. All compensatory damages, including, but not limited to, damages for emotional distress, reputational harm, loss of career advancement opportunities, damage to professional standing, and other consequential damages;

5. Special damages pursuant to 18 U.S.C. § 1514A(c)(2)(C);

6. All amounts due under the Employment Agreement, including, but not limited to severance, unpaid bonus, accrued compensation, COBRA reimbursement, and withheld 401(k) contributions;

7. Punitive damages pursuant to California Civil Code § 3294;

8. Civil penalties pursuant to California Labor Code § 1102.5(f);

9. Reasonable attorneys' fees, expert witness fees, costs, and expenses pursuant to 18 U.S.C. § 1514A(c)(2)(C), California Labor Code § 1102.5(j), Wash. Rev. Code Ann. §§ 21.40.090(6)(c), 49.52.070 and 49.48.030, and any other applicable provision of law;

10. Pre-judgment and post-judgment interest at the maximum rate permitted by law; and

11. Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b) and 18 U.S.C. § 1514A(b)(2)(E), Plaintiff hereby demands a trial by jury on all claims and issues so triable.

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE, UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

Dated: July 7, 2026          By:     */s/ Brenton R. Babcock*
                                     **STERLINGTON, PLLC**
                                     Brenton R. Babcock (State Bar No. 162,120)
                                     Jonathan Sherman (*pro hac vice forthcoming*)
                                     Jesse Sherrett (*pro hac vice forthcoming*)
                                     Patrick McDonough (*pro hac vice forthcoming*)
                                     530 Fifth Avenue, Suite 804
                                     New York, New York 10036
                                     Tel: (212) 433-2993
                                     brent.babcock@sterlingtonlaw.com
                                     jonathan.sherman@sterlingtonlaw.com
                                     jesse.sherrett@sterlingtonlaw.com
                                     patrick.mcdonough@sterlingtonlaw.com

                                     *Counsel for Plaintiff*

-78-

**COMPLAINT FOR WHISTLEBLOWER RETALIATION, WRONGFUL DISCHARGE,
UNPAID WAGES, AND BREACH OF EMPLOYMENT AGREEMENT**

-79-

# EXHIBIT A

John's LinkedIn post: https://www.linkedin.com/posts/johnkao1_the-30-young-leaders-who-are-forging-a-new-activity-7099452711946883072-GaV_

 **John Kao** 🔗 · 1st
Founder and CEO at Alignment Health
1yr · Edited · 🌐

Well-deserved recognition to **Hakan Kardes**, **Alignment Health**'s Chief Technology and Experience Officer, who was named one of **Business Insider**'s 30 Leaders Under 40 to watch in the healthcare industry.

Beyond his brilliance in data science, I've seen up close Hakan's serving heart and commitment to our seniors. In addition to serving as our technology lead, he recently took on additional responsibilities to lead our Member Services team, ensuring that every decision and every interaction with our members counts.

**#healthcare #leaders #gratitude**

**https://lnkd.in/ggPJxrSU**

 **The 30 young leaders who are forging a new future for the healthcare industry in 2023**
businessinsider.com

 94                                                          8 comments

Reactions

        +86

-81-

# EXHIBIT B

**8/2023: Business Insider**



**Hakan Kardes, 36, is using data and AI to help clinicians provide proactive care to seniors.**



**Kardes is the chief technology and experience officer at Alignment Health.**
Alignment Health

A common gripe about the US healthcare system is that a patient's data is often scattered in different places that don't communicate with each other.

That can make it tough for a single healthcare provider to get a complete picture of a patient's health, leading to redundant tests and a frustrating experience.

"There are so many different silos of data. All these different entities are disconnected, and it puts seniors in a very tough situation to navigate all this," said Kardes, the chief technology and experience officer at Alignment Health, an insurer that serves seniors enrolled in the privatized version of Medicare.

Kardes is the lead architect behind AVA, the proprietary technology that powers the insurance company. His goal in building it was to break down those data silos, allowing Alignment to take better care of its members.

AVA — short for Alignment's Virtual Application — gathers data from hundreds of different sources, such as hospital visits, medical claims, and lab results, to provide an accurate account of a patient.

It then applies more than 200 different AI models to make predictions. It can tell Alignment which members are likely to become hospitalized or develop a chronic disease, for example, and helps clinicians respond.

The company's in-house team of healthcare providers use information from AVA to focus on those high-risk, costly patients and try to keep them healthier and out of the hospital.

Next up, Kardes is exploring ways that new generative-AI technology could save healthcare providers time. A doctor could ask a generative-AI tool for a member's most recent A1C test results and get the answer instantly, rather than having to comb through lab reports, he said.

*— Shelby Livingston*

-84-

 **Alignment Health**
44,316 followers
1yr · 🌐

ICYMI: Alignment Health's Chief Technology and Experience Officer **Hakan Kardes** was named one of **Business Insider**'s 30 Leaders Under 40 to watch in the health care industry! Hakan oversees our data, technology, AI strategy and execution along with our member services teams to ensure the best patient outcomes and experiences. Congrats! **https://lnkd.in/d7ahtVQr**



# CONGRATS

**INSIDER 30 UNDER 40 IN HEALTHCARE**

## Hakan Kardes
Chief Technology and Experience Officer



243                                                          16 comments

**Reactions**

       

Becker's : https://www.beckershospitalreview.com/lists/emerging-leaders-37-vendor-leaders-under-40-2023/

BECKER'S ——
**HOSPITAL REVIEW**      Leadership ∨      Finance ∨      Health IT ∨      Clinical Care ∨      Specialties ∨

# Emerging leaders: 37 healthcare company leaders under 40 | 2023

The emerging leaders of this generation are helping to overcome barriers to care access and health equity. These individuals are leaders within healthcare companies that work to bring innovative products, initiatives and strategies to patients. Becker's is delighted to honor these emerging leaders in healthcare, who are 40 years old or younger and are positively impacting their healthcare companies.

Anna Falvey, Claire Wallace and Zoe McClain  Monday, December 18th, 2023

*Note: This list is not an endorsement of included leaders or healthcare companies. Leaders cannot pay for inclusion on this list. Leaders are presented in alphabetical order. We extend a special thank you to Rhoda Weiss for her contributions to this list. If you have a leader you'd like to suggest, please feel free to contact Anna at the email address below.*

*Thanks to a high volume of nominations this year, we will be releasing multiple categories for this list. Please also refer to our hospital and health system and provider rising stars lists.*

Contact Anna Falvey at afalvey@beckershealthcare.com with questions or comments.

**Hakan Kardes. Chief Technology and Experience Officer of Alignment Health (Orange, Calif.).** As chief technology and experience officer, Mr. Kardes works to build a culture of innovation and transformation in the oversight of approximately 450 employees at Alignment Health, a health maintenance organization partnered with Medicare Advantage. His team is responsible for data, technology, AI strategy and execution, and consumer-centric operations in the delivery of positive outcomes and experiences for senior patients. Mr. Kardes co-led the development of Alignment's proprietary technology platform, AVA, which provides care teams with more accurate, organized and actionable insights into patient data, and utilizes AI-led technology to power over 35 modules and applications for an integrated data solution. The AVA Personalized COVID-19 Assessment tool, also developed by Mr. Kardes and his team, was utilized by Alignment heavily during the height of the COVID-19 pandemic as a questionnaire analysis of individual risk for COVID-19 infection. Before assuming his role at Alignment, Mr. Kardes was vice president of data science and advanced analytics at Cambia Health Solutions.