SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
JASON WEISS, Cal. Bar No. 185268
MEGAN BILBAO, Cal. Bar No. 357247
650 Town Center Drive, 10th Floor
Costa Mesa, CA 92626
Telephone: 714.513.5100
Email: jweiss@sheppard.com
mbilbao@sheppard.com

JOSHUA D. N. HESS, Cal. Bar No. 244115
BRIDGET RUSSELL, Cal. Bar No. 288107
JULIA ANDERSON, Cal. Bar No. 353164
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Telephone: 415.434.9100
Email: jdhess@sheppard.com
brussell@sheppard.com
juanderson@sheppard.com

BRIDGET J. RUSSELL, Cal Bar No. 288107
30 Rockefeller Plaza
New York, NY 10112-0015
Telephone: 212.653.8700
Email: brussell@sheppard.com

*Attorneys for Defendants*
ALIGNMENT HEALTHCARE, INC.,
ALIGNMENT HEALTHCARE USA, LLC,
JOHN KAO, DAWN MARONEY, ROBERT
SCAVO, AND ANDREAS WAGNER

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION**

HAKAN KARDES,

Plaintiff,

v.

ALIGNMENT HEALTHCARE, INC., ALIGNMENT HEALTHCARE USA, LLC, JOHN KAO, DAWN MARONEY, ROBERT SCAVO, AND ANDREAS WAGNER,

Defendants.

Case No. 8:26-cv-01764

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' NOTICE OF MOTION FOR SANCTIONS IN THE AMOUNT OF $14,610 PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE**

Date: October 8
Time: 10:00am PT

Complaint Filed: July 7, 2026
FAC Filed: September 3, 2026

[*Filed concurrently with Notice of Motion and Motion; Declaration of Joshua D. N. Hess; [PROPOSED] Order*]

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ............ 1
II. PROCEDURAL HISTORY ............ 3
III. RELEVANT FACTS ............ 4
  A. Kardes Voluntarily Resigns from Alignment In Response to a Corporate Reorganization. ............ 4
  B. Kardes First Alleges Accounting Irregularities After He Learns He Left Stock Options On The Table Due To His Voluntary Resignation. ............ 5
  C. There Is No Contemporaneous Evidence That Kardes Engaged in Protected Activity, and His Own Allegations Reveal Budget-Correction Discussions Rather Than Reports of Securities Fraud. ............ 8
IV. ARGUMENT ............ 9
  A. Legal Standard ............ 9
  B. The SOX Claim Is Time-Barred On Its Face. ............ 11
  C. The Central Factual Predicate Of The SOX Claim Lacks Any Evidentiary Support. ............ 13
  D. The SOX Claim Is Legally Unreasonable. ............ 14
V. SANCTIONS ARE WARRANTED ............ 15
VI. CONCLUSION ............ 17

# TABLE OF AUTHORITIES

Page(s)

## Federal Cases

*Business Guides, Inc. v. Chromatic Commc'ns Enters.*
498 U.S. 533 (1991) ........ 10, 11

*Cooter & Gell v. Hartmax Corp.*
496 U.S. 384 (1990) ........ 10

*Coppinger-Martin v. Solis*
627 F.3d 745 (9th Cir. 2010) ........ 12

*Draper v. Coeur Rochester, Inc.*
147 F.3d 1104 (9th Cir. 1998) ........ 13

*Est. of Blue v. Cnty. of Los Angeles*
120 F.3d 982 (9th Cir. 1997) ........ 11, 12

*Green v. Brennan*
578 U.S. 547 (2016) ........ 12, 13

*Lake v. Gates*
130 F.4th 1064 (9th Cir. 2025) ........ 11

*Pujol v. McDonald*
2017 WL 1064993 (N.D. Cal. Mar. 21, 2017) ........ 13

*Smith v. Ricks*
31 F.3d 1478 (9th Cir. 1994) ........ 10

*Sneller v. City of Bainbridge Island*
606 F.3d 636 (9th Cir. 2010) ........ 15

*Truesdell v. S. California Permanente Med. Grp.*
209 F.R.D. 169 (C.D. Cal. 2002) ........ 16

*Vinson v. Nielsen*
2018 WL 5617733 (S.D. Cal. Oct. 29, 2018) ........ 13

*Zaldivar v. City of L.A.*
780 F.2d 823 (9th Cir. 1986) ........ 10, 11

Federal: Statutes, Rules, Regulations, Constitutional Provisions

18 U.S.C. § 1514A(b)(2)(D) .......... 2, 7, 12

Fed. R. Civ. P. 11(b) .......... 10

Fed. R. Civ. P. 11(c)(1) .......... 10, 15

Fed. R. Civ. P. 11(c)(2) .......... 10, 16, 17

Fed. R. Civ. P. 11(c)(4) .......... 10

Sarbanes-Oxley Act § 806 .......... 1, 3

SOX .......... 1, 2, 3, 8, 9, 11, 12, 13, 14, 15, 16

Other Authorities

OSHA File No. 301064300 .......... 3

# I. INTRODUCTION

Plaintiff's counsel ("Sterlington") filed the Complaint and First Amended Complaint ("FAC") in this action with full knowledge that Plaintiff Hakan Kardes' ("Plaintiff" or "Kardes") claim under Section 806 of the Sarbanes-Oxley Act ("SOX") (Count 1 in the FAC) is time-barred and devoid of evidentiary and legal support, as set forth in Defendants' pending motion to dismiss. Standing alone, this conduct violates Rule 11 and warrants the imposition of sanctions against Sterlington. Sterlington's conduct, however, is far more egregious – they, with Kardes, have manufactured a case where they know one does not exist. The record is clear that Kardes is not a bona fide whistleblower who suffered adverse employment action because of protected whistleblowing activity. Rather, Kardes voluntarily resigned on amicable terms. But, in doing so, he forfeited severance and equity. In an effort to unwind that forfeiture, Sterlington constructed a false narrative portraying Kardes as a whistleblower who was forced to resign.

This case is a study in reverse engineering, unfortunately led by Sterlington, in an attempt to frame a lawsuit out of whole cloth and secure a financial windfall. Kardes is a computer scientist by training with no background in accounting who voluntarily resigned from Defendant Alignment USA, LLC ("Alignment" or the "Company") after learning that a corporate reorganization would not proceed as he had hoped. It was after the financial consequences of that voluntary departure became apparent that litigation counsel recast Kardes' amicable and voluntary resignation as a constructive discharge and recharacterized routine internal budget discussions as whistleblowing about securities fraud, in a transparent attempt to capture severance and equity-acceleration benefits that Kardes forfeited upon his resignation.

The appearance of Sterlington on the Company's doorstep more than one month after Kardes' cordial resignation email (which email belies the framed SOX claim) underscores the true origins of Kardes' unsupported allegations of whistleblowing and retaliatory discharge. Sterlington first delivered the conclusory

allegations simultaneously with a demand to open settlement discussions. As Alignment had no information to substantiate the allegations, it rebuffed Sterlington's overture as premature, and advised them that the Company would investigate the allegations first. Alignment, through counsel, requested details from Sterlington and the opportunity to interview Kardes. Neither Kardes nor Sterlington provided any information to substantiate their allegations and further denied Alignment its right to interview Kardes, which actions not only are wholly inconsistent with a bona fide whistleblower, but also reflect Sterlington's knowledge of the manufactured nature of the claims.

Having litigated the identical issues through a near-complete OSHA proceeding, Sterlington was on notice that: (1) Plaintiff's SOX claim is untimely on its face, as his OSHA complaint was filed more than 180 days after his April 9, 2025 resignation in violation of the mandatory limitations period set forth in 18 U.S.C. § 1514A(b)(2)(D); (2) the central factual predicate of the SOX claim—that Kardes reported an $8–10 million CapEx/OpEx misclassification to Alignment's senior leadership—is unsupported by a single contemporaneous document and is directly rebutted by statements made under oath by each individual named in the FAC to whom Plaintiff allegedly made an oral report; and (3) the FAC's constructive discharge theory underlying the SOX claim is a post-hoc litigation construct manufactured by Sterlington and Kardes to convert Kardes' voluntary resignation into a compensable termination event, thereby unlocking severance and equity-acceleration benefits to which he is not entitled. Kardes' bad faith and reverse engineering are further and prominently displayed in Sterlington's written communications with counsel for Alignment in the aftermath of Kardes' voluntary resignation, as discussed below. No reasonable attorney that conducted the inquiry required by Rule 11 would have filed the SOX claim contained in the Complaint or the FAC. The tell-tale signs of Sterlington's misconduct include:

- No record of Kardes engaging in protected activity or suffering adverse employment action;
- Kardes' own words in tendering his voluntary resignation;
- A month after Kardes' resignation, Sterlington reached out to Alignment to pursue a settlement, offering only a vague allegation of retaliation without detail, which Alignment committed to investigate;
- Alignment's outside counsel immediately contacted Sterlington to investigate and Sterlington promised to provide information to substantiate the claim, but never did;
- Sterlington did not allow Kardes to be interviewed, despite his contractual obligation to cooperate in Alignment's investigation; and
- In connection with the OSHA administrative proceeding, Sterlington was met with controlling case law and facts demonstrating that the SOX claim was wholly without merit, yet nevertheless filed this frivolous action.

Defendants respectfully request that the Court impose sanctions on Sterlington, including an award of Defendants' reasonable attorneys' fees and costs incurred in connection with this motion and Defendants' responsive pleading.

## II. PROCEDURAL HISTORY

Kardes submitted his voluntary resignation from Alignment on April 9, 2025. More than 180 days later, on October 14, 2025, Kardes filed a complaint with the Occupational Safety and Health Administration ("OSHA") under Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (OSHA File No. 301064300). Declaration of Jason Weiss ("Weiss Decl."), ¶ 1. More than 180 days elapsed from the filing of the OSHA complaint without a final decision by OSHA, and on July 7, 2026, Plaintiff's Counsel filed the Complaint in this Court. Weiss Decl., ¶ 2. Plaintiff's Counsel, who litigated the OSHA proceedings in full, was on notice of all of the deficiencies described herein before filing the Complaint. On September 3, 2026, Plaintiff's Counsel filed the FAC. *Id.*

## III. RELEVANT FACTS

### A. Kardes Voluntarily Resigns from Alignment In Response to a Corporate Reorganization.

Kardes joined Alignment as Chief Data Officer on January 7, 2019. By 2024, Kardes held the title of "Chief Experience Officer" at Alignment.

Beginning in the fourth quarter of 2024, Alignment initiated an organizational restructuring that included the promotion of Dawn Maroney ("Maroney") to President, under which certain members of leadership (including Kardes) would report to Maroney rather than to Alignment's CEO, John Kao ("Kao"). Kardes objected to the proposed change in his reporting structure and threatened to resign if it were implemented. This was not the first time he had threatened to resign; by Alignment's account, it was at least his fourth such threat. As a result of his objection, Kardes continued to report to Kao, and Kao discussed the possibility of creating a "Chief Transformation Officer" role for Kardes. No formal transfer of duties or promotion was, however, promised or made.

In early 2025, concerns regarding Kardes' operating results and management approach in his areas of responsibility arose and intensified. Senior executives raised concerns about his divisive behavior to Kao and requested assistance in addressing it. Allegations were also made and substantiated that Kardes had approached at least one executive and offered him a future promotion in exchange for supporting Kardes' personnel decisions during Alignment's Chief Information Officer Rob Scavo's ("Scavo") temporary medical leave. The executive understood this to be an explicit *quid pro quo*, which he promptly reported to Alignment's Chief Human Resources Officer and General Counsel. These performance and behavioral concerns prompted Kao to reconsider creating a Chief Transformation Officer position for Kardes. Kardes was told that the previously discussed potential position change of Chief Transformation Officer was not being enacted and he would report to Maroney under the new organizational structure as originally intended.

On April 9, 2025, and consistent with his prior threats, Kardes submitted his written resignation. His resignation email stated: "After thoughtful reflection, I've decided to move forward with a transition from my role at Alignment. I respect the decisions that have been made and will always be rooting for Alignment's continued success." He invoked his contractual 90-day notice period. Critically, Kardes did not invoke the "Good Reason" cure procedure in his Employment Agreement, which required written notice within 60 days and a 60-day cure period, nor did his resignation mention fraud, retaliation, or any protected activity. A contemporaneous text to Maroney confirmed the amicable nature of the departure: "I respect the decisions and appreciate your time today. I will do whatever necessary to do appropriate transition."

As required by SEC regulations, Alignment publicly acknowledged Kardes' resignation in a Form 8-K filed on April 15, 2025, designating his last day of employment as May 16, 2025. Kardes continued to perform his duties, retained his title of Chief Experience Officer, and received his full $425,000 base salary and benefits through his last day of employment on May 16, 2025.

### B. Kardes First Alleges Accounting Irregularities After He Learns He Left Stock Options On The Table Due To His Voluntary Resignation.

By the FAC's own account, at the time of his voluntary resignation, Kardes' unvested equity included 237,103 performance stock units ("PSUs") scheduled to vest on December 31, 2025, 70,000 additional PSUs at target, 149,076 restricted stock units, and 9,124 stock options. *See* FAC ¶ 184. Kardes' Employment Agreement provides that a resignation without "Good Reason" entitles Kardes only to "the unpaid portion of the Base Salary and paid time off accrued and payable through the Termination Date," "reimbursement of expenses for which the Employee shall not have been previously reimbursed," and "continuation of health insurance coverage rights, if any, as required under applicable law." Employment Agreement, § 6(a), (b). Notably, a resignation without "Good Reason" does not entitle Kardes to severance,

bonuses, or unvested equity awards. "Good Reason" is defined as "a material reduction during any 24 consecutive month period in Base Salary . . . or in the Employee's total cash compensation opportunity," "a material breach by the Employer of [the] Agreement," and a change in the Employee's principal work location in excess of 50 miles. *Id*. at 3. As detailed above, Kardes did not invoke such "Good Reason" in his resignation letter.

It was not until May 13, 2025—more than a month after Kardes' voluntary resignation and after the financial consequences of that departure had become apparent—that Kardes' counsel, Sterlington, first contacted Alignment's General Counsel, vaguely relaying that Kardes had been "retaliated against after raising accounting concerns around capitalizing labor." Weiss Decl., ¶ 3. No specifics were provided regarding any protected activity, adverse action, or retaliation. Alignment's General Counsel referred the matter to outside counsel. *Id.* Notably, when outside counsel engaged with Sterlington on May 14 and 15, 2025, they immediately pivoted to settlement and equity recovery. *Id.* This sequence—voluntary resignation, followed by belated and vague allegations tethered to demands for equity acceleration—was known to Sterlington and is itself evidence of the reverse engineering that pervades this case.

Alignment's outside counsel expressly informed Sterlington that the concern "was NOT raised by [Kardes] prior to his voluntary resignation (on April 9) and first and only has been raised by [Kardes' counsel] (on May 13)," and that Alignment had "no record or evidence of [Kardes] engaging in protected activity, much less him suffering adverse employment action." Weiss Decl., ¶ 4. Kardes' counsel never disputed this characterization. *Id.* Sterlington was therefore on notice, well before filing the FAC, that Alignment's position was that no protected activity had occurred prior to Kardes' resignation.

Kardes was asked to assist in the ensuing investigation, consistent with his contractual cooperation obligations. Weiss Decl., ¶ 5. Kardes' counsel, Sterlington,

refused, stating that "the Company is not entitled to involve him in this investigation," thereby facilitating their client's breach of contract and depriving Alignment of the opportunity to investigate the post-resignation complaint first made by Sterlington. *Id.* Despite twice promising to provide a "written roadmap of Mr. Kardes' allegations," Sterlington never delivered one. Weiss Decl., ¶ 6. Going back to May 15, 2025, Alignment's Counsel advised Sterlington that Alignment had no information to substantiate the post-resignation claim. Weiss Decl., ¶ 7. Accordingly, Alignment needed information from Kardes and his counsel. *Id.* Sterlington declined to provide, and precluded their client from providing, to Alignment any information to substantiate the claim. *Id.* On June 6, 2025, Alignment's outside counsel closed the investigation, finding the "concerns you raised on [Kardes'] behalf are unsubstantiated" and that "the evidence I have reviewed strongly negates any claim of retaliation." Kardes' counsel never responded. Weiss Decl., ¶ 8.

The next communication from Kardes or his counsel was the OSHA complaint filed on October 14, 2025—more than 180 days after his April 9, 2025 resignation. Weiss Decl., ¶ 9. Pursuant to 18 U.S.C. § 1514A(b)(2)(D) of SOX, a purported whistleblower must file a retaliation claim with OSHA within 180 days of a violation. Thus, the 180-day limitations period began to run no later than the date Kardes gave notice of his resignation. The 180-day period therefore expired no later than October 6, 2025—eight days before Kardes filed his OSHA complaint.

Sterlington was fully aware of this authority and of the time-bar issue, having litigated it extensively before OSHA. Alignment raised the time-bar in its January 16, 2026 OSHA response and again in its April 2, 2026 surreply. Kardes' counsel, Sterlington, nonetheless filed the Complaint and FAC in this Court asserting the same time-barred claims.

### C. There Is No Contemporaneous Evidence That Kardes Engaged in Protected Activity, and His Own Allegations Reveal Budget-Correction Discussions Rather Than Reports of Securities Fraud.

The heart of Kardes' SOX claim lies in his assertion that he reported an $8–10 million CapEx/OpEx misclassification in Alignment's fiscal year 2024 financial statements to Alignment's senior leadership in March and April 2025. The evidentiary record developed through the OSHA proceedings provides not a single piece of evidence that Kardes made any such report.

Kardes did not produce a single contemporaneous document reflecting any report of a securities-related concern or any calculation of the purported misclassification. Despite submitting voluminous text chains, emails, and meeting records in the OSHA proceedings covering virtually every other aspect of his tenure at Alignment, there is no email, no text message, no spreadsheet, and no memorandum reflecting the $8–10 million figure or any communication framing Alignment's capitalization practices as a securities violation or fraud against shareholders. Further, Kardes retained copies of his Alignment email account and company files after his departure in breach of his contractual obligations, yet neither Kardes nor his counsel produced a single document from those retained materials corroborating the alleged report.

Moreover, even by the FAC's own account, Kardes' alleged "protected disclosures" were framed as internal budget-correction exercises, not reports of securities fraud. The FAC alleges that Kardes wrote to finance personnel about the need to "migrate some dollars from capex to opex," told Scavo he was designing a "financial transparency model," and proposed to Kao "a new approach to handling these allocations." FAC, ¶ 109. These are descriptions of internal budgeting exercises. Notably absent from the FAC is any allegation that Kardes reported his concerns to the SEC, the Audit Committee, outside auditors, or any regulatory body. These are channels with which Kardes, as the fourth-most senior executive at the Company, was thoroughly familiar. Nor does the FAC allege that Kardes ever used

the word "fraud," cited a federal securities statute, or suggested that investors were being deceived.

Additionally, every executive to whom Kardes allegedly reported these concerns submitted sworn declarations under penalty of perjury denying that any such report was ever made. Specifically, for example, Defendants Kao, Maroney, and Scavo each declared under oath before OSHA that Kardes never disclosed, flagged, or reported a misclassification involving an estimated $8–10 million in operating expenses.

Further, once Alignment was made aware of the allegation in May 2025, it conducted, through outside counsel, a search of Kardes' email account and retained files and found no instance of Kardes raising fiscal year 2024 financial reporting concerns, nor any files estimating, calculating, or interpolating any amount of alleged irregularities.

Alignment's Audit Committee also commissioned an independent investigation by a nationally recognized accounting firm. This investigation found that the applicable SOX control regarding the classification of labor as capital expenditures was designed sufficiently and operated effectively to detect material errors in the financial statements. Kardes declined to participate in Alignment's investigations, despite being contractually obligated to do so under Section 14 of his Employment Agreement, which expressly requires cooperation "after the termination of the Employee's employment for any reason." His refusal to cooperate is difficult to reconcile with someone motivated by a genuine desire to expose fraud, and is itself inconsistent with the conduct of a bona fide whistleblower.

## IV. ARGUMENT

### A. Legal Standard

The Federal Rules of Civil Procedure require that papers filed with the court: (1) not be presented for any improper purpose, such as to harass, cause unnecessary delay or needlessly increase the cost of litigation; (2) contain claims, defenses and

other legal contentions warranted by existing law or by a non-frivolous argument for changing the law; and (3) have evidentiary support or, if specifically so identified, be likely to have evidentiary support after a reasonable opportunity for further investigation or discovery. *See* Fed. R. Civ. P. 11(b). By signing a pleading filed with the court, an attorney is certifying that to the best of the attorney's knowledge, information and belief, formed after an inquiry reasonable under the circumstances, the papers meet the conditions specified in Rule 11(b). *Id.*

If, after notice to opposing counsel and a reasonable opportunity to respond, the court determines that a filing fails to meet the conditions set forth under Rule 11, it may impose an appropriate sanction on any attorney or law firm that violated the Rule or is responsible for the violation. *See* Fed. R. Civ. P. 11(c)(1). A court may sanction an attorney, as warranted for effective deterrence, in an amount equal to the reasonable expenses, including attorneys' fees, incurred by the moving party as a direct result of the violation. *See* Fed. R. Civ. P. 11(c)(2). A court-ordered sanction may also consist of non-monetary directives. *See* Fed. R. Civ. P. 11(c)(4).

A violation of Rule 11 does not require a showing of subjective bad faith; rather, an objective standard governs conduct under Rule 11. *Business Guides, Inc. v. Chromatic Commc'ns Enters*., 498 U.S. 533, 549 (1991); *see also Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994) ("Counsel can no longer avoid the sting of Rule 11 sanctions by operating under the guise of a pure heart and empty head"). The Advisory Committee Notes, as interpreted by the Ninth Circuit, make clear that Rule 11 was "intended to be applied by district courts vigorously to curb widely acknowledged abuse from the filing of frivolous pleadings, and other papers." *Zaldivar v. City of L.A.*, 780 F.2d 823, 829 (9th Cir. 1986), *disapproved on other grounds by Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 399, 405 (1990). Rule 11 sanctions "shall be assessed if the paper filed in district court and signed by an attorney or an unrepresented party is frivolous, legally unreasonable, or without factual foundation, even though the paper was not filed in subjective bad faith."

*Zaldivar*, 780 F.2d at 830; *see also Lake v. Gates*, 130 F.4th 1064, 1069 (9th Cir. 2025) (holding that Rule 11 is violated where counsel either fails to conduct a reasonable factual and legal inquiry or, after such an inquiry, proceeds with claims no reasonable attorney would find well-founded).

The standard under the frivolousness clause of Rule 11 is objective reasonableness. *Id*. at 830. The reasonableness is measured against the conduct of a "competent attorney admitted to practice before the district court . . . [who] certifies that to the best of his knowledge, information and belief formed after a reasonable inquiry, the document is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." *Id.*

Further, to avoid Rule 11 sanctions, any person who signs a pleading, motion or paper must comply with the "affirmative duty to conduct a reasonable inquiry into the facts and the law before filing[.]" *Business Guides, Inc.*, 498 U.S. at 551. "[Reasonable] inquiry is that amount of examination into the facts and legal research which is reasonable under the circumstances." *Zaldivar*, 780 F.2d at 831; *see also Lake*, 130 F.4th at 1069 (holding a reasonable inquiry is "an inquiry reasonable under all of the circumstances of a case.").

As explained below, when Kardes' counsel, Sterlington, drafted and filed the Complaint and FAC, they not only failed to satisfy Rule 11's requirements, they disregarded them.

**B. The SOX Claim Is Time-Barred On Its Face.**

Kardes' counsel, Sterlington, filed the Complaint after litigating the OSHA proceedings, during which Alignment squarely raised the time-bar defense. By the time the Complaint was filed in this Court on July 7, 2026, Sterlington was on notice that the SOX claim was time-barred on its face. Notwithstanding that notice, Sterlington filed a Complaint and FAC asserting the same time-barred claim in this Court. That conduct violates Rule 11's objective standard of reasonable inquiry and warrants the imposition of sanctions. *See Est. of Blue v. Cnty. of Los Angeles*, 120

F.3d 982, 985 (9th Cir. 1997) (holding that a reasonable investigation would have revealed the claim was barred by the statute of limitations, making the filing frivolous and sanctions were warranted).

The SOX limitations period is mandatory: a complainant must commence an action within 180 days of the alleged violation. 18 U.S.C. § 1514A(b)(2)(D). The statute of limitations on a constructive discharge claim begins to run no later than the date the employee gives notice of resignation. *Green v. Brennan*, 578 U.S. 547, 563–64 (2016). Kardes submitted his written resignation on April 9, 2025. The 180-day period therefore expired no later than October 6, 2025, eight days before Kardes filed his OSHA complaint on October 14, 2025. The SOX claim is time-barred on its face under *Green v. Brennan*, and the FAC filed in this Court asserting that same claim is therefore frivolous. *See Coppinger-Martin v. Solis*, 627 F.3d 745, 749 (9th Cir. 2010) (holding the limitations clock begins to run when the discriminatory decision has been both made and communicated to the complainant); *Est. of Blue*, 120 F.3d at 985 (holding filing of claim known as barred under statute of limitations is frivolous and sanctionable under Rule 11). Sterlington was fully aware of this authority before filing the Complaint and FAC. Alignment raised *Green v. Brennan* and the time-bar argument in its January 16, 2026 OSHA response and again in its April 2, 2026 surreply.

Kardes' theory, advanced by Sterlington, that the April 15, 2025 Form 8-K—rather than the April 9, 2025 resignation—constituted the operative "violation" for limitations purposes is legally untenable. The 8-K was a mandatory SEC disclosure reporting Kardes' own prior decision to resign; it did not constitute an independent adverse action by Alignment. Moreover, Kardes' "constructive discharge" theory estops him from claiming that his claim somehow accrued prior to April 9, 2025. Constructive discharge requires working conditions "so intolerable" that a reasonable person would feel forced to quit. *Green*, 578 U.S. at 555. The claim does not exist – and the limitations clock does not begin – until both elements are satisfied: intolerable

conditions and actual resignation. *Id*. Once the employee gives notice of resignation, the claim is complete and the clock runs from that date. *Id.* at 563-64; *see also Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir. 1998); *Pujol v. McDonald*, 2017 WL 1064993, at *6 (N.D. Cal. Mar. 21, 2017); *Vinson v. Nielsen*, 2018 WL 5617733, at *3-4 (S.D. Cal. Oct. 29, 2018).

**C. The Central Factual Predicate Of The SOX Claim Lacks Any Evidentiary Support.**

The FAC's SOX claim rests entirely on the allegation that Kardes reported an $8–10 million CapEx/OpEx misclassification in Alignment's fiscal year 2024 financial statements to Alignment's senior leadership in March and April 2025, and that Defendants retaliated against him for doing so. Without it, there is no protected activity, no causation, and no viable claim under SOX.[1] Yet as set forth in detail above, the evidentiary record developed through the OSHA proceedings—a record that Sterlington possessed in its entirety before filing the Complaint and FAC—contains not a single piece of contemporaneous documentary evidence supporting that allegation.

Despite producing voluminous text chains, emails, and meeting records in the OSHA proceedings covering virtually every other aspect of Kardes' tenure at Alignment, Kardes produced no email, no text message, no spreadsheet, and no memorandum reflecting a review of fiscal year 2024 labor capitalization, the $8–10 million figure, any calculation of the purported misclassification, or any communication framing Alignment's capitalization practices as a securities violation or fraud against shareholders. The absence of any such document is not a gap in the current record that discovery might fill. Alignment conducted, with the assistance of outside counsel, an independent search of Kardes' email account and retained files

[1] While this necessarily applies to the remaining claims in the FAC as well, this motion is limited to the SOX claim as Defendants have sought to compel arbitration of the non-SOX claims.

and found no instance of Kardes raising fiscal year 2024 financial reporting concerns, nor any files estimating, calculating, or interpolating any amount of alleged irregularities. Kardes, who appears to have retained access to his Alignment emails, produced no such document either.

The absence of contemporaneous documentary evidence is compounded by the sworn declarations of every executive to whom Kardes allegedly reported. Specifically, Defendants Kao, Maroney, and Scavo (among others) denied under oath that Kardes ever disclosed, flagged, or reported a misclassification in Alignment's fiscal year 2024 financial statements involving an estimated $8–10 million in operating expenses.

**D. The SOX Claim Is Legally Unreasonable.**

Sterlington did not file the SOX claim in ignorance of the evidentiary record. They litigated the OSHA proceedings and received Alignment's detailed response identifying the deficiencies. They knew, before filing the Complaint and FAC, that the SOX claim was time-barred, that no contemporaneous document corroborated the alleged reports of accounting irregularities, that the relevant executives had denied under oath that any such report was made, that an independent search of Kardes' email account found no evidence of the report, and that an independent accounting investigation found that the applicable SOX control was designed sufficiently and operated effectively to detect material errors in the financial statements.

Filing a claim under these circumstances—after near-complete litigation of the identical issues before OSHA, with full knowledge of the evidentiary record and its deficiencies—is precisely the conduct that Rule 11 was designed to deter.

Further, Kardes' constructive discharge theory is not a good-faith legal claim; it is a post-hoc litigation construct advanced to trigger the severance and equity-acceleration provisions of Kardes' Employment Agreement. The practical effect of the constructive discharge theory, if credited, would be to unlock benefits that Kardes forfeited upon his voluntary resignation. The Employment Agreement provides that

a termination without cause or a resignation with "Good Reason" entitles Kardes to severance pay equal to one times the sum of Base Salary and target annual cash incentive bonus and a pro rata bonus for the year of termination. It further provides that a material breach of the Agreement by the Employer constitutes "Good Reason" for resignation. The constructive discharge theory advanced in the FAC is, at bottom, an attempt to recharacterize Kardes' voluntary resignation as a termination without cause or a resignation with "Good Reason," thereby unlocking severance benefits to which a voluntary resignation without "Good Reason" does not entitle him.

The FAC's constructive discharge theory is not warranted by the facts or by existing law; it is a litigation-driven construct designed to convert a voluntary departure into a compensable termination, and it was filed with full knowledge of the contemporaneous record that conclusively refutes it. That is precisely the conduct Rule 11 was designed to deter.

### E. This Rule 11 Motion Is Not Mooted By Plaintiff's First Amended Complaint.

Finally, Plaintiff's filing of the FAC on September 3, 2026 does not reset the Rule 11 clock or moot this motion as to any of the foregoing grounds. A Rule 11 motion is not precluded by the filing of an amended complaint unless the plaintiff has withdrawn the challenged claims. *See Sneller v. City of Bainbridge Island*, 606 F.3d 636, 639 (9th Cir. 2010). Here, the FAC reasserts the identical SOX claim without curing the statute-of-limitations defect, without offering any new evidentiary support for the central factual predicate, and without abandoning the legally unreasonable constructive discharge theory. Because Plaintiff has not withdrawn the challenged claim, the filing of the amended pleading has no effect on this motion.

## V. SANCTIONS ARE WARRANTED

Rule 11 authorizes the Court to impose sanctions "on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). The Rule further provides that, "[i]f warranted, the court may award to the

prevailing party the reasonable expenses, including attorney's fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2).

Here, Sterlington, on behalf of Kardes, has made multiple frivolous factual and legal assertions in the FAC, and should be sanctioned. *See Truesdell v. S. California Permanente Med. Grp.*, 209 F.R.D. 169, 177–78 (C.D. Cal. 2002) (sanctioning counsel for filing a factually misleading, legally baseless complaint). Sterlington has been on notice that Kardes' SOX claim is time-barred and unsupported before the action was filed.

Sterlington should be required to pay Defendants' attorneys' fees incurred in preparing this motion. This will only constitute partial reparations by Sterlington for this frivolous action, as Defendants have already incurred significant expense (to say nothing of reputational damages) at the pleading stage.

As of August 18, 2026 (the date this motion was personally served on Plaintiff pursuant to Rule 11(c)(2)), Defendants incurred a minimum of $14,610 in preparing this motion. Weiss Decl., ¶¶ 10, 11. Defendants have incurred additional fees preparing and finalizing their responsive pleading to the Complaint, as well as responding to any oppositions by Plaintiff. Defendants will supplement the amount of fees incurred at the appropriate time.

//

//

//

//

//

//

//

//

//

//

## VI. CONCLUSION

For the reasons set forth above, Defendants request that the Court grant this motion and sanction Kardes' counsel, Sterlington, for all reasonably incurred fees and costs incurred by Defendants in relation to this motion and Defendants' responsive pleading pursuant to Rule 11(c)(2). As of August 18, 2026, Defendants incurred a minimum of $14,610, but this amount will necessarily increase unless Kardes dismisses his lawsuit. Weiss Decl., ¶¶ 10, 11.

Dated: September 9, 2026

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By *_/s/ Joshua D. N. Hess_*

JASON WEISS
JOSHUA D. N. HESS
BRIDGET RUSSELL
MEGAN BILBAO
JULIA ANDERSON

Attorneys for Defendants
ALIGNMENT HEALTHCARE, INC.,
ALIGNMENT HEALTHCARE USA, LLC,
JOHN KAO, DAWN MARONEY, ROBERT SCAVO, AND ANDREAS WAGNER

## CERTIFICATION OF WORD COUNT

The undersigned, counsel of record for Defendants, certifies that this brief contains 5,031 words which complies with the word limit of L.R. 11-6.1.

*_/s/ Joshua D. N. Hess_*
Joshua D. N. Hess