SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
JOSHUA D. N. HESS, Cal Bar No. 244115
jdhess@sheppard.com
JULIA C. ANDERSON, Cal Bar No. 353164
juanderson@sheppard.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111
Telephone: 415.434.9100
Facsimile: 415.434.3947

JASON A. WEISS, Cal Bar No. 185268
jweiss@sheppard.com
MEGAN T. BILBAO, Cal Bar No. 357247
MBilbao@sheppard.com
650 Town Center Drive, 10th Floor
Costa Mesa, CA 92626-1993
Telephone: 714.513.5100
Facsimile: 714.513.5130

BRIDGET J. RUSSELL, Cal Bar No. 288107
brussell@sheppard.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone: 310.228.3700
Facsimile: 310.228.3701

Attorneys for Defendants
ALIGNMENT HEALTHCARE, INC., ALIGNMENT HEALTHCARE USA, LLC, JOHN KAO, DAWN MARONEY, ROBERT SCAVO, AND ANDREAS WAGNER

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

HAKAN KARDES,

Plaintiff,

v.

ALIGNMENT HEALTHCARE, INC., ALIGNMENT HEALTHCARE USA, LLC, JOHN KAO, DAWN MARONEY, ROBERT SCAVO, AND ANDREAS WAGNER,

Defendants.

Case No. 8:26-cv-01764

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT PURSUANT TO RULE 12(b)(6)**

*[Filed concurrently with Notice of Motion and Motion, Request for Judicial Notice, and Proposed Order]*

Date: October 15, 2026
Time: 10:00 a.m.
Crtrm.: 10D

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .......... 1
II. RELEVANT FACTS .......... 2
  A. Kardes Voluntarily Resigns from Alignment in Response to a Corporate Reorganization .......... 2
  B. Kardes First Alleges Accounting Irregularities After He Learns He Left Stock Options on the Table .......... 4
  C. Kardes Files His OSHA Complaint over 180 Days After He Resigned .......... 6
III. ARGUMENT .......... 7
  A. Plaintiff's SOX Claim Is Procedurally Barred .......... 7
    1. *Plaintiff's SOX Claim Is Time-Barred* .......... 8
      a. The 180-day filing deadline is mandatory .......... 8
      b. Each alleged violation is time-barred .......... 8
      c. The alleged post-April 12 events do not extend the limitations period .......... 9
        *(i) Alignment's disclosures* .......... 9
        *(ii) The post-employment consequences* .......... 10
        *(iii) The AC's new "investigation as retaliation" allegations* .......... 12
      d. The continuing violation doctrine is inapplicable .......... 13
    2. *Plaintiff's SOX Claim Is Also Barred as to Scavo, Maroney, and Wagner for Failure to Exhaust* .......... 13
      a. Exhaustion is a mandatory prerequisite .......... 13
      b. Scavo and Wagner were not named in the OSHA Complaint .......... 14
      c. The OSHA Complaint contains no retaliation allegations against Maroney .......... 15
      d. Failure to exhaust cannot be cured by amendment .......... 15
  B. Plaintiff's Complaint Fails to State a Claim .......... 15

1. *Plaintiff Fails to Allege That He Engaged in Protected Activity* ..... 16

a. Plaintiff's communications do not "definitively and specifically" relate to any enumerated category of fraud ..... 16

b. Plaintiff fails to plausibly allege his subjective belief ..... 17

c. No objectively reasonable person would believe the conduct constituted securities fraud ..... 18

2. *Plaintiff Fails to Sufficiently Allege Individual Liability* ..... 19

a. The allegations against Scavo are legally insufficient ..... 19

b. The allegations against Maroney are legally insufficient ..... 20

c. The allegations against Wagner are legally insufficient ..... 21

IV. CONCLUSION ..... 23

# TABLE OF AUTHORITIES

Page(s)

Cases

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) .......... 7, 20

*Bell Atlantic Corp. v. Twombly*
550 U.S. 544 (2007) .......... 7

*Botta v. PricewaterhouseCoopers LLP*
2018 WL 11360442 (N.D. Cal. Oct. 9, 2018) .......... 13, 14

*Boyd v. Accuray, Inc.*
873 F. Supp. 2d 1156 (N.D. Cal. 2012) .......... 16, 22

*Burden v. Isonics Corp.*
2009 WL 3367071 (D. Colo. Oct. 15, 2009) .......... 12

*Burlington N. & Santa Fe Ry. Co. v. White*
548 U.S. 53 (2006) .......... 7, 21

*Carrico v. City and County of San Francisco*
656 F.3d 1002 (9th Cir. 2011) .......... 14

*City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 454 (9th Cir. 2011) .......... 23

*Coppinger-Martin v. Solis*
627 F.3d 745 (9th Cir. 2010) .......... 7, 8

*Daly v. Citigroup Inc.*
939 F.3d 415 (2d Cir. 2019) .......... 8, 12, 13

*Del Signore v. Nokia of Am. Corp.*
672 F. Supp. 3d 560 (N.D. Ill. 2023) .......... 12

*Draper v. Coeur Rochester, Inc.*
147 F.3d 1104 (9th Cir. 1998) .......... 9

*Emrich v. Touche Ross & Co.*
846 F.2d 1190 (9th Cir. 1988) .......... 13

*Erhart v. BofI Holding, Inc.*
269 F. Supp. 3d 1059 (S.D. Cal. 2017) ....................7, 10, 17, 19

*Erhart v. BofI Holding, Inc.*
612 F. Supp. 3d 1062 (S.D. Cal. 2020) ....................15

*Ernst & Ernst v. Hochfelder*
425 U.S. 185 (1976) ....................17, 18

*Gallagher v. Granada Entertainment USA et al.*
2004 WL 5633781 (Dep't of Labor Oct. 19, 2004) ....................20, 21

*Geary v. Parexel Int'l Corp.*
2022 WL 827250 (N.D. Cal. Mar. 18, 2022) ....................13

*Green v. Brennan*
578 U.S. 547 (2016) ....................8, 9, 10

*Hanna v. WCI Cmtys.*
Inc., 2004 U.S. Dist. LEXIS 25652 (S.D. Fla. Nov. 15, 2004) ....................13

*Hansen v. Musk*
122 F.4th 1162 (9th Cir. 2024) ....................17

*See Lee v. Hawaii*, 2010 WL 235009, at *7 (D. Haw. Jan. 20, 2010), *aff'd*,
454 F. App'x 610 (9th Cir. 2011) ....................12

*Leznik v. Nektar Therapeutics, Inc.*
2007 WL 5596626 (Dep't of Labor Nov. 16, 2007) ....................21

*Nat'l R.R. Passenger Corp. v. Morgan*
536 U.S. 101 (2002) ....................8, 12, 13

*Navarro v. Block*
250 F.3d 729 (9th Cir. 2001) ....................7

*Pujol v. McDonald*
2017 WL 1064993 (N.D. Cal. Mar. 21, 2017) ....................9

*Schutter v. Harold Zeigler Auto Grp., Inc.*
416 F. Supp. 3d 708, 718 (W.D. Mich. 2019) ....................21

*Tafoya v. Corr. Dep't, Cent. New Mexico Corr. Facility*
2006 WL 8444137 (D.N.M. June 7, 2006) ....................20, 21

*United States v. Ritchie*
342 F.3d 903 (9th Cir. 2003) .......... 13

*Van Asdale v. Intl. Game Tech.*
577 F.3d at 996 (9th Cir. 2009) .......... 15, 17, 22

*Vinson v. Nielsen*
2018 WL 5617733 (S.D. Cal. Oct. 29, 2018) .......... 9

*Wadler v. Bio-Rad Labs., Inc.*
141 F. Supp. 3d 1005 (N.D. Cal. 2015) .......... 13, 14

*Wyatt v. Occidental Petroleum Corp.*
392 F. Supp. 2d 1274 (N.D. Okla. 2005) .......... 11

Statutes

15 U.S.C. § 78j(b) .......... 7, 18

18 U.S.C. § 1348 .......... 7, 18

18 U.S.C. § 1514A .......... *passim*

Other Authorities

17 C.F.R § 240.19b-5 .......... 7, 18

29 C.F.R. § 1980.103(d) .......... 7, 8

29 C.F.R. § 1980.104(b)(1)(ii) .......... 22

Fed. R. Civ. Proc. 12(b)(6) .......... 1, 7

Defendants Alignment Healthcare, Inc., Alignment Healthcare USA, LLC ("Alignment"), John Kao ("Kao"), Dawn Maroney ("Maroney"), Robert Scavo ("Scavo"), and Andreas Wagner ("Wagner") (collectively, "Defendants") submit this memorandum of law in support of their motion to dismiss Plaintiff Hakan Kardes' ("Plaintiff") Amended Complaint ("AC") for failure to state a claim under Fed. R. Civ. Proc. 12(b)(6).[1]

## I. INTRODUCTION

This is a case of sour grapes that has been reverse engineered by Plaintiff in an attempt to frame a lawsuit. Hakan Kardes – a computer scientist with no background in accounting – voluntarily resigned from Alignment after learning that a corporate reorganization would not proceed as he had hoped. His resignation letter was cordial, unequivocal, and made no mention of fraud, retaliation, or any protected activity. He simply left – as he had threatened to do several times before – forfeiting substantial unvested equity.

It was only after the financial consequences of that voluntary departure became apparent and litigation counsel entered the picture that Kardes recast his amicable resignation as a constructive discharge. On October 14, 2025 (more than six months after his amicable resignation), he belatedly filed his Occupational Safety and Health Administration ("OSHA") Complaint (the "OSHA Complaint"), alleging retaliation under Section 806 of the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. § 1514A. He then filed the instant action on July 7, 2026, and filed his AC on September 3, 2026, after receiving Defendants' Motion to Dismiss. The AC suffers from the same flaws detailed in Defendants' prior Motion to Dismiss and Alignment's OSHA response.

[1] This Motion seeks dismissal of Count I. Defendants have moved to compel arbitration of the remaining state-law claims.

First, his SOX claim is time-barred. The statute of limitations for a SOX administrative complaint is 180 days. Plaintiff filed the OSHA Complaint on October 14, 2025, and every adverse employment action he alleges occurred on or before April 9, 2025 (resignation date). Under binding Supreme Court authority, his constructive discharge claim accrued no later than this date. The SOX claim is also independently barred as to three of the four individual Defendants – Scavo, Wagner, and Maroney – for failure to exhaust administrative remedies.

Second, Kardes' SOX claim also fails on the merits. Kardes does not plausibly allege that he engaged in protected activity, because his own allegations are founded upon interdepartmental budget discussions rather than reports of securities fraud. Nor do the AC's allegations support that Kardes believed, or that any reasonable person with his training would have believed, that the conduct he observed constituted a violation of the federal securities laws. Tellingly, the AC still hedges on required scienter elements, pleading fraud-based statutes only "to the extent" the alleged irregularities were undertaken with intent to deceive. The SOX claim also otherwise fails to sufficiently plead individual liability as to Scavo, Maroney, and Wagner.

The structure of the AC reveals its true purpose. Kardes names four individual Defendants to maximize reputational exposure for Alignment's senior leadership. The inflammatory allegations, filed against a publicly traded company and its officers, are calculated to generate adverse publicity, coerce a settlement that would compensate Kardes for the equity his own voluntary resignation left on the table, and manipulate and depress Alignment's stock price. The Court should not permit Kardes' litigation strategy to succeed. The SOX claim should be dismissed.

## II. RELEVANT FACTS

### A. Kardes Voluntarily Resigns from Alignment in Response to a Corporate Reorganization

Kardes holds a Ph.D. in Computer Science and Engineering from the University of Nevada, Reno, with academic training in large-scale data architecture,

algorithms, predictive modeling, and statistical systems. (AC), ¶ 41.) He has no formal training in financial reporting, GAAP, or securities regulation. (*See id.*, ¶¶ 41-42.) Kardes joined Alignment as Chief Data Officer on January 7, 2019. (*Id.*, ¶ 43.) By 2024, Kardes held the title of "Chief Experience Officer." (*Id.*, ¶ 46.)

While not necessary to the resolution of this Motion, the following facts are set forth here to accurately reflect the OSHA record. Beginning in the fourth quarter of 2024, Alignment initiated an organizational restructuring under which certain members of leadership (including Kardes) would report to Maroney rather than to Kao, Alignment's CEO. Kardes objected to the proposed change in his reporting structure and threatened to resign if it were implemented. As a result of his objection, Kao discussed the possibility of creating a "Chief Transformation Officer" role for Kardes. While contemplated, no formal transfer of duties or promotion was promised or made in response to this latest threat.

Moreover, in early 2025, concerns regarding Kardes' operating results and management approach arose and intensified. Senior executives raised concerns about his behavior to Kao and requested assistance in addressing it. Allegations were also made and substantiated that Kardes had approached at least one executive and offered him a future promotion in exchange for supporting Kardes' personnel decisions. The executive understood this to be an explicit *quid pro quo*, which he promptly reported to Alignment USA's Chief Human Resources Officer and General Counsel. These performance and behavioral concerns prompted Kao to reconsider creating a Chief Transformation Officer position for Kardes.

On April 1, 2025, Kardes was told that the contemplated changes would not be enacted. (*See* AC, ¶ 132.) On April 9, 2025, and consistent with his prior threats, Kardes submitted his written resignation. (*See id.*, ¶ 162.) His resignation email to Kao and Maroney stated: "After thoughtful reflection, I've decided to move forward with a transition from my role at Alignment. I respect the decisions that have been

made and will always be rooting for Alignment's continued success." (*Id.; see also* Request for Judicial Notice ("RJN"), Ex. A.)

He invoked his contractual 90-day notice period and offered to facilitate an earlier transition if preferred. (*Id.*) Notably, his resignation email reflected no rancor with Alignment, nor did he invoke the "Good Reason" cure procedure set forth in his Employment Agreement, which required him to provide written notice to the Company within 60 days of the triggering event and afford the Company a 60-day cure period before any resignation could qualify as one for "Good Reason." (*See* AC, ¶¶ 162, 280; *see also* RJN, Exs. A and B.) Nor did his resignation email mention fraud, retaliation, accounting irregularities, or any protected activity. (*See id.*) There was nothing to indicate that his resignation was anything other than voluntary and amicable.

After internally notifying personnel of his resignation, Alignment complied with mandatory SEC regulations and acknowledged Kardes' April 9, 2025 resignation in a Form 8-K filed on April 15, 2025, noting his last day of employment as May 16, 2025. (*Id.*, ¶¶ 174-175.) Kardes continued to perform his duties and remained fully engaged in his role and Company matters through his last day of employment, receiving his full $425,000 base salary and benefits throughout that period. (*See id.*, ¶ 166.)

### B. Kardes First Alleges Accounting Irregularities After He Learns He Left Stock Options on the Table

Kardes' Employment Agreement provides that a resignation without "Good Reason" does <u>not</u> entitle Kardes to severance, bonuses, or unvested equity awards. (RJN, Ex. B, § 6(a), (b).) "Good Reason" is defined as "a material reduction during any 24 consecutive month period in Base Salary . . . or in the Employee's total cash compensation opportunity," "a material breach by the Employer of [the] Agreement," and a change in the Employee's principal work location in excess of 50 miles. (*Id.*).

As detailed above, Kardes did not invoke such "Good Reason" in his resignation letter. (AC, ¶ 162.)

Again, while not necessary to the resolution of this Motion, the following facts are set forth here to again accurately reflect the procedural record. On May 13, 2025 – more than a month after Kardes' voluntary resignation – Kardes' counsel contacted Alignment's General Counsel and relayed vaguely that Kardes had been "retaliated against after raising accounting concerns around capitalizing labor," providing no details concerning the protected activity in which he purportedly engaged.

In response, the Company and Alignment's Audit Committee commenced an investigation into the claims. Alignment's outside counsel specifically advised Kardes' counsel that the concern "was NOT raised by [Kardes] prior to his voluntary resignation (on April 9) and first and only has been raised by [Kardes' counsel] (on May 13)," and that Alignment had "no record or evidence of [Kardes] engaging in protected activity, much less him suffering adverse employment action." Kardes' counsel never disputed this characterization. Kardes was asked to assist in the investigation, consistent with his cooperation obligations under his Employment Agreement. But Kardes' counsel refused, stating that "the Company is not entitled to involve him in this investigation." Kardes' counsel nonetheless twice promised to provide a "written roadmap of Mr. Kardes' allegations," but never delivered it. On June 6, 2025, having received nothing from Kardes or his counsel, Alignment's outside counsel closed the investigation, finding that the "concerns you raised on [Kardes'] behalf are unsubstantiated" and that "the evidence I have reviewed strongly negates any claim of retaliation." Kardes' counsel never responded.

Additionally, the independent members of Alignment's Audit Committee, commenced an investigation into the claims. The Audit Committee hired outside counsel and an independent accounting firm to review the accounting and controls for the classification of labor as a capital or operating expense. That review concluded

that the controls in place were effective and that the Company's accounting of labor as either a capital or operating expense was correct.

**C. Kardes Files His OSHA Complaint over 180 Days After He Resigned**

The next communication from Kardes or his counsel was the OSHA Complaint filed on October 14, 2025 – more than four months later and over 180 days after his April 9, 2025 resignation. (AC, ¶ 236; RJN, Ex. C.) Kardes did not name Scavo or Wagner in his OSHA Complaint. (RJN, Ex. C.) Moreover, while he named Maroney, he did not allege that she had engaged in any retaliatory conduct. (*See id.*) More than 180 days elapsed from the filing of the OSHA Complaint without a final decision by OSHA, and on July 7, 2026, Plaintiff filed his Complaint in this Court. (AC, ¶ 14.) Plaintiff filed his AC on September 3, 2026, after receiving Defendants' Motion to Dismiss.

Even by the AC's own account, Kardes' alleged "protected disclosures" were framed as internal budget discussions, not reports of securities fraud. Beginning the week of March 10, Kardes allegedly told Scavo he was working with DTS personnel to design a "financial transparency model." (*Id.*, ¶ 108.) On or about March 11, 2025, Kardes allegedly wrote to the SVP of Finance and a DTS budget manager that the Company needed to "migrate some dollars from capex to opex" (AC, ¶ 109). On March 18, Kardes allegedly met with Kao to propose "a new approach to handling these allocations," and his proposed remediation was an executive-level transparency model to "allocate spend accurately" and "create clear accountability" – a managerial budgeting tool. (*Id.*, ¶¶ 113, 116.) Kardes alleges he made similar reports about capex/opex allocations on March 28, 2025 to Finance and DTS leadership, on March 29, 2025 to Maroney, and on April 4, 2025 to the SVP of Finance. (*Id.*, ¶ 223(e)-(g).) While Kardes now alleges that he informed the Board Chairman of DTS "governance" and "budget-allocation concerns" on April 4, 2025 (*id.*, ¶ 223(h)), he does not allege that he reported securities fraud. This omission is especially significant given that Kardes was among the top six or seven senior executives at the

Company, was familiar with the Company's compliance reporting channels, and had previously attested on all prior occasions that no compliance issues existed. Nor does Kardes allege that he ever used the word "fraud," referred to any federal securities statute, or suggested that investors were being deceived. (*Id.*, ¶¶ 107-120.) Indeed, the AC pleads scienter-based provisions – 15 U.S.C. § 78j(b), SEC Rule 10b-5, and 18 U.S.C. § 1348 – only conditionally, stating they apply "to the extent the CapEx/OpEx irregularities were undertaken knowingly and with the intent to deceive investors." (*Id.*, ¶ 224(g).) Kardes thus does not allege that he actually believed the conduct was undertaken with intent to deceive. (*Id.*)

## III. ARGUMENT

A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency" of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Factual allegations must be sufficient to raise a right to relief above the speculative level, and the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts are not required to accept as true legal conclusions cast in the form of factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### A. Plaintiff's SOX Claim Is Procedurally Barred

Section 806 of SOX prohibits "discriminat[ing] against an employee in the terms and conditions of employment" because of protected whistleblowing activity. 18 U.S.C. § 1514A(a). Conduct outside the enumerated acts only qualifies if it is "more than trivial" such that it would deter a reasonable employee from engaging in protected activity. *Erhart v. BofI Holding, Inc.*, 269 F. Supp. 3d 1059, 1075-76 (S.D. Cal. 2017) (*citing Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Each act of prohibited retaliation constitutes a separate "violation" that occurs when the discriminatory decision has been both made and communicated to the complainant. 29 C.F.R. § 1980.103(d); *Coppinger-Martin v. Solis*, 627 F.3d 745, 749 (9th Cir. 2010). In the case of a constructive discharge, the violation occurs no later

than the date the employee gives notice of resignation. *Green v. Brennan*, 578 U.S. 547, 563-64 (2016).

### 1. *Plaintiff's SOX Claim Is Time-Barred*

#### a. The 180-day filing deadline is mandatory

Section 806 of SOX establishes a mandatory two-step process. Before filing in federal district court, a plaintiff must first file a complaint with OSHA. 18 U.S.C. § 1514A(b)(1). That OSHA Complaint "shall be commenced not later than 180 days after the date on which the violation occurs, or after the date on which the employee became aware of the violation." 18 U.S.C. § 1514A(b)(2)(D); 29 C.F.R. § 1980.103(d). The word "shall" makes the filing deadline mandatory. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002). A plaintiff who fails to file within the 180-day window cannot proceed. *Coppinger-Martin*, 627 F.3d at 749-51; *Daly v. Citigroup Inc.*, 939 F.3d 415, 426-28 (2d Cir. 2019). A subsequent act related to an adverse employment action does not revive a claim that is already time-barred. *Morgan*, 536 U.S. at 113-14.

#### b. Each alleged violation is time-barred

Plaintiff filed his OSHA Complaint on October 14, 2025 – 188 days after his April 9, 2025 resignation. (AC, ¶ 14.) Accordingly, any alleged violation[2] that occurred on or before April 12, 2025 is time-barred, including: denial of pending promotion requests (*id.*, ¶ 129); reversal of the DTS transition and planned promotion (*id.*, ¶¶ 132, 228(a)); removal from AVA 2.0 (*id.*, ¶¶ 137, 228(b)); the meeting with a security guard present (*id.*, ¶¶ 146-147, 228(c)); transfer of AI and Data Science responsibilities to Scavo (*id.*, ¶¶ 150, 228(d)); delivery of the revised organizational chart and the ultimatum to accept demotion or leave (*id.*, ¶¶ 156, 160, 228(e)); Plaintiff's constructive discharge in the form of his resignation notice (*id.*, ¶¶ 162,

[2] For purposes of this Motion, Defendants assume each alleged violation, even if true, qualifies as a "violation" of SOX; several do not, *see infra*.

229); threats at the Health Evolution Summit (*id.*, ¶¶ 181, 228(f)); and the offer of demotion-level alternative roles (*id.*, ¶¶ 168, 228(g)).

c. The alleged post-April 12 events do not extend the limitations period

*(i) Alignment's disclosures*

Plaintiff attempts to save his time-barred SOX claim by contending that his constructive discharge was not consummated until Alignment internally announced his departure on April 14, 2025, and filed the Form 8-K on April 15, 2025. (AC, ¶¶ 167, 174, 179.) By recharacterizing these as the "final and consummating acts" of constructive discharge (*id.*, ¶ 9), Plaintiff seeks to move the accrual date of his constructive discharge claim into the 180-day window. That theory fails at every step.

First, the theory is foreclosed by *Green*. Constructive discharge requires working conditions "so intolerable" that a reasonable person would feel forced to quit. *Green*, 578 U.S. at 555. Once the employee gives notice of resignation, the claim is necessarily complete and the clock runs from that date. *Id.* at 563-64; *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1110 (9th Cir. 1998); *Pujol v. McDonald*, 2017 WL 1064993, at *6 (N.D. Cal. Mar. 21, 2017); *Vinson v. Nielsen*, 2018 WL 5617733, at *3-4 (S.D. Cal. Oct. 29, 2018). The Supreme Court adopted a notice-of-resignation rule precisely because the limitations period must attach to something fixed and ascertainable – the moment the employee communicates resignation – not to downstream events that follow from it. *Green*, 578 U.S. at 562-63. A plaintiff "cannot resign and then wait until the consequences of that resignation became most painful" to file. *Id.* at 562.

Second, Plaintiff's characterization of his April 9 resignation as having left his status "in flux" (AC, ¶¶ 167) fails on the face of the AC. At 6:20 p.m. on April 9, Plaintiff emailed Kao and Maroney to provide written notice of resignation and stated that his "priority is to ensure a smooth and responsible handoff." (*Id.*, ¶¶ 162-163.) Nothing in that email conditioned the resignation on any future event. Written notice

with a specified effective date and an offered transition is the hallmark of a deliberate and voluntary departure. That Maroney subsequently told Kardes the question was "still under discussion" (*id.*, ¶ 172) and later asked whether he wanted to "change [his] mind and stay with us" (*id.*, ¶ 173) does not alter the analysis. Under *Green*, the limitations clock attaches to the employee's communication of resignation, not to the employer's downstream response or post-resignation retention overtures. 578 U.S. at 562-63. Moreover, Plaintiff's own AC alleges that Kao told him the reorganization was final – "Well I've changed it now – this is the new direction" (*id.*, ¶ 134) – and that Wagner informed him "everything was final and nothing would change" (*id.*, ¶ 156). Plaintiff relies on those very allegations to argue that invoking the Employment Agreement's Good Reason cure procedure would have been futile (*id.*, ¶ 283). Kardes cannot maintain that Alignment's decisions were so irrevocable as to excuse his failure to trigger the cure procedure, but that his own resignation in direct response to those decisions left his status "in flux."

Finally, neither the April 14 internal announcement nor the April 15 Form 8-K independently qualifies as a cognizable SOX violation. By April 14, Plaintiff had resigned and was serving out his notice period. Alignment did not discharge, demote, suspend, threaten, or harass him on either date, nor would either act deter a reasonable employee from engaging in protected activity. *See Erhart*, 269 F. Supp. 3d at 1075-76. The AC now adds the allegation that the 8-K was "itself retaliatory." (AC, ¶ 231.) But the 8-K's description of Kardes' departure was a routine SEC disclosure obligation triggered by a Section 16 officer's resignation – not a discretionary act of retaliation. Both were directed at third parties to communicate a status that Plaintiff himself had created – the administrative consequence of an employee's departure that any employer would carry out regardless of protected activity.

*(ii) The post-employment consequences*

The same analysis applies to the post-employment economic consequences Plaintiff invokes. None constitutes an independently actionable adverse employment

action under SOX; each is a downstream economic consequence of Plaintiff's time-barred constructive discharge.[3]

**Equity forfeiture.** Plaintiff himself characterizes the equity forfeiture as having been "caused by the constructive discharge" (AC, ¶ 232(b)), foreclosing any argument that it was an independent retaliatory act. A contractual mechanism operating automatically according to pre-existing award terms does not constitute an "unfavorable personnel action" under SOX. Because the forfeiture is derivative of the alleged constructive discharge, the relevant act for limitations purposes is the constructive discharge itself.

**Severance.** Plaintiff's entitlement to severance is entirely contingent on establishing that his resignation qualified as one for "Good Reason." (AC, ¶¶ 280-281.) Because Plaintiff has not established entitlement to severance, Alignment's non-payment cannot constitute a SOX violation. *See Wyatt v. Occidental Petroleum Corp.*, 392 F. Supp. 2d 1274, 1278 (N.D. Okla. 2005); *Burden v. Isonics Corp.*, 2009 WL 3367071, at *2 (D. Colo. Oct. 15, 2009).

**401(k) contributions.** Plaintiff alleges that Alignment USA "failed to properly remit amounts withheld from [Plaintiff's] final paycheck, including 401(k) contributions." (AC, ¶ 183.) Although the AC now lists this item among its enumerated retaliatory acts (AC, ¶ 232(a)), this is a ministerial payroll-administration matter, not a discrete retaliatory employment action. The AC offers no factual basis to connect the failure to remit to Plaintiff's protected activity beyond the conclusory assertion that it was retaliatory. *See Del Signore v. Nokia of Am. Corp.*, 672 F. Supp.

[3] The AC now characterizes these items as part of a continuing course of retaliation and listing each item as an independent SOX violation. (AC, ¶ 232.) This does not alter the legal analysis: labeling downstream economic consequences of a time-barred constructive discharge as "continuing retaliation" does not transform them into independently actionable adverse employment actions.

3d 560, 570-71 (N.D. Ill. 2023) (post-termination actions unrelated to employment and lacking any nexus to employment do not satisfy SOX's retaliation provisions).

**Bonus Withholding.** The non-payment of a contractual bonus installment is a post-separation compensation dispute – not a discrete retaliatory adverse employment action. Plaintiff himself recognizes this by pleading the identical claim as a breach of contract in Count IV (AC, ¶¶ 272-278) and as a wage statute violation in Count VII (*id.*, ¶¶ 335-343). SOX is not a vehicle for recovering unpaid contractual compensation independently actionable under state contract and wage law.

*(iii) The AC's new "investigation as retaliation" allegations*

Plaintiff now alleges that after his counsel reported retaliation to Alignment in May 2025, the Company's litigation counsel conducted a purportedly "bogus" investigation, manufactured a "non-cooperation narrative," and used the investigation to justify treating his separation as voluntary and stripping him of compensation. (AC, ¶ 232(d), 186-194.)

These allegations fail to state an actionable SOX violation for several reasons. First, it is black-letter law that an investigation of employee conduct does not support a retaliation claim. *See Lee v. Hawaii*, 2010 WL 235009, at *7 (D. Haw. Jan. 20, 2010), *aff'd*, 454 F. App'x 610 (9th Cir. 2011) ("An investigation into alleged misconduct is not such adverse employment action and cannot support [the plaintiff's] retaliation claim.") Here, it is not even an investigation of Kardes, it is Alignment's Audit Committee's retention of outside counsel and an accounting firm to review the issues Kardes purportedly raised (AC, ¶ 227), which is precisely the response a public company should have to such allegations. Second, any alleged forfeiture of contractual rights are garden-variety post-separation compensation disputes, not the type of "unfavorable personnel action" that Section 806 was designed to address. *See Erhart*, 269 F. Supp. 3d at 1075-76.

d. The continuing violation doctrine is inapplicable

Plaintiff alleges that Defendants began "a course of retaliatory conduct that stripped Kardes of his core responsibilities" after his March 18, 2025 report (AC, ¶ 125) and that this retaliation "did not cease after Kardes's constructive termination" (¶ 232). The continuing violation doctrine is foreclosed by binding precedent. The Supreme Court has squarely held that the doctrine does not apply to "discrete discriminatory acts" such as "termination, failure to promote, denial of transfer, or refusal to hire." *Morgan*, 536 U.S. at 114. Each such act "start[s] a new clock for filing charges alleging that act," and a plaintiff cannot aggregate individually time-barred discrete acts to circumvent the filing deadline. *Id.* at 113-14; *Daly*, 939 F.3d at 428-29 (applying doctrine to SOX claim). Here, every alleged adverse action in the AC is a discrete act: each is independently identifiable, each occurred on a specific date, and each was communicated to Plaintiff when it occurred. *Morgan*, 536 U.S. at 114.

**2. *Plaintiff's SOX Claim Is Also Barred as to Scavo, Maroney, and Wagner for Failure to Exhaust***

a. Exhaustion is a mandatory prerequisite

Section 806 of SOX requires that a plaintiff exhaust administrative remedies by filing a complaint with OSHA identifying the respondents and stating the factual basis for the claim before bringing suit in federal court. 18 U.S.C. § 1514A(b)(1)(A); 29 C.F.R. § 1980.103(a), (e). Courts have characterized this requirement as a mandatory prerequisite to suit in federal court that provides respondents notice of the claims against them and affords OSHA the opportunity to investigate. *See Daly*, 939 F.3d at 427-28. A plaintiff who fails to name a defendant in the administrative complaint, or who fails to allege retaliatory conduct by a named respondent, has not exhausted as to that party and the federal court action must be dismissed. *See Hanna v. WCI Cmtys.,* Inc., 2004 U.S. Dist. LEXIS 25652, at *8-9 (S.D. Fla. Nov. 15, 2004); *Wadler v. Bio-Rad Labs., Inc.*, 141 F. Supp. 3d 1005, 1021-22 (N.D. Cal. 2015)

(administrative complaint must identify "specific conduct by the individuals accused of retaliation"); *Botta v. PricewaterhouseCoopers LLP*, 2018 WL 11360442, at *3 (N.D. Cal. Oct. 9, 2018) (same).

The Court may consider the OSHA Complaint without converting this motion to summary judgment because the AC incorporates it by reference, *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003), and it is an official government record subject to judicial notice, *Emrich v. Touche Ross & Co.,* 846 F.2d 1190, 1198 (9th Cir. 1988)*; Geary v. Parexel Int'l Corp.,* 2022 WL 827250, at *3, n.3 (N.D. Cal. Mar. 18, 2022) (taking judicial notice of records from OSHA proceeding).

b. Scavo and Wagner were not named in the OSHA Complaint

Scavo and Wagner were not named as respondents in the OSHA Complaint. (RJN, Ex. C.) Kardes alleges that he "provided details as to the roles of Scavo and Wagner" in the OSHA Complaint and that both later submitted declarations in the OSHA proceeding. (AC, ¶¶ 237, 239-240.) But providing background details about individuals' roles in the underlying facts does not satisfy exhaustion; the OSHA Complaint must allege specific retaliatory conduct by the individual. *Wadler*, 141 F. Supp. 3d at 1021-22. In *Botta*, the court rejected the same argument, holding that allegations that individual defendants worked with the plaintiff, participated in the practices at issue, and knew of the investigation were insufficient because "[n]one of these averments … are evident from the contents of the administrative claim itself." 2018 WL 11360442, at *3. And in *Wadler*, the court dismissed non-CEO Board members despite their submission of declarations and listing as witnesses in the proceeding. 141 F. Supp. 3d at 1011, 1022. Scavo and Wagner were not named as respondents, and no retaliatory conduct was alleged against them. Count I must be dismissed as to both for failure to exhaust.

c. The OSHA Complaint contains no retaliation allegations against Maroney

While Maroney was named as a respondent in the OSHA Complaint, that alone does not satisfy the exhaustion requirement. The OSHA Complaint identifies Maroney solely as a supervisor to whom Kardes allegedly reported the purported CapEx/OpEx irregularities – not as a participant in retaliation. (RJN, Ex. C.) Beyond alleging that Kardes informed Maroney of the irregularities, the OSHA Complaint contains no allegations that she contributed to the purported retaliation. The complaint must place an individual on notice of the specific conduct alleged to be retaliatory and causally connected to the plaintiff's termination. *Wadler*, 141 F. Supp. 3d at 1021-22; *Botta*, 2018 WL 11360442, at *3. The AC now alleges retaliatory conduct against Maroney for the first time, but none of these acts was presented to OSHA. Consequently, Count I must be dismissed as to Maroney.

d. Failure to exhaust cannot be cured by amendment

Dismissal on this ground must be with prejudice because no amendment can cure the deficiency. The time to file any OSHA complaint has long expired. Plaintiff cannot now name Scavo and Wagner as respondents or supplement the complaint against Maroney. Where amendment is futile, dismissal with prejudice is appropriate. *Carrico v. City and County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

**B. Plaintiff's Complaint Fails to State a Claim**

To state a claim for retaliation under SOX, a plaintiff must plausibly allege: (1) that he engaged in protected activity; (2) that his employer knew or suspected, actually or constructively, that he engaged in protected activity; (3) that he suffered an unfavorable personnel action; and (4) that the circumstances raise an inference that the protected activity was a contributing factor in the unfavorable action. *Van Asdale*, 577 F.3d at 996.

### 1. *Plaintiff Fails to Allege That He Engaged in Protected Activity*

An employee engages in protected activity only when he reports conduct that he "reasonably believe[s]" constitutes a violation of one of the specific federal laws enumerated in Section 806 of SOX. *Van Asdale*, 577 F.3d at 996. SOX, however, "is not a general compliance statute" and "does not police all employee grievances and suspicions of wrongdoing." *Erhart v. BofI Holding, Inc.*, 612 F. Supp. 3d 1062, 1099 (S.D. Cal. 2020). In addition, plaintiff's belief must be both subjectively held and objectively reasonable – evaluated from the perspective of a reasonable person with the same training and experience as the plaintiff. *Van Asdale,* 577 F.3d at 1000.

a. <u>Plaintiff's communications do not "definitively and specifically" relate to any enumerated category of fraud</u>

The threshold question is whether Plaintiff alleges that his actual communications – not his legal conclusions – definitively and specifically related to one of the six categories enumerated in Section 806 of SOX. The answer is no. Although the AC now characterizes the reported conduct as a "material misclassification" (AC, ¶¶ 108), and alleges that the misclassifications were "systematic" and "on information and belief, intentional" (*id.*, ¶ 120), Plaintiff's own allegations reveal that every actual communication he describes was directed at interdepartmental budgeting cost reclassification and forward-looking budgetary accuracy, not at reporting a securities fraud:

- Beginning March 10, 2025, Plaintiff allegedly raised concerns about CapEx/OpEx allocations with Scavo and stated he was working with DTS personnel to design a "financial transparency model" – a managerial tool, not a fraud report. (AC, ¶ 108.)
- On March 11, 2025, Plaintiff allegedly wrote to SVP of Finance that the Company needed to "migrate some dollars from capex to opex" – the language of budget reclassification, not fraud reporting. (AC, ¶ 109.)
- Plaintiff's March 18, 2025 meeting with Kao was framed as proposing "a new approach to handling these allocations" – operational improvement, not securities violation reporting. (*Id.*, ¶ 113.)
- Plaintiff's proposed remediation – an executive-level transparency model to allocate spend accurately and create accountability – was

oriented toward internal budgetary accuracy, not preventing investor deception with respect to prior period financial statements. (*Id.*, ¶ 116.)

- On March 28, 2025, Plaintiff allegedly informed Finance and DTS leadership that previously presented CapEx budget allocations were merely "estimates" that needed to be "re-adjusted based on the actual underlying work" – the language of budget recalibration, not fraud reporting. (*Id.*, ¶ 107.)

Nowhere does Plaintiff allege that he communicated to any recipient that a federal securities law was being violated or that investors were being defrauded. The vocabulary Plaintiff himself uses throughout – "migrate," "transparency model," "new approach," "re-adjusted based on reality" – describes an internal advocacy campaign for accounting reclassification. Post-hoc recharacterization of budget discussions as whistleblowing does not satisfy the requirement that a communication definitively and specifically relate to shareholder fraud or any other enumerated category of Section 806 of SOX. *See Boyd v. Accuray, Inc.*, 873 F. Supp. 2d 1156, 1163-64 (N.D. Cal. 2012) (plaintiff's alleged protected activity was "directed toward promoting regulatory compliance and patient safety," not fraud against shareholders).

b. <u>Plaintiff fails to plausibly allege his subjective belief</u>

The subjective component requires that the plaintiff actually believed, at the time of his disclosures, that the conduct he was reporting constituted a violation of one of the laws enumerated in Section 806 of SOX. *Erhart*, 269 F. Supp. 3d at 1072. For the same reasons listed above, Plaintiff fails to satisfy this requirement. Although the AC now alleges that Kardes "reasonably believed" the misclassification constituted a violation of federal securities laws (AC, ¶¶ 98, 225), it does not allege that at the time he made his March 2025 communications he subjectively believed he was reporting a securities violation. His emails and internal discussions sought budget migration and accounting transparency. He does not allege that in making those communications he was reporting what he believed to be securities fraud or any other enumerated violation. Plaintiff's attempt to recharacterize those communications as

whistleblowing in hindsight does not satisfy the subjective component. *See Erhart*, 269 F. Supp. 3d at 1073.

c. <u>No objectively reasonable person would believe the conduct constituted securities fraud</u>

The objective inquiry asks whether a reasonable person with Plaintiff's background would believe the reported conduct constituted an enumerated violation. *Van Asdale*, 577 F.3d at 1000. The AC now enumerates both non-scienter provisions – including 15 U.S.C. § 78m(a) (accurate financial reporting), § 78m(b)(2)(A)-(B) (books and records; internal controls), Regulation S-X – and scienter-based provisions such as § 78j(b), Rule 10b-5, and 18 U.S.C. § 1348. (AC, ¶ 224.) But merely listing statutory provisions in a complaint does not establish that a reasonable person would have believed those provisions were being violated; the inquiry is whether Plaintiff's actual communications, at the time they were made, reflected a reasonable belief that the conduct constituted a violation. *Van Asdale*, 577 F.3d at 1000-01; *Hansen v. Musk*, 122 F.4th 1162, 1175 n.8 (9th Cir. 2024). Plaintiff fails to satisfy this requirement for several reasons.

Plaintiff holds a Ph.D. in Computer Science and Engineering and worked as a data scientist before joining Alignment. (AC, ¶¶ 41-42.) He is not an accountant, CPA, or securities lawyer. Whether particular activities fall within the "application development stage" versus the "post-implementation/operation phase" under ASC 350-40 requires specialized accounting judgment that lies outside the training and experience of a computer scientist. A reasonable person with Plaintiff's background would recognize that an internal CapEx/OpEx classification dispute involves judgment-laden accounting determinations, not securities fraud.

Finally, Plaintiff's conditional pleading of the scienter-based provisions further negates his objective belief. The most serious provisions Plaintiff enumerates – 15 U.S.C. § 78j(b), SEC Rule 10b-5, and 18 U.S.C. § 1348 – require scienter. *Ernst & Ernst*, 425 U.S. at 193. Yet Plaintiff pleads these provisions only conditionally: they

apply only "to the extent the CapEx/OpEx irregularities were undertaken knowingly and with the intent to deceive investors." (AC, ¶ 224(g).) A reasonable person in Plaintiff's position – a senior technology executive with access to Finance leadership and the ability to escalate to the Audit Committee – who observed conduct that merely *might* have been intentional could not thereby form an objectively reasonable belief that a § 10(b) or Rule 10b-5 violation was occurring. An accounting practice that is consistent with both good-faith judgment and intentional fraud does not, without more, provide an objectively reasonable basis for believing the latter.

**2. *Plaintiff Fails to Sufficiently Allege Individual Liability***

A plaintiff must plead specific, non-conclusory facts establishing that each individual defendant personally participated in the adverse employment action. Again, SOX defines the scope of prohibited conduct by enumerating specific acts. 18 U.S.C. § 1514A(a). And for acts falling under the catch-all, the applicable SOX standard requires conduct that is "more than trivial" and capable of deterring a reasonable employee from engaging in protected activity under the statute. *Erhart*, 269 F. Supp. 3d at 1087. None of the alleged acts Plaintiff identifies Scavo, Maroney and Wagner as participating in fall within the enumerated categories or satisfy the catch-all standard and they must all be dismissed from Count I.

a. <u>The allegations against Scavo are legally insufficient</u>

Plaintiff's theory as to Scavo is principally that he was the Chief Information Officer who oversaw the DTS division in which the CapEx/OpEx irregularities occurred – making him the subject of Kardes' disclosures, not the retaliator. The retaliatory conduct attributed specifically to Scavo consists of: (1) becoming "unresponsive and avoid[ing] discussions with Kardes" (AC, ¶ 126); (2) allegedly telling DTS leaders that he would continue leading DTS (*id.*); (3) attending a private dinner with Kao (*id.*, ¶ 121); (4) accepting the transfer of Kardes' AI and Data Science responsibilities (*id.*, ¶ 150); and (5) seeking to rehire a previously laid-off employee over Kardes' objection (*id.*, ¶ 127).

None of these allegations establish that Scavo retaliated against Kardes under SOX. Becoming unresponsive is not an adverse employment action. *See Tafoya v. Corr. Dep't, Cent. New Mexico Corr. Facility*, 2006 WL 8444137, at *12 (D.N.M. June 7, 2006) (passive behavior does not qualify as retaliation) (citation omitted). Having dinner with the CEO is not retaliation. Being a beneficiary of retaliation does not create liability under SOX, and Scavo's acceptance of transferred responsibilities (*id.*, ¶ 155) does not transform passive receipt of a CEO-directed transfer into independent retaliatory conduct. *See Gallagher v. Granada Entertainment USA et al.*, 2004 WL 5633781, at *2, *4 (Dep't of Labor Oct. 19, 2004) (seeking to hold liable any person who acts in "concert" with supervisor is far too broad; SOX is meant to hold those liable with supervisory power who control terms of employment). The AC now alleges that Scavo had a "strong personal motive to retaliate." (AC, ¶¶ 122-123.) But motive is not conduct.

b. <u>The allegations against Maroney are legally insufficient</u>

The AC alleges the following specific acts against Maroney: (1) attending the April 1, 2025 meeting at which Kao reversed the DTS transition and that Maroney "would have been consulted on, and signed off on, the retraction" (AC, ¶ 132); (2) discouraging Kardes from documenting his concerns in writing (*id.*, ¶ 130); (3) effectively blaming Kardes for the resignation of two employees (*id.*, ¶ 159); and (4) proposing alternative roles under which Kardes would retain a diminished title (*id.*, ¶ 168).

Conclusory phrases that Maroney "would have been consulted on, and signed off on" the retraction of Kardes' responsibilities (AC, ¶ 132) is speculation, not a factual allegation of personal participation. This is the bare-bones pleading *Iqbal* prohibits. Attendance at the April 1 meeting does not establish that Maroney directed or participated in the decision announced there. Discouraging written documentation is not itself a prohibited adverse employment action under SOX. Blaming Kardes for others' resignations, while insensitive, is not an enumerated adverse employment

action. And offering alternative roles, however inadequate, is not an adverse action – it is the opposite. *Schutter v. Harold Zeigler Auto Grp., Inc.*, 416 F. Supp. 3d 708, 717 (W.D. Mich. 2019) (applying *Burlington* and finding offering alternative position to allow for continued employment not retaliatory).

c. The allegations against Wagner are legally insufficient

The allegations against Wagner present the same structural problem. Wagner functions throughout the AC as a mere instrument of implementation, not as an independent retaliator. His mere attendance at the April 1 executive meeting at which the reversal of the DTS transition was announced (AC, ¶ 132) is not an adverse employment action by Wagner. *Gallagher*, 2004 WL 5633781, at *4; *Tafoya*, 2006 WL 8444137, at *12. Nor is merely implementing the CEO's directive retaliatory conduct. *Gallagher*, 2004 WL 5633781, at *4; *Leznik v. Nektar Therapeutics, Inc.,* 2007 WL 5596626, at *13-14 (Dep't of Labor Nov. 16, 2007) (HR employee not liable for merely effectuating officer's decision). On April 8, Wagner called Kardes to deliver the new organizational chart and stated that "everything was final and nothing would change." (AC, ¶ 156.) The AC now alleges that Wagner "was not merely relaying information" and "knew of Kardes's protected disclosures" (*id.*), but these are bare legal conclusions layered atop the same underlying facts. The conduct described remains unchanged: Wagner communicated a decision that Kao had already made, not his own independent adverse employment decision.

The most concrete act attributed to Wagner personally is the March 29 denial of Kardes' pending team promotion requests. (AC, ¶ 129.) But the AC pleads no facts establishing that Wagner made that decision independently rather than at a superior's direction, and a Chief Human Resources Officer routinely administers promotion decisions at the direction of the CEO. Moreover, a decision to deny a subordinate executive's team members' promotions, without more, does not constitute a materially adverse change in *Kardes*' own terms and conditions of employment on its face.

Finally, a SOX retaliation claim requires that the named person with supervisory authority over the plaintiff "knew or suspected, actually or constructively, that the employee engaged in the protected activity." *Van Asdale*, 577 F.3d at 996; 29 C.F.R. § 1980.104(b)(1)(ii). The AC now alleges that Wagner "learned of Kardes' reporting of the accounting irregularities in discussions with Kao" (AC, ¶ 226), but this allegation is made only "on information and belief" and is unsupported by any factual basis beyond the conclusory assertion itself. Conclusory allegations of knowledge, pleaded on information and belief without supporting facts, do not satisfy *Iqbal*'s plausibility standard. *See Iqbal*, 556 U.S. at 678. Moreover, even if Wagner were aware of Kardes' budget-alignment discussions, awareness that an employee raised internal budget concerns is not the same as knowledge that the employee engaged in activity protected under SOX. *Boyd,* 873 F. Supp. 2d at 1171 (plaintiff's supervisors' lack of knowledge of the protected activity was "a necessary element of a SOX retaliation claim").

//

//

//

//

//

//

//

//

//

//

//

//

//

//

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant their Motion and dismiss Plaintiff's AC without leave to amend. *See City of Los Angeles v. San Pedro Boat Works*, 635 F.3d 440, 454 (9th Cir. 2011).

Dated: September 17, 2026

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: *[/s/ Joshua D. N. Hess]*
JOSHUA D. N. HESS
JASON A. WEISS

Attorneys for Defendants
ALIGNMENT HEALTHCARE, INC.,
ALIGNMENT HEALTHCARE USA, LLC,
JOHN KAO, DAWN MARONEY, ROBERT SCAVO, AND ANDREAS WAGNER

**Certificate of Compliance**

Pursuant to L.R. 11-6.1, the undersigned counsel of record for Defendants certifies that this brief contains 6,900 words.

Dated: September 17, 2026

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By: *_/s/ Joshua D. N. Hess_*

JOSHUA D. N. HESS
JASON A. WEISS

Attorneys for Defendants
ALIGNMENT HEALTHCARE, INC., ALIGNMENT HEALTHCARE USA, LLC, JOHN KAO, DAWN MARONEY, ROBERT SCAVO, AND ANDREAS WAGNER